**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
Eastern Division**

| | |
|---|---|
| WILLIAM FAMBROUGH, | |
| *Plaintiff*, | Civil Case No. 1:22-cv-00992 |
| v. | **Complaint and Jury Demand** |
| THE CITY OF EAST CLEVELAND, OHIO; MAYOR BRANDON KING, in his individual capacity; CHIEF OF POLICE SCOTT GARDNER, in his individual capacity; LAW DIRECTOR WILLA HEMMONS, in her individual capacity; ASSISTANT LAW DIRECTOR HEATHER McCOLLOUGH, in her individual capacity; OFFICER MARK ALLEN, in his individual capacity; CAPTAIN KENNETH LUNDY, in his individual capacity; OFFICER ANDREW MAJERCIK, in his individual capacity; OFFICER WILLIAM NEVELS, in his individual capacity; OFFICER KYLE WOOD, in his individual capacity; and JOHN DOES I-X, | |
| *Defendants*. | |

---

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND RETROSPECTIVE RELIEF**

---

Plaintiff William Fambrough hereby sues the City of East Cleveland, Ohio; Brandon King; Scott Gardner; Willa Hemmons; Heather McCollough; Mark Allen; Kenneth Lundy; Andrew Majercik; William Nevels; Kyle Wood; and John Does I-X for Defendants' deprivation of his rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

## INTRODUCTION

1.      For over 15 years, Plaintiff William Fambrough ("William") has lived at the same home in the City of East Cleveland, Ohio ("East Cleveland," or the "City"). He is proud to live in East Cleveland, is invested in its success as a community, and is committed to seeing the City overcome its troubles.

2.      William has worked in media and advertising for over 40 years, and his business sometimes does work for political campaigns. As part of his business, William owns a step van—which is a vehicle like a FedEx delivery truck—that he can outfit with sound equipment to operate as a "sound truck." He has used the step van several times in his campaign work, driving it through the streets of East Cleveland broadcasting pre-recorded messages in support of the candidate. For the nearly two decades that he has lived in East Cleveland, he parked his step van at his home—and used it to campaign—without incident.

3.      But that all changed in 2021, when William decided to back a mayoral campaign challenging the incumbent mayor, Brandon King. When he used his step van to campaign against the mayor in the summer of 2021, he received a series of visits from East Cleveland police officers to his home, during which the officers insisted that his step van was parked illegally at his home—though there were similar trucks parked at William's neighbors' houses—and threatened to tow it.

4.      The visits culminated in a swarm of police descending on William's home in August 2021—mere weeks before the election—to issue William citations and tow his step van, crippling the campaign of the mayor's challenger. The officers had William's step van towed even though William and others were present and able to drive it away, and they cited William under a rarely enforced noise ordinance and a never-enforced parking ordinance. As a result of the tow,

William's step van sustained thousands of dollars in damage and was effectively inoperable for the remainder of the campaign.

5. In the leadup to and at a hearing on the noise citation, East Cleveland Assistant Law Director Heather McCollough made it clear that William's support of Mayor King's challenger and his criticisms of the mayor and other City officials were the reason for the citation.

6. The citations and tow of William's step van were part of a City plan and policy— orchestrated by high-level City officials—to retaliate against William for his political speech to advocate for Mayor King's campaign opponent.

7. The First and Fourteenth Amendments prevent government officials from selectively enforcing little-used ordinances to punish and suppress the speech of political opponents. And the Fourth Amendment prevents the government from unreasonably towing away a sound truck when others are available to drive it away. This civil-rights lawsuit is filed to protect those rights under the First, Fourth, and Fourteenth Amendments and to ensure the constitutional accountability of government officials who violate them.

## JURISDICTION AND VENUE

8. Plaintiff William Fambrough is suing under the First Amendment, the Fourth Amendment, and the Fourteenth Amendment; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28 U.S.C. § 2201.

9. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 and civil-rights jurisdiction under 28 U.S.C. § 1343.

10. Venue lies in this Court under 28 U.S.C. § 1391(b)(2) and L.R. 3.8(c) because, as described below, the events giving rise to the claims in this action occurred in Cuyahoga County.

## PARTIES

11.     Plaintiff William Fambrough is a citizen of the United States and has been a resident of East Cleveland for over 15 years.

12.     Defendant City of East Cleveland, Ohio is a municipality located in Cuyahoga County, Ohio.

13.     Defendant Brandon King is the Mayor of East Cleveland. He is sued in his individual capacity.

14.     Defendant Scott Gardner is the Chief of Police of East Cleveland. He is sued in his individual capacity.

15.     Defendant Willa Hemmons is the Law Director for the City of East Cleveland. She is sued in her individual capacity.

16.     Defendant Heather McCollough is the Assistant Law Director for the City of East Cleveland. She is sued in her individual capacity.

17.     Defendant Mark Allen is a police officer with the East Cleveland Police Department. He is sued in his individual capacity.

18.     Defendant Kenneth Lundy is a police officer with the East Cleveland Police Department. He is sued in his individual capacity.

19.     Defendant Andrew Majercik is a police officer with the East Cleveland Police Department. He is sued in his individual capacity.

20.     Defendant William Nevels is a police officer with the East Cleveland Police Department. He is sued in his individual capacity.

21.     Defendant Kyle Wood is a police officer with the East Cleveland Police Department. He is sued in his individual capacity.

22.     Defendants John Does I-X are the individual employees of the City of East Cleveland who, in conjunction with the Defendants named above, orchestrated and executed the plan to retaliate against Plaintiff William Fambrough for his core political speech in support of Juanita Gowdy's mayoral campaign. These include the yet-to-be-identified police officers who participated in issuing William citations and towing his step van.

## FACTS

**East Cleveland**

23.     East Cleveland is a suburb of Cleveland, Ohio.

24.     East Cleveland is a small city of approximately 14,000 people, which is reflected in a relatively small circle of people involved in the City's politics and governance. The politicians and activists involved in East Cleveland politics know each other and where each person stands on the issues facing the City and their views of City officials.

25.     They are often sharply divided on those issues, in part because the City suffers from a number of serious problems, including comparatively high crime rates, one of the highest poverty rates in the state, and budget problems that have placed the City in a state of official fiscal emergency for much of the last several decades.

26.     The City's general fund is about $10 million (compared to Cleveland's $651 million), the median household income is just $22,426, and the poverty rate in the City is over 36%.

27.     As a result, East Cleveland is among the poorest cities in Ohio and has been under state fiscal supervision since 2012.

28.     The City's police department has also been plagued by scandals, including numerous cases of excessive force.

29.     For example, in 2020, the Ohio Eighth District Court of Appeals upheld a jury verdict awarded to a man that East Cleveland police had beaten and locked in a storage room—without food or a toilet—for four days. The court found that the East Cleveland police department "had an unwritten custom and practice of using violence and arrests to intimidate people."[1]

30.     East Cleveland police officers also regularly initiate high-speed chases on East Cleveland streets that end in violence. According to one report, in 2021, the police launched 105 chases in 120 days, 50 percent of which topped out at 70 miles per hour or more and 39 percent of which ended in crashes. Three chases ended in fatalities.[2]

31.     Though the crime rate in the City is comparatively high, the City's police department is perennially short-staffed.[3] City officials do not disclose the number of East Cleveland police officers as a matter of policy, but in 2019 the then-police chief admitted that the department employed well below the required 72 officers.

32.     The mayor of East Cleveland is an elected position. The mayor is the chief conservator of the peace within the City, responsible for the enforcement of all its laws and ordinances. *See* Ohio Rev. Code § 733.03; *see also* East Cleveland Charter § 113(A).

---

[1] *See* Corey Shaffer, *Appeals court says East Cleveland police had 'unwritten custom' of violence, upholds $50M verdict for man beaten and locked in a storage room*, Cleveland.com (Aug. 6, 2020, 7:25 PM), https://www.cleveland.com/court-justice/2020/08/appeals-court-says-east-cleveland-police-had-unwritten-custom-of-violence-upholds-50m-verdict-for-man-beaten-and-locked-in-a-storage-room.html.

[2] *See* Adam Ferrise, *Fastest police chase hit 121 miles per hour and other key numbers: East Cleveland Police Chases*, Cleveland.com (Sept. 26, 2021, 5:30 A.M.), https://www.cleveland.com/metro/2021/09/fastest-police-chase-hit-121-miles-per-hour-and-other-key-numbers-east-cleveland-police-chases.html.

[3] *See, e.g.*, Jordan Heller, *Down but not out: How East Clevelanders aren't giving up on Ohio's poorest city*, Cleveland.com (Oct. 6, 2019, 9:09 AM), https://www.cleveland.com/news/2019/10/down-but-not-out-how-east-clevelanders-arent-giving-up-on-ohios-poorest-city.html.

33.     The current mayor is Brandon King.

34.     The East Cleveland chief of police exercises supervision and control over the police department and oversees its operations. *See* East Cleveland Code of Ordinances § 305.01. Among other duties, the chief of police oversees the police department's enforcement of East Cleveland's traffic code and assigns officers to enforce the City's traffic code. *See id.*

35.     The current chief of police is Scott Gardner.

36.     The law director for East Cleveland is appointed by the mayor and serves as the prosecuting attorney for the City and legal counsel for the mayor and other city officials. *See* Ohio Rev. Code § 733.51. She has supervision and control over the law department. *See* East Cleveland Code of Ordinances § 23.

37.     The current law director is Willa Hemmons.

38.     The assistant law director is designated by the law director to serve as the prosecuting attorney for the city. *See* Ohio Rev. Code § 733.51.

39.     The current assistant law director is Heather McCollough.

40.     On information and belief, Hemmons and McCollough are the only two members of the City's Law Department.

**William Fambrough**

41.     William Fambrough is 74 years old and has lived in East Cleveland with his wife since 2006.

42.     Though he is aware of the problems facing the City, he is proud to live in East Cleveland and he is invested in the success of the City as a community.

43.     Because he wants to see East Cleveland succeed, William has been involved in local politics since he became a resident. He is a well-known figure in the City's political scene.

44.     William has lived in the Cleveland area and worked in the media field for over 40 years. He owns a media company called Legacy Communications, which has done work for local governments and political campaigns, including producing campaign advertisements and using sound equipment for rallies.

45.     William and his media company regularly do work for political campaigns to promote candidates for election. William only takes on political-candidate clients whose political campaigns he supports.

46.     When he first moved to East Cleveland in 2006, he supported the incoming mayor's campaign and later obtained a job running the City's public access television station, which he ran until 2014. William also served on the Board of Trustees of the East Cleveland Library from 2011 to 2018.

47.     Among the other services William and his media company can provide for political campaigns is using his step van—which he also uses to carry equipment for his media company— as a sound truck.

48.     A sound truck is a vehicle equipped with speakers that plays pre-recorded messages while driving through different areas in a city. Sound trucks have been used to express support for political candidates and causes almost since the invention of amplified sound.

49.     When William uses his step van as a sound truck, he places a loudspeaker in the doorway of his step van. With a campaign sign posted on the side of the step van, he can drive the truck—by itself, or in a "caravan" with other vehicles—through the streets of different areas in East Cleveland broadcasting pre-recorded messages in support of a campaign.

50.     William has run for political office himself only once, in 2019, for a seat on the school board and lost. His main method of campaigning was using his step van as a sound truck to

broadcast messages that supported his own campaign and two others who were running with William as a ticket.

51.     William also used his step van as a sound truck to support a congressional campaign in an election that ended in early August 2021.

52.     Using a step van or other vehicle as a sound truck to broadcast messages while driving through the City is a common campaigning practice for local and state political campaigns in East Cleveland. Using sound trucks for political campaigns is also common across the country and has been a regular part of political campaigns since the invention of amplified sound.

53.     William and his wife have been close friends with East Cleveland City Councilor Juanita Gowdy for several years.

54.     In 2019, Juanita Gowdy hired William's media company to work on her campaign for City Councilor. William produced a campaign advertisement for her that was published on Facebook, YouTube, and other social media platforms.

55.     William's support for Gowdy's City Council campaign was well known in East Cleveland's relatively small political scene, and William and Gowdy remained political allies after she won a seat on the City Council.

56.     Both William and Councilor Gowdy have regularly criticized Mayor King, Police Chief Gardner, and Law Director Hemmons for several years.

57.     William was and is a well-known supporter of Councilor Gowdy. For example, he very publicly supported her campaign to be elected to the city council.

58.     When Juanita Gowdy decided in the spring of 2021 to challenge Brandon King in the mayoral primary[4] later that year, she once again asked William to help her campaign.

59.     William agreed, and by May 2021 he was a known supporter of the Gowdy mayoral campaign.

60.     That's when William's troubles began.

**May 14: An East Cleveland police officer issues William a parking ticket.**

61.     William and his wife have lived in the same home on a tree-lined street in the Forest Hills neighborhood since they moved to East Cleveland in 2006.

62.     For over fifteen years, he parked his step van in the driveway of that home without incident. In fact, he used his step van to move his belongings into the house and even had his driveway expanded specifically to accommodate the truck.

63.     Below is a picture of William's step van parked in the driveway of his home from 2020:



---

[4] All of the candidates for mayor were Democrats, so the results of the primary effectively determined the winner of the election.

64.     William has never heard a complaint from any neighbor or anyone else about his step van.

65.     Before May 2021, no police officer, other city official, or anybody at all had ever suggested to William that it was improper to park his step van at his home.

66.     In fact, a neighbor has regularly parked a near-identical step van at his home less than two blocks away for at least the last several years. That step van was regularly parked at the neighbor's home in the summer of 2021, and it is still occasionally parked there.

67.     On May 14, 2021, however, East Cleveland Police Officer Mark Allen showed up at William's door, told him that he was violating East Cleveland Code of Ordinances § 351.11 by parking his step van in his driveway, and wrote him a warning ticket. Officer Allen gave William three days to come into compliance.

68.     East Cleveland Code of Ordinances § 351.11 (the "Parking Ordinance") prohibits "park[ing] a truck, commercial tractor, trailer, semi-trailer, a motor home or recreational vehicle on a roadway or driveway at any time in front of or alongside property used for residential purposes except in case of a breakdown of such vehicle, or for loading and unloading purposes."

69.     The parking ordinance was enacted in 1998, so it has been in place the entire time William has lived in East Cleveland and parked his truck at his house.

70.     The East Cleveland police had never enforced the parking ordinance against William prior to his involvement in Juanita Gowdy's mayoral campaign.

71.     William was not aware that it was illegal to park his step van at his home.

72.     Residents of East Cleveland commonly park vehicles ranging in size from step vans to RVs to big rigs at residential homes. Upon information and belief, the City does not enforce the Parking Ordinance against any of those vehicles.

73.     In a response to a public records request submitted in the spring of 2022, the City produced no tickets or other records of the parking ordinance being enforced between January 2016 and May 2022.

**May 17: The same police officer returns and tries to have William's step van towed.**

74.     True to his word, Officer Allen returned three days later on May 17, 2021.

75.     William thought that he had until the end of the day on May 17 to move his step van, so the van was still in his driveway when Officer Allen arrived.

76.     This time, he brought a tow truck with him. Officer Allen attempted to have William's step van towed that day, but the light-duty tow truck that he had brought was not equipped to tow William's van.

77.     William drove the step van away himself instead, out of East Cleveland.

78.     From that point on, he always parked his step van outside of the City when he was not using it.

**June 28: William obtains a "sound device" permit.**

79.     East Cleveland Code of Ordinances § 509.15(a) (the "Noise Ordinance") prohibits "play[ing] any radio, music player . . . audio system . . . or any other type of sound service upon any public road, street, highway or private property in this municipality in a manner or volume as to disturb the quiet, comfort or repose of other persons."

80.     The Noise Ordinance contains an exception for "organized events which have received a valid permit from the city as set forth in § 311.02 and any other applicable section." East Cleveland Code of Ordinances § 509.15(a). As that provision notes, permits that satisfy the exception are governed by East Cleveland Code of Ordinances § 311.02 (the "Permit Ordinance").

81.    The Permit Ordinances prohibits "parad[ing] or hold[ing] a procession, or attempt[ing] to parade or hold a procession, in or upon any of the streets, park or public grounds of the city without first obtaining a permit therefor."

82.    Under Section 311.02(c), a permit "shall be issued only upon and after the approval by the Chief of Police and the Mayor."

83.    The permit form used by East Cleveland—styled a "sound device permit"—has signature lines for both the Mayor and the Chief of Police.

84.    Upon information and belief, it is standard practice in East Cleveland that either the Mayor's signature or the Police Chief's signature is alone sufficient to render a permit valid.

85.    Because William wanted to use his step van to campaign for Juanita Gowdy the same way he had used it for his school board campaign in 2019, William went downtown to city hall on June 28, 2021, to obtain a sound device permit.

86.    William went to the Mayor's office, and the Mayor's assistant gave him the form and directed him to obtain the Police Chief's signature. William understood that to mean that the Mayor's approval was implied.

87.    On the permit form, under "reason for sound truck," William put "inform residents of election."

88.    He took the form to the police department, and Police Chief Gardner's administrative assistant took the permit back to be signed. William received a permit signed by the Police Chief the same day.

89.    After obtaining the permit, William began using his step van to drive around the City, broadcasting messages in support of Juanita Gowdy's campaign. For example, the most

effective messages consisted of recordings of prominent East Cleveland residents endorsing Gowdy and encouraging other residents to vote for her.

90.     William also placed a sign with a life-size picture of Councilor Gowdy on the side of his step van.

91.     William campaigned for Councilor Gowdy with his step van at least once a week—and sometimes twice a week—between late June 2021 and August 2021. During at least four of those drives, he was joined by several cars driven by other Gowdy supporters and fitted out with balloons and Gowdy signs to form a "caravan."

92.     William's sound-truck step van was the centerpiece of the Gowdy campaign. It was the campaign's main method of outreach to voters before the election.

93.     While crisscrossing the City broadcasting messages, the sound truck and caravans regularly encountered police officers without incident. No police officer ever stopped them or suggested that any City ordinance was being violated.

94.     William only ever parked his step van by his home on days that he was using it to campaign. On those days, it would be parked for no more than a few hours at his home before a campaign event, after which William would return the step van to its spot outside the City.

**July 27: Police officers return to William's house again and interrogate William about using his step van to campaign for Gowdy.**

95.     After William had used his step van to caravan for the Gowdy campaign at least four times, Officer Allen returned to his home again with Captain Kenneth Lundy on July 27, 2021.

96.     William's step van was not parked at his home that day.

97.     Captain Lundy asked William if he owned a step van that played recorded messages about voting in an upcoming election.

98.     When William told him he did, Captain Lundy told him that he needed a permit to do that.

99.     William told the officers that he understood and that he would comply with the law.

100.    Though the officers either already knew William had a permit or could have checked City records to determine whether William had a permit, they chose to drive to his home to interrogate William about it.

101.    William has never before had any City employee ask him whether he had a permit to use his step van as a sound truck—not when he campaigned for school board in 2019, and not during the several times that he had campaigned for Juanita Gowdy since he obtained the permit in June 2021.

**July 29: William files a citizen's complaint against the police department.**

102.    Worried that the police would continue hassling him or even prevent him from using his truck, William went to the Cuyahoga County Sheriff's Office on July 29, 2021, and filled out a citizen's complaint—including a signed statement—against the police officers who had written him the warning parking ticket, threatened to tow his step van, and bothered him about the permit for using his step van to campaign for Juanita Gowdy.

103.    In his statement, William explained that he had a permit to operate his step van as a sound truck signed by the chief of police.

104.    William specifically alerted the police to the retaliation he was suffering, explaining that "in the current mayor[']s race I am supporting [the incumbent's] opposition" and demanding a "stop" to "the police harassment and intimidation."

105.    Thus, as of July 29, there is no doubt that the City's police department was made aware of the difficulties William was having with the unusual enforcement against his step van.

**August 18: A phalanx of police officers return to William's home, write him citations for a parking violation and noise pollution, and have his step van towed.**

106.　The City's and police department's leadership did not rein in the officers who were harassing William. To the contrary, the situation escalated.

107.　On the morning of August 18, 2021—with less than a month until the election—William retrieved his step van from outside the City because he planned to use it to campaign around 5:30 P.M. that day.

108.　William parked the step van on the street because the Parking Ordinance must necessarily allow step vans to park in the street during ordinary business hours during the workweek when they are actively being used for a legitimate purpose.

109.　For example, it cannot possibly violate the Ordinance for a plumber to park a step van in front of a residential home in the middle of a workday while working on the home's plumbing, and that would be true even if the van were parked there for hours. There is certainly no evidence the City of East Cleveland has ever enforced its Parking Ordinance against the ordinary use of step vans.

110.　Likewise, from William's perspective, the fact that he brought the van to his home from outside the city to prepare it for a campaign event was not materially different than the routine use of these commercial vehicles in residential neighborhoods every single day of the week.

111.　The City of East Cleveland has no legitimate interest—whether for aesthetics, property values, congestion, noise, or some other factor—in preventing step vans from being temporarily parked in residential neighborhoods in the middle of a workday while in active use for valid reasons.

112.    Despite East Cleveland having no legitimate interest in enforcing the Parking Ordinance against William that afternoon, seven or eight police officers in multiple police cars showed up again to William's house. Again, they brought a tow truck with them.

113.    This was unusual because East Cleveland has comparatively high crime rates and has had difficulty fully staffing its police force. Sending numerous officers to William's low-crime neighborhood was plainly disproportionate for enforcing a simple supposed parking violation.

114.    The East Cleveland police knew from Captain Lundy and Officer Allen's July 27 visit that William was not parking his step van at his home around the clock. William had decided to bring the step van to his house for campaign purposes less than a day before. The only way that police officers could have known to arrive at William's home on the day that he brought it from outside the City was if the police had been surveilling William's house, waiting until the step van was parked there.

115.    After the police arrived, Officer Kyle Wood told William that the step van was parked illegally on the street and wrote him a citation for a violation of the same East Cleveland ordinance that formed the basis of the warning ticket Officer Allen had issued him back in May— Section 351.11, the Parking Ordinance.

116.    Officer Wood also informed William that the step van would be towed.

117.    The step van was not impeding any traffic or causing any other problems to public health, safety, or welfare.

118.    A sitting city council member, Juanita Gowdy, was present and strenuously objected to the towing.

119.    William protested that he could drive the step van away himself, but Officer Wood refused to allow William to do so. William's adult daughter, Gowdy, Gowdy's campaign manager, and other supporters were also present and capable of driving the step van away safely.

120.    When William asked to remove his expensive sound equipment from the step van before it was towed, Officer Wood prevented him from doing that as well.

121.    The police officers had William's step van towed that same day.

122.    Below is a picture of William's step van on the day it was towed:



123.    On that same day, August 18, William's neighbor two blocks away also had his near-identical step van parked at his home, but the police neither issued that neighbor a citation nor towed the neighbor's step van.

124.    Indeed, just one house away from where William's step van was parked on August 18, another white van, similarly sized to William's step van, was parked at the same time the police were having William's step van towed. Yet the police did nothing to indicate that the other van was parked illegally, nor did they tow it.

125.    Below is a picture of the van parked at the home next the William's (van circled in red), behind William's step van as it was being towed:



126.    Police Officer Andrew Majercik wrote William a second citation, a "complaint and summons" for "noise pollution." He ordered William to sign the complaint, threatening to arrest him if he refused.

127.    Majercik said that "this is coming from my boss" and that "this is coming from the brass." When William pressed Majercik on who his boss was, Majercik said it was his commander and "Chief Gardner."

128.    After being repeatedly threatened with arrest, William signed the complaint to acknowledge he received it.

129.    The citation for "noise pollution" was issued pursuant to East Cleveland Code of Ordinances § 509.15.

130.    Majercik told William that he was issuing the citation because the police department had received five calls for service concerning William's sound truck. The citation references five calls for service originating from William's street and a nearby cross-street.

131. But William had only brought the step van to East Cleveland and his street earlier that day. He had not used the step van to broadcast messages or test his sound equipment that day and was not planning on doing so until that evening.

132. William subsequently made a public records request for any records or recordings of the supposed phone calls for service about noise pollution. The City's response did not include any records for any such calls, but instead only for two calls that occurred months or years earlier and had nothing to do with noise complaints.

133. Officer William Nevels was the supervising officer for the noise enforcement, as reflected by being listed as the supervising officer on the police report for the incident.

134. From the time the police arrived to when the step van was towed away from William's home took over an hour.

135. Three different tow trucks were used. The towing company first attempted to tow the truck with a pair of lighter tow trucks. Eventually, a heavier tow truck with a large flatbed arrived.

136. Rather than load the step van onto the heavier tow truck's flatbed—which would have presented a lower risk of damage to the van—the towing company instead towed William's step van across Cleveland.

137. While the tow truck operators were attempting to tow the step van, William could see and hear that they were causing damage to the van. He told the police officers and the tow truck operators at the time that they were damaging his van.

138. To retrieve his step van after it was towed, William went to city hall the next day. He was required to pay an $80 fee at the East Cleveland Finance Department for the impound

release paperwork. The receipt he received broke the fee down into $30 for a "Release" from the towing company and $50 as an "Admin Fee."

139. William then had to go to the impound lot and pay the towing company $448.20 in fees for them to release his truck.

140. When the step van was towed, it was in excellent working order. But when he retrieved it from the tow lot, it was severely damaged.

141. The step van's ignition would no longer start, and parts of the exhaust system either were falling off or had fallen off. A mechanic who inspected it discovered the wiring to the ignition had become disconnected.

142. William received a repair estimate from a mechanic, who estimated that it would cost over $6,000 just to repair the exhaust system on the step van.

143. As a result of the damage to the van caused by the unnecessary towing, it was inoperable for the remainder of the Gowdy mayoral campaign.

**September 2: William files petitions for protective orders against Chief of Police Scott Gardner and Mayor Brandon King.**

144. Based on the frequency of East Cleveland police officers' visits and the fact that he had never before received citations concerning his step van or its use as a sound truck, William believed he was being targeted based on his support of the Juanita Gowdy campaign.

145. On September 2, 2021, William filed petitions for civil stalking protection orders—pursuant to Ohio Rev. Code § 2903.214—in the Court of Common Pleas for Cuyahoga County to protect himself and his wife from both Mayor King and Police Chief Gardner.

146. He attached a statement that he had written on August 18 that detailed each visit he had received from the police between May 14, 2021, and August 18, 2021, the citations he had received, and that his truck had been towed. He explained that he believed he was being "singled

out and discriminated against because I don't support Brandon King for Mayor in this year's upcoming election [because] I support Juanita Gowdy for Mayor and choose to work within her campaign."

147. William also explained that he believed that "Brandon King" and the "police department[] are motivated by politics and a desire to stop Juanita Gowdy's campaign, by any means necessary," and he pleaded for the "East Cleveland Police to cease and desist this harassment and intimidation, immediately, so I can work to help Juanita Gowdy win her campaign against Brandon King."

148. He sought *ex parte* protection orders against both King and Gardner in his initial petition. The court denied the *ex parte* protection orders on September 3, 2021, and set both petitions for protection orders for hearing on September 20, 2021.

149. At the hearing on September 20, 2021, Mayor King and Chief Gardner were both present. Willa Hemmons was also present in her capacity as Law Director. William and Juanita Gowdy were present at well. The magistrate judge denied the petitions for protection orders against Mayor King and Chief Gardner.

150. Thus, as of September 2021, there is no doubt that Mayor King, Chief Gardner, and Law Director Hemmons were made aware of the series of police visits to William's home, the citations he received, and the fact that his step van was towed.

151. On information and belief, neither Mayor King, nor Chief Gardner, nor Law Director Hemmons took any action to reprimand or otherwise address the police officers' enforcement actions against William.

**September 14: Juanita Gowdy is defeated in the mayoral primary.**

152.    Brandon King, the incumbent mayor, won the Democratic primary in September 2021. King is the current mayor of East Cleveland. His term ends in 2026.

**September 23: William attends the hearing on his noise pollution citation.**

153.    Soon after the August 18 visit, William received a notice to appear at a hearing on the Noise Ordinance complaint scheduled for September 23, 2021.

154.    Two days before the hearing, the attorney representing William called East Cleveland's Assistant Law Director—Heather McCollough—to discuss a potential resolution of the noise complaint prior to the hearing.

155.    During the phone call, McCollough indicated to William's attorney that she was very familiar with William's case already and told William's attorney that the issue was that William's "sound device" permit needed to have been signed by both Mayor King and Police Chief Gardner.

156.    McCollough told William's attorney that her office was typically willing to resolve minor issues like a noise pollution citation, but that they would treat William differently and might be unwilling to resolve the matter favorably with him because William needed to "stand down."

157.    McCollough cited the following actions as reasons that William needed to stand down: that William had "made complaints about the police department," that he had made "public records requests," that he had asked for a copy of the City's charter, and that he had inquired about specific election ordinances. All of these are activities protected by the First Amendment to the United States Constitution.

158.    McCollough made it clear to William's attorney that she was concerned about William's interest and involvement in the recent mayoral primary and that they might be able to reach a deal because Brandon King had won reelection.

159.    On September 23, the day of the hearing, William and his attorney went to the municipal court.

160.    The judge was not present and did not make an appearance in the court room for the entire hearing.

161.    When William's attorney introduced himself and William to the bailiff, the bailiff said, "Oh, I know who he is."

162.    When Assistant Law Director McCollough arrived at the hearing, she characterized the citation William received as "just a noise" violation.

163.    McCollough also told William and his attorney that she could not guarantee that William would be treated in the future as leniently as he was being treated that day if he continued to cause problems "downtown."

164.    William ultimately agreed to a plea of no contest to a reduced charge of disorderly conduct.

165.    After William signed the plea form, the bailiff took it back to the judge to sign in chambers. The judge assessed a fine of $5.00, plus court costs of $94.00. William paid the fine a few days later.

166.    As William and his attorney were leaving the court room, McCollough called after them and said that William needed to watch himself and mind his own business going forward.

## INJURY TO PLAINTIFF

167.    The retaliatory citations and tow of William's step van directly and proximately caused severe harms to William.

168.    Because of the citations and threatened towing William suffered in May to July, he was forced to park his step van outside of the City. This imposed nearly two hours of additional travel time—along with attendant gas costs and wear on the van—every day he used the step van to campaign for the Gowdy campaign, which was at least once a week and often twice a week.

169.    But for the increased burdens to use the step van when it had to be parked outside of East Cleveland, William would have exercised his core political speech rights more often to campaign for Gowdy's election.

170.    Being forced to park the step van outside of the City also induced more wear and tear, and well as gas usage, on William's other vehicle, as he had to make round trips outside of the City to pick up and return the step van.

171.    When it was towed on August 18, William's step van was damaged to the point that it would no longer start. It remains inoperable for regular use, and the cost to repair it is well over $6,000.

172.    William also had to pay the City $80 and the towing company $448.20 to retrieve his truck from the impound lot.

173.    Because the step van was rendered inoperable, it could not be used for the Gowdy campaign in the crucial closing weeks of the campaign. As a result, William lost the ability to effectively voice his political support for the Gowdy campaign, and the Gowdy campaign lost its principal medium of communication to voters.

174.    But for the damage to the step van caused by the Defendants' retaliatory actions, William would have exercised his core political speech rights in the closing weeks of the campaign by using his step van as a sound truck for the Gowdy campaign.

175.    But for the damage to the step van caused by the Defendants' retaliatory actions, William would also have considered requests from other candidates to campaign for them in the election.

176.    Because his step van has been inoperable, William's business has lost out on and continues to lose out on potential income.

177.    William has also lost out on the ability to use the van for non-communicative purposes. He used to use the van regularly for his business and to help friends and family but could no longer do so after it was damaged. For example, but for the damage to the step van that left it inoperable, he would have used it as a moving truck to help his daughter move.

178.    As a result of the noise complaint he received, William had to plead guilty to a misdemeanor and pay a fine and court costs totaling $99.

179.    But for Defendants' retaliation against his core political speech, William would participate in future campaigns, but is presently chilled from doing so because he fears future harassment, fines, seizures of valuable property, and arrest.

180.    William also fears the consequences of making further public records requests because Assistant Law Director McCollough specifically mentioned his prior requests as one of the reasons for the City's and its officials' retaliation against William.

181.    Officer Allen selectively enforced the Parking Ordinance against William, on at least three separate occasions, for the purpose of punishing and suppressing his core political speech against the incumbent mayor, not because the Ordinance is routinely enforced against step

vans that are parked in residential areas for reasons that have nothing to do with political speech. Officer Allen also selectively threatened William with enforcement of the Noise Ordinance, for the purpose of punishing and suppressing his core political speech against the incumbent mayor, not because the Noise Ordinance is routinely enforced against sound trucks used to broadcast community or political messages in East Cleveland.

182.    Captain Lundy selectively enforced the Parking Ordinance against William for the purpose of punishing and suppressing his core political speech against the incumbent mayor, not because the Ordinance is routinely enforced against step vans that are parked in residential areas for reasons that have nothing to do with political speech. Captain Lundy also selectively threatened William with enforcement of the Noise Ordinance, for the purpose of punishing and suppressing his core political speech against the incumbent mayor, not because the Noise Ordinance is routinely enforced against sound trucks used to broadcast community or political messages in East Cleveland.

183.    Officer Majercik selectively enforced the Parking Ordinance against William, and had his step van towed, for the purpose of punishing and suppressing his core political speech against the incumbent mayor, not because the Ordinance is routinely enforced against step vans that are parked in residential areas for reasons that have nothing to do with political speech. Officer Majercik also selectively enforced the Noise Ordinance against William, for the purpose of punishing and suppressing his core political speech against the incumbent mayor, not because the Noise Ordinance is routinely enforced against sound trucks used to broadcast community or political messages in East Cleveland.

184.    Officer Nevels selectively enforced the Noise Ordinance against William, for the purpose of punishing and suppressing his core political speech against the incumbent mayor, not

because the Noise Ordinance is routinely enforced against sound trucks used to broadcast community or political messages in East Cleveland.

185.    Officer Wood selectively enforced the Parking Ordinance against William, and had his step van towed, for the purpose of punishing and suppressing his core political speech against the incumbent mayor, not because the Ordinance is routinely enforced against step vans that are parked in residential areas for reasons that have nothing to do with political speech.

186.    These police officers acted against William pursuant to an official policy or custom of the City of East Cleveland to punish and suppress William's core political speech against the incumbent mayor.

187.    On information and belief, Police Chief Gardner directed, approved, or ratified the use of the City's police department that he supervised to selectively enforce the Parking and Noise Ordinances against William, for the purpose of punishing and suppressing his core political speech against the incumbent mayor. This was not because the Parking Ordinance is routinely enforced against step vans that are parked in residential areas for reasons that have nothing to do with political speech, or because the Noise Ordinance is routinely enforced against sound trucks used to broadcast community or political messages in East Cleveland.

188.    Assistant Law Director McCollough selectively enforced the Noise Ordinance against William, for the purpose of punishing and suppressing his core political speech against the incumbent mayor and for exercising his First Amendment rights to make public records requests, not because the Noise Ordinance is routinely enforced against sound trucks used to broadcast community or political messages in East Cleveland. She coercively used her official discretion to attempt to force William to sacrifice his First Amendment speech rights in exchange for more lenient treatment.

189.    McCollough acted against William pursuant to an official policy or custom of the City of East Cleveland to punish and suppress William's core political speech against the incumbent mayor.

190.    On information and belief, Law Director Hemmons directed, approved, or ratified the use of the City's law department that she supervised to selectively enforce the Noise Ordinance against William, for the purpose of punishing and suppressing his core political speech against the incumbent mayor, not because the Noise Ordinance is routinely enforced against sound trucks used to broadcast community or political messages in East Cleveland. On information and belief, she also directed, approved, or ratified the selective enforcement of the Parking Ordinance against William, for the purpose of punishing and suppressing his core political speech against the incumbent mayor, not because the Parking Ordinance is routinely enforced against step vans that are parked in residential areas for reasons that have nothing to do with political speech.

191.    On information and belief, Mayor King directed, approved, or ratified the use of the city police and law departments over which he has control to selectively enforce the Parking and Noise Ordinances against William, for the purpose of punishing and suppressing his core political speech against King's reelection. This was not because the Parking Ordinance is routinely enforced against step vans that are parked in residential areas for reasons that have nothing to do with political speech, or because the Noise Ordinance is routinely enforced against sound trucks used to broadcast community or political messages in East Cleveland.

## CAUSES OF ACTION

### Count I

### 42 U.S.C. § 1983 – First and Fourteenth Amendments

**(Retaliation Claim Against Defendants Brandon King, Scott Gardner, Willa Hemmons, Heather McCollough, Mark Allen, Kenneth Lundy, Andrew Majercik, William Nevels, Kyle Wood, and John Does I-X (the "Individual Defendants"))**

192.    William realleges and incorporates by reference the allegations in Paragraphs 1 through 191 of this complaint, as if fully stated herein.

193.    William's advocacy on behalf of the Juanita Gowdy election campaign and his association with that campaign, including operating his sound truck on behalf of the campaign, constitute core political speech that warrants the very highest protection under the First Amendment to the United States Constitution.

194.    Using their respective authorities under color of state law, the Individual Defendants subjected William to the deprivation of his First Amendment rights by retaliating against him for exercising those rights.

195.    Motivated to punish and intimidate William for his exercise of his free speech rights, the Individual Defendants engaged in various harmful acts against William in violation of clearly established First Amendment law. These acts include, but are not limited to:

    a.  Sending police officers to William's home on at least four occasions to threaten him and his step van with enforcement actions.

    b.  Issuing William two citations for violating the Parking Ordinance, *i.e.*, East Cleveland Code of Ordinances § 351.11.

    c.  Sending an unjustifiably large number of police officers to William's home to intimidate him.

    d.   Forcibly towing William's step van, even though he and several other adults were available to safely drive the van away. This towing resulted in severe damage to the step van, requiring thousands of dollars' worth of repairs.

    e.   Imposing $80 in fines and fees to release the step van, in addition to the $448.20 in fees charged by the towing company.

    f.   Issuing William a misdemeanor complaint and summons for violating the Noise Ordinance, *i.e.*, East Cleveland Code of Ordinances § 509.15.

    g.   Requiring William to plead guilty to a misdemeanor and pay a fine and court costs totaling $99 as a condition of resolving the Noise Ordinance complaint, even though the Law Department would normally resolve minor issues like a noise citation more leniently.

    h.   Telling William's attorney that the misdemeanor complaint might not be resolved favorably unless William were willing to "stand down" from his First Amendment-protected activity.

    i.   Threatening William with regards to his misdemeanor complaint that he would not be treated in the future as leniently if he continued to cause problems "downtown"—a clear reference to his political advocacy—and that he needed to watch himself and mind his own business going forward.

196. Police officers Mark Allen, Kenneth Lundy, Andrew Majercik, William Nevels Kyle Wood, and the yet-to-be-identified John Doe police officers (collectively, the "Police Officer Defendants") each personally participated in at least one of the threatening encounters at William's home where he and his step van were threatened with enforcement actions.

197.     Heather McCollough, acting as the City's representative in processing the Noise Ordinance complaint against William, acted beyond any legitimate scope of her authority by using her office to coerce William into relinquishing his First Amendment rights. She personally conditioned lenient treatment on William "stand[ing] down" from his political advocacy and threatened that William needed to watch himself and mind his own business going forward.

198.     Coupling a threat of prosecution with a demand to relinquish First Amendment rights was plainly outside McCollough's legitimate powers.

199.     On information and belief, Law Director Willa Hemmons directed Heather McCollough and/or the police officers to retaliate against William, or at least was aware of their retaliatory actions and did nothing to stop them. In particular, given that Hemmons directly supervises McCollough in a two-person municipal law office, Hemmons must have known of McCollough's retaliatory actions and either expressly approved of them or willfully refrained from stopping them.

200.     On information and belief, Police Chief Scott Gardner directed the Police Officer Defendants under his command and/or Heather McCollough to retaliate against William, or at least Gardner was aware of their retaliatory actions and did nothing to stop them. Given the number of police officers involved in the retaliation and the multiple retaliatory incidents over the course of months, Gardner must have known of their retaliatory actions and either expressly approved of them or willfully refrained from stopping them.

201.     On information and belief, Mayor Brandon King directed the other Individual Defendants—who are all subordinate officials to him in the East Cleveland government—to retaliate against William, or at least King was aware of their retaliatory actions and did nothing to stop them. Given the number of officials involved in the retaliation and the multiple retaliatory

incidents, King must have known of their retaliatory actions and either expressly approved of them or willfully refrained from stopping them.

202.    On information and belief, King, Hemmons, and Gardner were made aware of the retaliatory conduct occurring towards William no later than July 29—well before the step van was towed—when William filed the citizen's complaint against the police department for its retaliatory selective enforcement of the Parking Ordinance. Nevertheless, they either expressly approved of or willfully refrained from stopping the retaliatory actions.

203.    On information and belief, additional John Does yet to be identified were also involved in planning or executing the retaliatory actions against William. These include, at least, the individual police officers who have not yet been identified who were involved in towing William's step van and issuing him citations.

204.    On information and belief, the retaliatory actions taken against William were part of a concerted campaign. Only concerted action can account for the multiple retaliatory actions involving numerous officials across both the City's police department and law department.

205.    The foregoing retaliatory actions are independently unconstitutional but were also intended to send a warning to anyone else in East Cleveland bold enough to use their First Amendment rights to support changes to the City government.

206.    The risk of being subjected to those actions or others like them would chill a person of ordinary firmness from exercising First Amendment rights.

207.    It is clearly established that retaliating against individuals by selectively enforcing municipal ordinances because of an individual's speech is a violation of the First Amendment. Every reasonable government official would have had a fair warning that taking such retaliatory actions or participating in such a retaliatory scheme is unconstitutional.

208.    Even if William had technically violated the Parking Ordinance or the Noise Ordinance, the selective enforcement of those ordinances would still be unconstitutional under clearly established law because the Individual Defendants enforced those ordinances against William only *because* of his First Amendment-protected political activity.

209.    Defendant Heather McCollough made that retaliatory motivation clear when she made the numerous statements indicating that William's treatment was because of his political advocacy.

210.    When the Individual Defendants took their unconstitutional retaliatory actions against William, they were not acting under time constraints and made no split-second decisions. Instead, over the course of several months they repeatedly sought out William to issue him citations, tow his step van, and then enforce the noise citation.

211.    The Parking Ordinance is generally not enforced against individuals, like William, who park a van, truck, or RV at their homes—if it is ever enforced at all. That is demonstrated by, among other things, the following facts:

    a.    The City has *no* record of *any* enforcement actions related to the Parking Ordinance between January 1, 2016, and May 11, 2022.

    b.    William parked the step van in his driveway for 15 years before the foregoing retaliatory actions without any suggestion from any City official that parking his step van was illegal. William even used the step van to move into his home in 2006 and specifically expanded his driveway to accommodate the step van. This did not cause an issue until William was supporting the Gowdy 2021 mayoral campaign.

c.  A neighbor who lived just a block and a half away had a nearly identical step van parked in his driveway, which was never subjected to any enforcement action.

d.  Even as William's step van was being towed, a similarly sized van was parked at the house next door, and the police did not tow that vehicle or otherwise suggest it was parked illegally.

e.  The Parking Ordinance applies not only to trucks, but also to tractor/trailers, motor homes, and recreational vehicles. Those types of vehicles are routinely parked around the City, without being subject to enforcement of the Parking Ordinance.

f.  The City's parking-ticket citation form, including the one issued to William, has 45 check-boxes for specific parking ordinances that may receive a citation. Yet the Parking Ordinance under which William was cited is so infrequently invoked that the officers had to use the catch-all "OTHER" category and fill in the ordinance number by hand.

212.  The Noise Ordinance is also not generally enforced against individuals, like William, who use a sound truck to communicate community or political messages in East Cleveland. That is demonstrated by, among other things, the following facts:

a.  William himself had used the same step van as a sound truck to broadcast campaign messages in previous campaigns with a similar sound device permit. No City officials suggested he was then violating the Noise Ordinance, or any other ordinance.

b.  When William was actively using the step van as a Gowdy campaign sound truck to broadcast campaign messages, he routinely encountered police officers on his route. They never stopped him or did anything to suggest he was violating the Noise Ordinance when actively broadcasting.

c.  When William requested records of any calls for service about his sound broadcasts, the City's response included no records of any such calls.

d.  On information and belief, the Noise Ordinance has never been enforced against another individual who had a sound device permit signed by the Chief of Police.

e.  On information and belief, sound device permits are routinely granted for the use of sound trucks, and the City has never enforced the Noise Ordinance against the use of sound trucks by asserting a deficiency in the permit.

f.  Sounds trucks are routinely used in political campaigns in East Cleveland. On information and belief, no other sound trucks used in political campaigns have faced enforcement under the Noise Ordinance.

213.    Had William not been using his step van as a sound truck to express a viewpoint opposed to the reelection of Mayor King, the Individual Defendants would not have enforced the Parking Ordinance or the Noise Ordinance against William.

214.    McCollough's statements to William's attorney during the misdemeanor Noise Ordinance enforcement confirm that the true motivation of the enforcement was retaliation for political speech and that the ordinance would not have been enforced against a similarly situated

individual who was *not* engaged in William's First Amendment-protected political activity. In particular, McCollough:

a.   Told William's attorney that her office is typically willing to resolve "minor issues" like the noise ordinance, but that it might treat William differently because he needs to "stand down."

b.   Cited to William's attorney the following grievances: that William had made complaints about the police department, had made public records requests, had asked for a copy of the City charter, and had inquired about election ordinances—all of which are First Amendment-protected activities.

c.   Told William's attorney that perhaps a deal could be reached now that King had won reelection, indicating that the enforcement was directly connected to the campaign.

d.   Threatened that William would face more severe treatment in the future if he continued to cause problems "downtown."

e.   Threatened William to watch himself and mind his own business going forward.

215.    Even if it were constitutionally relevant that William arguably violated the Parking Ordinance or the Noise Ordinance, it is clear in light of the foregoing that the enforcement of those ordinances against him is contrary to the City's usual practice. Even if those otherwise unenforced ordinances could apply to William, that is insufficient to outweigh the retaliatory animus demonstrated by the nature of the enforcement and the surrounding circumstances.

216.    The Individual Defendants' unconstitutional acts, motivated by retaliatory animus, directly harmed William and chilled his First Amendment rights by restricting his ability to engage

in political speech, by incapacitating the step van William was using as the primary campaign tool of the Gowdy campaign, and by causing William pecuniary loss.

217.    Had it not been for the retaliatory animus, the Individual Defendants would never have issued William the parking or noise citations, towed his step van, or otherwise sought to enforce the Parking Ordinance and Noise Ordinance against him.

**Count II**

**42 U.S.C. § 1983 – First and Fourteenth Amendments**

**(Retaliation Claim Against the City of East Cleveland)**

218.    William realleges and incorporates by reference the allegations in Paragraphs 1 through 217 of this complaint, as if fully stated herein.

219.    Through the Individual Defendants, East Cleveland adopted and enforced an official policy or custom to retaliate against William for his First Amendment-protected activities, in particular his advocacy on behalf of Juanita Gowdy's mayoral campaign.

220.    As elaborated in Count I and elsewhere in this complaint, the City retaliated against William in violation of the First Amendment by executing a concerted scheme to interfere with William's political advocacy. That scheme involved police harassing William and his step van at his home, police issuing William citations for ordinances that are never enforced against similarly situated individuals, police unjustifiably towing William's step van, and the City's law department using the Noise Ordinance proceedings as a vehicle to extort William into relinquishing his First Amendment rights.

221.    This scheme was part of an official policy or custom that was deliberate, executed over the course of several months, and pervasive throughout the police department and law

department. It was not like an on-the-spot decision to arrest sometimes made by individual officers in split-second situations.

222.    The actions of the Individual Defendants are attributable to the City. Several of the Individual Defendants were final policymakers with final authority, or were delegated final authority, and made a deliberate choice to adopt a course of action that retaliated against William.

223.    At the very least, City policymakers condoned and ratified the retaliatory scheme, which took place over several months and across the police department and law department.

224.    As mayor—with authority to supervise and direct all City employees and departments, and to appoint or remove department heads—Brandon King is and was a municipal policymaker. The scheme described in this complaint, which he either directed or at least ratified, represents official City policy.

225.    As chief of police—with authority to supervise and control the police department— Scott Gardner is and was a municipal policymaker, at least for the policies of the police department. The scheme described in this complaint, which he either directed or at least ratified, represents official City policy.

226.    As law director—with authority to supervise and control the law department— Willa Hemmons is a municipal policymaker, at least for the policies of the law department. The scheme described in this complaint, which she either directed or at least ratified, represents official City policy. Hemmons is responsible for her subordinate McCollough.

227.    Alternatively, King, Gardner, and Hemmons ratified the concerted retaliatory conduct of their subordinates and adopted it as City policy. In particular:

a.   King is responsible for all the City executive officials' concerted actions, taken on multiple occasions over several months, to retaliate against William for his political advocacy.

b.   Gardner is responsible for his subordinates' concerted actions over several months to harass William, issue him multiple citations, and tow his step van.

c.   Hemmons is responsible for her subordinate's use of legal process to attempt to extort William into relinquishing his First Amendment rights to resolve the Noise Ordinance complaint.

228.    McCollough's statements to William and his attorney, described above in Count I and elsewhere in this complaint, reflect that a strong animus against William for his political advocacy in the 2021 mayoral campaign motivated the enforcement actions against him. McCollough was not motivated by such animus on her own, but rather was executing the wishes of senior policymakers to retaliate against William for his political advocacy.

229.    The actions undertaken or ratified by the City constitute the moving force behind the retaliatory enforcement against William aimed at the exercise of his First Amendment rights.

230.    That enforcement would chill a person of ordinary firmness from exercising First Amendment rights. In fact, it did cause significant harm to William, including severe damage to his step van, the loss of the ability to use his step van to campaign for Gowdy in the crucial closing weeks of the mayoral campaign, and the financial injury of hundreds of dollars in fines and fees.

231.    Had it not been for the retaliatory animus, the City would never have caused, permitted, or approved the retaliatory actions taken against William for his political advocacy.

**Count III**

**42 U.S.C. § 1983 – First and Fourteenth Amendments**

**(Free Speech Prior Restraint Claim Against the City of East Cleveland and the Individual Defendants)**

232. William realleges and incorporates by reference the allegations in Paragraphs 1 through 231 of this complaint, as if fully stated herein.

233. The Noise Ordinance (*i.e.*, East Cleveland Code of Ordinances § 509.15) and the Permit Ordinance (*i.e.*, East Cleveland Code of Ordinances § 311.02) together unconstitutionally condition the exercise of First Amendment activities on the broad discretion of local officials. They are facially unconstitutional and are unconstitutional as they were applied to William.

234. The Noise Ordinance and Permit Ordinance are legislative enactments of the City of East Cleveland and are official City policy.

235. The Noise Ordinance broadly prohibits any use of an "audio system" that could "disturb the quiet . . . of other persons." This expansive language sweeps in a wide swath of First Amendment-protected speech, such as using sound trucks to communicate political messages.

236. The Permit Ordinance provides a permit exception, which vests broad discretion in the mayor and the chief of police to determine whether to apply the exception. The ordinance requires that any permit have "approval by the Chief of Police and the Mayor," but lacks the narrowly drawn standards to deny a permit that are required by the First Amendment.

237. The ordinance lists a wide variety of grounds on which the "Mayor may refuse to issue" a permit, many of which are so malleable that they leave open important questions of enforcement to official discretion. For instance, the mayor or chief of police may deny a permit for any proposed event that "would unreasonably interfere with the public convenience."

238.     The Permit Ordinance speaks in terms of allowing "parades" as an exception to the Noise Ordinance, but the City treats the ordinance as more broadly applying to events and not just to parades. The sound device permit that William received describes the Permit Ordinance as an "[e]xception" for "organized events"—not just for parades—and the form is styled as a "sound device permit," not a "parade permit."

239.     Together, the Noise and Permit Ordinances result in virtually unreviewable prior restraints on First Amendment rights.

240.     They also vest City officials with substantial discretion to enforce the permitting regime after the fact. This case is illustrative:

    a.  William received a permit with the police chief's signature. As discussed above, he reasonably believed that was sufficient to comply with the Noise Ordinance in light of his own personal experience with the permitting regime and the City's prior practice in applying the permitting regime.

    b.  As explained above, when William used his step van as a campaign sound truck, he regularly passed police officers, and they never suggested his campaign activity violated the Noise Ordinance.

    c.  It was not until after William had been campaigning with his sound truck for weeks that the City and its officials enforced the Noise Ordinance against William.

    d.  It was not until William had already received a misdemeanor complaint that Assistant Law Director McCollough announced that the City would strictly require signatures from both the mayor and the chief of police for a sound permit to be valid.

241.    On their face, the Noise and Permit Ordinances together violate clearly established First Amendment law reflected in decades of U.S. Supreme Court and Sixth Circuit case law.

242.    The Noise and Permit Ordinances are also clearly unconstitutional as they were applied to William.

243.    As applied to William, the Noise and Permit Ordinances required William to get the approval of the incumbent mayor, the very official against whom William planned to use the permit to campaign. And the Permit Ordinance vested broad discretion in the mayor to deny the permit.

244.    In effect, the Noise and Permit Ordinances—as interpreted and applied by the City to William—gave the mayor unfettered discretion to impose a prior restraint on political campaigning in the City. They put William in the position of requiring discretionary approval to speak from the very person against whom he wished to speak.

245.    William was thus subjected to a prior restraint on his First Amendment-protected activity, subject to broad discretion in the mayor and the chief of police to grant an exemption and in police officials to enforce the ordinances.

246.    That prior restraint violates clearly established First Amendment law.

247.    Any reasonable official would have known that the Noise and Permit Ordinances were unconstitutional under clearly established law, at least as applied to William. They were thus on notice that administering or enforcing the Noise and Permit Ordinances violated clearly established constitutional rights. In particular:

> a.  Mayor King and Police Chief Gardner were on notice that administering a permitting regime that vested such broad discretion in them to impose a prior restraint violated clearly established law.

b.  Law Director Hemmons and Assistant Law Director McCollough were on notice that applying the Noise Ordinance to William violated clearly established law, and thus that their enforcement against William was unconstitutional.

c.  The Police Officer Defendants were on notice that the Noise and Permit Ordinances together constituted an unconstitutional prior restraint on speech under clearly established law, at least as they were applied to William. Enforcing the ordinances against William was thus clearly unconstitutional.

### Count IV

### 42 U.S.C. § 1983 – Fourteenth Amendment

### (Equal Protection Selective Enforcement Claim Against the Individual Defendants and the City of East Cleveland)

248.    William realleges and incorporates by reference the allegations in Paragraphs 1 through 247 of this complaint, as if fully stated herein.

249.    The Defendants violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by selectively enforcing the Parking and Noise Ordinances against William when those ordinances are never enforced against other similarly situated individuals.

250.    As elaborated above in Count I and elsewhere in this complaint, the Parking Ordinance is never enforced against similar vehicles to William's step van, if it is even enforced at all; and the Noise Ordinance is never enforced against similarly situated individuals.

251.    As further elaborated above in Count I and elsewhere in this complaint, the Defendants' true reason for enforcing the ordinances against William was animus and ill-will arising from a desire to retaliate against William for his political advocacy.

252.    Such a politically motivated retaliatory animus was not a legitimate government interest.

253.    Because the Defendants lacked a legitimate government interest to single out William, they lacked a rational basis to treat William differently from the similarly situated individuals against whom they routinely do not enforce the Parking and Noise Ordinances.

254.    The law is clearly established that retaliatory animus is not a legitimate government interest, and any reasonable officer would have been on notice that selectively enforcing an ordinance because of retaliatory animus violated the Equal Protection Clause.

255.    As elaborated above in Count II and elsewhere in this complaint, the retaliatory animus was embodied in an official City policy or practice, and the retaliatory actions taken against William are attributable to City policymakers.

### Count V

### 42 U.S.C. § 1983 – Fourth and Fourteenth Amendments

### (Unreasonable Seizure Claim Against the Individual Defendants
### and the City of East Cleveland)

256.    William realleges and incorporates by reference the allegations in Paragraphs 1 through 255 of this complaint, as if fully stated herein.

257.    When the Police Officer Defendants, acting under color of law, ordered William's step van towed, they executed an unreasonable seizure in violation of the Fourth Amendment to the United States Constitution.

258.    Even if the step van was in violation of the Parking Ordinance when it was briefly parked outside William's home before being used in a campaign event, there was no reasonable basis to seize and tow it.

259.     At least four people—William, Councilor Juanita Gowdy, Gowdy's campaign manager, and William's daughter—were present when the step van was towed and could have safely driven the step van away from where it was, supposedly, illegally parked.

260.     The parked step van presented no danger to public safety or order. The following facts, among others, demonstrate there was no imminent need to remove the step van:

      a.    The step van was parked on a quiet residential street, and it did not interrupt the flow of traffic.

      b.    On information and belief, no neighbors had complained about the step van being parked in front of William's home. In fact, as described further above in Count I, the step van had routinely been parked there for 15 years without complaint.

      c.    A neighbor had a nearly identical step van parked at his home without complaint, and a similarly sized van was parked behind William's step van as the latter was being towed. Yet the police did not believe that these other vans had to be towed.

      d.    The step van was in good working order, and it was neither derelict nor out of compliance with vehicle safety regulations.

      e.    The parked step van was silent and was in no way a nuisance to the neighborhood.

261.     Even if the step van were unlawfully parked, any legitimate law-enforcement interests could have been served simply by issuing William a citation and/or instructing him to move the step van. No legitimate law-enforcement purpose was served by towing the step van.

262.    Nor was any legitimate law-enforcement interest served by seizing William's expensive sound equipment with the step van. There was no legitimate law-enforcement interest in refusing to allow William to remove the equipment from the van before it was towed.

263.    The law was clearly established that it was an unreasonable seizure to tow a vehicle that presented no public danger or nuisance and which could have been safely driven away by a driver at the scene. Any reasonable officer would have been aware that such a towing was an unconstitutional seizure.

264.    The decision to tow William's step van was not a spur-of-the-moment decision by the Police Officer Defendants on August 18. Rather, it was one part of the concerted retaliatory plan among the Individual Defendants described in Count I, Count II, and elsewhere above. In particular, evidence that the towing was part of a premeditated plan includes, but is not limited to, the following:

a.  The police repeatedly attempted or threatened to tow William's step van over the course of months.

b.  When police attempted to tow William's step van on May 17, William was available to safely drive the van away, and the van was not presenting any public safety or traffic problems. The circumstances were thus identical to August 18, when police did tow the van.

c.  A disproportionately large number of police descended on William's quiet street on August 18 shortly after William parked the step van there, even though the van was no longer normally parked there, and even though he had not yet used it to campaign that day. This reflects that the police were

monitoring William's use of the van and were poised to strike when the opportunity arose to tow it.

d.  It was unnecessary to tow the step van because William, his daughter, Councilor Gowdy, and Gowdy's campaign manager were available to safely drive it away. Even so, the police took over an hour and employed three different tow trucks to take William's van, a disproportionate and unnecessary use of resources to tow a van that was not presenting any public safety or traffic problems.

e.  The officers repeatedly mentioned noise complaints, even though William had not broadcast any sound from the step van that day.

265.   The decision to unreasonably tow William's van reflected a City policy or practice.

266.   Police Chief Gardner was a municipal policymaker for the policies and practices of the City's police department. He either directed his subordinate officers to tow William's van, even though there was no reasonable basis to do so, or—at the very least—he was aware that several officers were attempting to unreasonably tow William's van over the course of months, and he ratified those actions and took no action himself to stop them.

267.   Mayor King was a municipal policymaker. He either directed his subordinate officers to tow William's van, even though there was no reasonable basis to do so, or—at the very least—he was aware that several officers were attempting to unreasonably tow William's van over the course of months, and he ratified those actions and took no action himself to stop them.

268.   On information and belief, other Individual Defendants—including potentially the John Doe Defendants—who were municipal policymakers directed the police officers to tow William's van, even though there was no reasonable basis to do so, or they were aware that several

officers were attempting to unreasonably tow William's van over the course of months and ratified those actions.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff William Fambrough requests relief as follows:

A.      For an award of compensatory and punitive money damages against the City of East Cleveland, Ohio and the Individual Defendants for the injuries Plaintiff suffered due to Defendants' violations of his constitutional rights, including the towing fees, fines incurred, gas and mileage costs from being forced to park outside the City, and repair costs to the step van;

B.      For an award of $1 in nominal damages based on Defendants' violations of Plaintiff's constitutional rights;

C.      For a judgment declaring that Defendants' actions in, and the City's policy or practice of, selectively enforcing the City's laws in retaliation for political advocacy violates the First Amendment and the Equal Protection Clause of the Fourteenth Amendment;

D.      For an order permanently enjoining Defendants from taking actions against William based on retaliatory animus or from taking enforcement actions against William that they would not take against others similarly situated who were not engaged in like political activity;

E.      For a judgment declaring the Noise and Permit Ordinances together violate the First Amendment, both facially and as applied to William;

F.      For an order permanently enjoining Defendants from enforcing the Noise and Permit Ordinances against anyone by requiring discretionary permits for engaging in First Amendment-protected speech;

G.      For a declaration that towing William's step van was an unreasonable seizure that violated the Fourth Amendment;

H.     For an award of reasonable attorneys' fees and costs; and

I.     Such other relief that this Court deems appropriate.

**JURY DEMAND**

William Fambrough demands a trial by jury on all issues triable under Rule 38 of the

Federal Rules of Civil Procedure.

June 8, 2022                                    Respectfully submitted,

                                               /s/ *Brian A. Morris*
                                               Brian A. Morris (Bar No. 0093530)
                                               Benjamin A. Field*
                                               Caroline Grace Brothers*
                                               INSTITUTE FOR JUSTICE
                                               901 North Glebe Road, Suite 900
                                               Arlington, VA 22203
                                               Phone:     (703) 682-9320
                                               Facsimile:  (703) 682-9321
                                               bmorris@ij.org
                                               bfield@ij.org
                                               cgbrothers@ij.org

                                               Jeffrey Rowes*
                                               INSTITUTE FOR JUSTICE
                                               816 Congress Ave., Suite 960
                                               Austin, TX 78701
                                               Phone:     (512) 480-5936
                                               Facsimile:  (512) 480-5937
                                               jrowes@ij.org

                                               *Counsel for Plaintiff*

                                               *Pro hac vice applications to be filed.*