**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**Eastern Division**

| | |
|---|---|
| WILLIAM FAMBROUGH, | |
| *Plaintiff*, | Civil Case No. 1:22-cv-00992-BMB |
| v. | |
| THE CITY OF EAST CLEVELAND, OHIO; MAYOR BRANDON KING, in his individual capacity; CHIEF OF POLICE SCOTT GARDNER, in his individual capacity; LAW DIRECTOR WILLA HEMMONS, in her individual capacity; ASSISTANT LAW DIRECTOR HEATHER McCOLLOUGH, in her individual capacity; OFFICER MARK ALLEN, in his individual capacity; CAPTAIN KENNETH LUNDY, in his individual capacity; OFFICER ANDREW MAJERCIK, in his individual capacity; OFFICER WILLIAM NEVELS, in his individual capacity; OFFICER KYLE WOOD, in his individual capacity; and JOHN DOES I-X, | Judge Bridget Meehan Brennan Magistrate Judge Thomas M. Parker |
| *Defendants*. | |

---

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS OR**
**IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF THE ARGUMENT .......................................................1

BACKGROUND ...........................................................................................................................1

   I.   Factual Background ............................................................................................................1

      A.  Plaintiff William Fambrough Campaigns For A Challenger To Mayor
Brandon King ..........................................................................................................1

      B.  William Faces A Torrent Of Adverse Actions From City Officials ..............................2

      C.  The Evidence Is Overwhelming That Defendants' Actions Were Retaliation For
William's Political Speech .......................................................................................4

   II.  Procedural Background .......................................................................................................6

STATEMENT OF THE ISSUES TO BE DECIDED ...................................................................6

LEGAL STANDARDS .................................................................................................................7

ARGUMENT ................................................................................................................................7

   I.   Ohio-Law Immunities Do Not Apply To Section 1983 Federal Civil Rights Suits ............7

   II.  Defendants Are Not Entitled To Qualified Immunity .........................................................8

      A.  Skeletal Mentions Of Qualified Immunity Do Not Properly Raise the Defense ..........8

      B.  The Complaint Alleges Violations Of Clearly Established Constitutional Rights,
So Qualified Immunity Is Not Available To The Individual Defendants .....................9

          1.  The complaint alleges Defendants violated clearly established prohibitions on
First Amendment retaliation ...........................................................................9

          2.  The complaint alleges Defendants violated William's clearly established First
Amendment right against prior restraint ........................................................12

          3.  The complaint alleges Defendants violated William's clearly established equal
protection right against selective enforcement ..............................................13

          4.  The complaint alleges Defendants violated William's clearly established
Fourth Amendment right against unreasonable seizure ..................................13

       *a.   Seizing the van was unreasonable under clearly established law* ...................13

       *b.   Defendants' counterarguments are all invalid* .................................................15

III. Defendants Hemmons and McCollough Are Not Entitled To Absolute Immunity...........16

IV. The Complaint States Claims For *Monell* Liability Against The City Of East
     Cleveland Because It Alleges Unconstitutional Policies or Customs................................18

V.  Defendants Do Not Make Arguments To Dismiss The Claims For Prospective Relief....19

VI. Summary Judgment Is Inappropriate And Premature.........................................................20

CONCLUSION...........................................................................................................................20

CERTIFICATE OF COMPLIANCE ..........................................................................................22

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*Ayers v. Ohio*, No. 18-cv-2890, 2019 WL 4812957 (N.D. Ohio Oct. 1, 2019)............................18

*Ball v. Union Carbide Corp.*, 385 F.3d 713 (6th Cir. 2004)........................................................20

*Bright v. Gallia Cnty.*, 753 F.3d 639 (6th Cir. 2014)....................................................................18

*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) ............................................................................16

*Burns v. Reed*, 500 U.S. 478 (1991) ......................................................................................16, 17

*Collins v. Nagle*, 892 F.2d 489 (6th Cir. 1989)...........................................................................14

*Collyer v. Darling*, 98 F.3d 211 (6th Cir. 1996) ........................................................................20

*Colorado v. Bertine*, 479 U.S. 367 (1987)............................................................................14, 15

*Crawford-El v. Britton*, 523 U.S. 574 (1998) ...............................................................................9

*Doe v. Phillips*, 81 F.3d 1204 (2d Cir. 1996)........................................................................17, 18

*Felder v. Casey*, 487 U.S. 131 (1988)..........................................................................................8

*Garceau v. City of Flint*, 12-cv-15513, 2013 WL 5954493 (E.D. Mich. Nov. 7, 2013) ..............19

*Hart v. Hillsdale Cnty.*, 973 F.3d 627 (6th Cir. 2020)..................................................................9

*Hartman v. Moore*, 547 U.S. 250 (2006) .....................................................................................9

*Hartman v. Thompson*, 931 F.3d 471 (6th Cir. 2019)................................................................10

*Hicks v. Scott*, 958 F.3d 421 (6th Cir. 2020)...............................................................................7

*Holzemer v. City of Memphis*, 621 F.3d 512 (6th Cir. 2010)................................................11, 12

*Howlett ex rel. Howlett v. Rose*, 496 U.S. 356 (1990)...............................................................7, 8

*Johnson v. Morales*, 946 F.3d 911 (6th Cir. 2020) ....................................................................13

*Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396 (6th Cir. 2019) ............19, 20

*Kennedy v. City of Villa Hills*, 635 F.3d 210 (6th Cir. 2011) ......................................................11

*Koubriti v. Convertino*, 593 F.3d 459 (6th Cir. 2010) ..........................................................16, 17

*Lipman v. Budish*, 974 F.3d 726 (6th Cir. 2020) ........................................................8, 18

*Maben v. Thelen*, 887 F.3d 252 (6th Cir. 2018)...........................................................11

*McGrew v. Duncan*, 937 F.3d 664 (6th Cir. 2019) ........................................................8

*Meyer v. Grant*, 486 U.S. 414 (1988) .........................................................................10

*Miranda v. City of Cornelius*, 429 F.3d 858 (9th Cir. 2005) ........................................14

*Moore v. Shelby Cnty.*, 718 F. App'x 315 (6th Cir. 2017)............................................20

*Murphy v. Lockhart*, 826 F. Supp. 2d 1016 (E.D. Mich. 2011)......................................8

*Osberry v. Slusher*, 750 F. App'x 385 (6th Cir. 2018) .................................................18

*Perry v. Sindermann*, 408 U.S. 593 (1972).................................................................9

*Plain Dealer Publ'g Co. v. City of Lakewood*, 794 F.2d 1139 (6th Cir. 1986),
    *aff'd in relevant part*, 486 U.S. 750 (1988) ........................................................12

*Pollard v. City of Columbus*, 780 F.3d 395 (6th Cir. 2015) ...........................................8

*Rolen v. City of Cleveland*, 12-cv-1914, 2013 WL 12145960 (N.D. Ohio Aug. 7, 2013) ......18, 19

*Rouse v. Stacy*, 478 F. App'x 945 (6th Cir. 2012) ..................................................17, 18

*Rudd v. City of Norton Shores*, 977 F.3d 503 (6th Cir. 2020) ......................................10

*Saia v. New York*, 334 U.S. 558 (1948) ......................................................................12

*Shandor v. City of Eastpointe*, No. 20-1385, 2021 WL 4775190 (6th Cir. Oct. 13, 2021) ..........14

*South Dakota v. Opperman*, 428 U.S. 364 (1976) .......................................................14

*Stockdale v. Helper*, 979 F.3d 498 (6th Cir. 2020) .....................................................16

*Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) (en banc) ..............................10, 11

*Thompson v. Clark*, 142 S. Ct. 1332 (2022) ...............................................................15

*Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307 (6th Cir. 1998) .........................10

*Two Bridges, LLC v. City of Youngstown*,
    No. 4:20CV2759, 2022 WL 1487607 (N.D. Ohio May 10, 2022) ...................................7

*United States v. Harvey*, 16 F.3d 109 (6th Cir. 1994) ..................................................................14

*United States v. Jackson*, 682 F.3d 448 (6th Cir. 2012) ..............................................................14

*United States v. Kimes*, 246 F.3d 800 (6th Cir. 2001) ..................................................14, 15, 16

*United States v. Squires*, 456 F.2d 967 (2d Cir. 1972) ................................................................14

*United States v. Zannino*, 895 F.2d 1 (1st Cir. 1990) ....................................................................8

*Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392 (6th Cir. 2010) ...........................................11

*Warren v. City of Athens*, 411 F.3d 697 (6th Cir. 2005) .............................................................13

*Watkins v. Healy*, 986 F.3d 648 (6th Cir. 2021) ...........................................................................8

*Wayte v. United States*, 470 U.S. 598 (1985) ...............................................................................13

*Wesley v. Campbell*, 779 F.3d 421 (6th Cir. 2015) .....................................................................7, 9

*White's Landing Fisheries, Inc. v. Buchholzer*, 29 F.3d 229 (6th Cir. 1994) ...............................7

*Zilich v. Longo*, 34 F.3d 359 (6th Cir. 1994) ............................................................................9, 10


**Constitutional Provisions**

U.S. Const. amend. I .................................................................................................... *passim*

U.S. Const. amend. IV .................................................................................................. *passim*

U.S. Const. amend. XIV, § 1 ...................................................................................6, 9, 13


**Statutes and Codes**

42 U.S.C. § 1983 ...............................................................................................................7

Ohio Rev. Code Ann. § 2744 ..........................................................................................7

Ohio Rev. Code Ann. § 2744.09(E) .................................................................................7

East Cleveland Code of Ordinances
     § 311.02 .................................................................................................................12
     § 311.02(g)(1) .......................................................................................................12
     § 509.15 .................................................................................................................12

**Rules**

Fed. R. Civ. P. 12(b)(6)...........................................................................................7

Fed. R. Civ. P. 56(a) .............................................................................................7

Fed. R. Civ. P. 56(d) ............................................................................................20

**Other Authorities**

Wayne R. LaFave, 3 *Search and Seizure* § 7.3(d) (6th ed. 2021) ...................................14

**INTRODUCTION AND SUMMARY OF THE ARGUMENT**

The motion to dismiss or for summary judgment should be denied. First, Defendants rely on inapplicable state-court procedures that have no force in federal civil rights suits. Second, they hint at, but never seriously argue for, various federal immunities. The complaint's allegations are more than sufficient to overcome these barebones assertions of immunity. Nowhere does the motion even mention the First, Fourth, or Fourteenth Amendments, under which Plaintiff's claims arise. And nowhere does the motion confront the complaint's detailed factual allegations that the City of East Cleveland and its officials retaliated against Plaintiff's core political speech—a claim on which the government bears the burden of satisfying heightened scrutiny or showing its actions were not retaliatory. Nor does the motion confront the substance of the allegations that Defendants violated the Fourth Amendment by unreasonably seizing the van Plaintiff used to campaign.

**BACKGROUND**

**I.      Factual Background**

**A.      Plaintiff William Fambrough Campaigns For A Challenger To Mayor Brandon King.**

William Fambrough ("William") has lived with his wife in the same house in the City of East Cleveland ("City") since 2006. ECF No. 1 ("Compl.") ¶ 61. He is proud of East Cleveland and a well-known figure in its political scene. *Id.* ¶¶ 42–43. William runs a media company and regularly works with political campaigns to promote candidates he supports. *Id.* ¶¶ 44–45.

William is well-known as a friend and supporter of City Councilor Juanita Gowdy, and he worked on her city council campaign. *Id.* ¶¶ 53–54. Both William and Gowdy have been publicly critical of East Cleveland's current administration. *Id.* ¶ 56. When Gowdy challenged Mayor King in 2021's mayoral election, William naturally supported her. *Id.* ¶¶ 58–59. The centerpiece of the campaign was using William's step van—which is like a FedEx truck, *see id.* ¶¶ 2, 63, 122—as a

sound truck, adorned with a life-size campaign poster of Gowdy and outfitted with a speaker to broadcast campaign messages across the city. *Id.* ¶¶ 48–49, 89–92. William campaigned at least once a week between late June 2021 and August 2021, using his van as a sound truck. *Id.* ¶ 91. The sound truck—sometimes caravanning with other supporters—regularly encountered police officers while broadcasting, but no officer suggested any ordinance was being violated. *Id.* ¶ 93.

Out of concern with complying with a city noise ordinance, William had obtained a permit to operate a sound truck. He received the permit form from the mayor's assistant, who directed William to obtain the police chief's signature—which William did. *Id.* ¶¶ 86, 88. Although there were lines on the form for both the mayor's signature and the police chief's signature, it is standard practice in East Cleveland that either signature is sufficient. *Id.* ¶ 84.

## B. William Faces A Torrent Of Adverse Actions From City Officials.

William's support for the Gowdy campaign was well-known by May 2021. *Id.* ¶ 59. That's when City officials began a pattern of adverse actions that lasted for months. *Id.* ¶ 60.

The first encounter was on May 14, when Defendant Officer Mark Allen showed up at William's door and told him that he was violating a parking ordinance by parking his step van in his driveway—even though the ordinance had been in place for the 15 years William had parked his van there without issue. *Id.* ¶¶ 62–73. Allen wrote William a warning ticket and gave him three days to remove the van. *Id.* ¶ 67. Allen then returned before three days had elapsed, on May 17. *Id.* ¶ 74. Allen attempted to have William's step van towed, but because the light-duty tow truck he brought was not equipped to tow the van, William drove the van away himself. *Id.* ¶¶ 76–77.

After that, William parked his van outside the City when he was not using it. *Id.* ¶¶ 78, 94. Doing so forced William to drive nearly two hours round trip—and incur attendant gas costs and wear and tear on the van—every time he used it to campaign for Gowdy. *Id.* ¶ 168. That limited how much William could use the van as a sound truck to campaign. *Id.* ¶ 169.

Even so, Defendants' hostility continued. After William began using his van to campaign, Allen returned to his home with Defendant Captain Kenneth Lundy on July 27—when the van was not there. *Id.* ¶¶ 95–96. Even though the officers knew William had a permit or could have checked to determine that he did, they drove to his home to tell him he needed a permit to broadcast sound. *Id.* ¶¶ 98, 100. William told them that he understood and would comply with the law. *Id.* ¶ 99.

To try to stop the police hassling, William filed a citizen's complaint against the police department, which should have alerted the department and the City's senior leadership what was going on if they did not already know. *Id.* ¶¶ 102–05. But the City's leadership did not rein in the officers who were harassing William. *Id.* ¶ 106.

Instead, the situation escalated. On the morning of August 18—less than a month from the election—William retrieved his step van and parked it on the street in front of his home to campaign later that day. *Id.* ¶ 107. That afternoon, seven or eight police officers showed up to William's leafy, low-crime neighborhood, even though the police force is perennially under-staffed. *Id.* ¶¶ 112–13. After they arrived, Defendant Officer Kyle Wood told William that the van was parked illegally and wrote him yet another parking citation. *Id.* ¶ 115. The police had the van towed away—even though it was not impeding traffic or causing any other problems; even though it is not even clear the van was violating the ordinance because the ordinance surely allows utility vans to be temporarily parked at homes during the workday; and even though William and at least three other drivers were able to move the van away. *Id.* ¶¶ 108–09, 116–21, 135.

A different officer, Defendant Andrew Majercik, wrote William a second citation, a "complaint and summons" for "noise pollution"—even though Williiam had not broadcast any sound from his van that day. *Id.* ¶¶ 126, 131. Majercik told William that "this is coming from my boss" and "the brass," specifically naming "Chief Gardner." *Id.* ¶ 127.

William paid the City an $80 fee and the towing company $448.20 in fees to retrieve his van. *Id.* ¶¶ 138–39. The van was severely damaged during the tow, and a mechanic estimated that it will cost over $6,000 to repair. *Id.* ¶¶ 135–37, 140–42. As a result of the damage caused by the unnecessary towing, the van was inoperable for the remainder of the Gowdy campaign. *Id.* ¶ 143.

## C.  The Evidence Is Overwhelming That Defendants' Actions Were Retaliation For William's Political Speech.

The complaint's factual allegations show Defendants' enforcement was pretextual and motivated by animus against William's political speech. Defendants didn't even try to hide it.

Direct evidence of animus came from Defendant Heather McCollough, the assistant law director, who bluntly acknowledged ill-will for William's political activity. When William's lawyer first called McCollough to discuss the noise citation, she said her office would typically resolve such minor issues, but that they would treat William differently and might be unwilling to resolve the matter favorably because he needed to "stand down." *Id.* ¶ 156. McCollough specifically noted that William had made "complaints about the police department," "public records requests," and inquiries about the City's laws—all First-Amendment-protected activities. *Id.* ¶ 157. McCollough made it clear she was concerned about William's involvement in the recent election and that she might be able to reach a deal because Mayor King had won reelection. *Id.* ¶ 158. When William and his attorney went to the municipal court to resolve the noise complaint—though they never actually saw a judge, *id.* ¶ 160—McCollough let William plead no contest to a reduced charge and pay $99 in fines and fees. *Id.* ¶¶ 164–65. But McCollough told William and his lawyer that William may not be treated as leniently in the future if he continued to cause problems "downtown." *Id.* ¶ 163. As they were leaving the courtroom, McCollough called after them that William needed to watch himself and mind his own business. *Id.* ¶ 166.

There is also ample objective evidence that there would have been no enforcement but for William's political advocacy. The parking ordinance generally prohibits "park[ing] a truck," "commercial tractor," "recreational vehicle," and similar vehicles at a residential property. *Id.* ¶¶ 68–69. But trucks and RVs are routinely parked in residential neighborhoods without enforcement. *Id.* ¶ 72. Indeed, William parked his van at his home since 2006, without incident until he campaigned against Mayor King. *Id.* ¶ 62. William's neighbor regularly parked a near-identical van less than two blocks away. *Id.* ¶ 66. It was parked there the day William's van was towed, as was a similar van parked one house down from William's, yet neither vehicle was towed. *Id.* ¶¶ 123–24. And William learned through a public-records request that the City has no records of enforcing the ordinance *at all* in the time for which records were provided. *Id.* ¶ 73.

The complaint also alleges facts to show the noise ordinance is never enforced against activity like William's. Even though William has used his van as a sound truck for political campaigning on many occasions, no City employee has ever stopped him or asked if he had a sound permit while he was actively broadcasting—not when he campaigned himself for the East Cleveland school board in 2019, and not during the many times that he campaigned for Juanita Gowdy after obtaining a sound permit in June 2021. *Id.* ¶ 101. That was even though William routinely encountered police when using his van as a sound truck to campaign for Gowdy. *Id.* ¶ 93.

The circumstances of the noise complaint itself were also suspicious. Officer Majercik and the complaint referenced five calls for service concerning William's sound truck, but William had not used the sound equipment that day. *Id.* ¶¶ 130–31. William made a public records request for any records of those calls, but at the time the complaint was filed the City had produced only two records from months or years earlier that had nothing to do with noise. *Id.* ¶ 132.

## II. Procedural Background

William filed this lawsuit against the City and its officials who orchestrated and executed the retaliatory scheme. The complaint detailed each Defendant's role. *See, e.g.*, Compl. ¶¶ 181–91, 196–203, 220–27, 234, 247, 254–255, 265–68 (summarizing role and bases for liability for each Defendant). And it alleged four violations of clearly established constitutional rights: (1) Defendants violated the First Amendment by retaliating against William for his political speech, *id.* ¶¶ 192–231 (Counts I and II); the noise ordinance and its enforcement violated the First Amendment as an unconstitutional prior restraint on speech, *id.* ¶¶ 232–47 (Count III); Defendants' selective and arbitrary enforcement against William based on animus violated the Equal Protection Clause of the Fourteenth Amendment, *id.* ¶¶ 248–55 (Count IV); and it was an unreasonable seizure violating the Fourth Amendment to tow William's van, *id.* ¶¶ 256–68 (Count V). William sought damages, as well as declaratory and injunctive relief. *Id.* at 49–50.

Defendants have since answered the complaint (ECF No. 22) and filed the instant motion (ECF No. 19) ("Mot.").[1]

### STATEMENT OF THE ISSUES TO BE DECIDED

1. Whether Ohio municipal immunity doctrines apply to federal civil rights claims.

2. Whether any Defendant is entitled to qualified immunity at this case's pleading stage.

3. Whether any Defendant is entitled to absolute immunity at this case's pleading stage.

4. Whether the complaint states *Monell* liability claims against the City of East Cleveland.

5. Whether there is any basis to dismiss the complaint's claims for prospective relief.

6. Whether summary judgment, at the pleading stage of this case, is appropriate.

---

[1] Defendants also filed a motion to strike the complaint (ECF No. 14), which William opposed (ECF No. 18). That motion remains pending, although Defendants appear to have abandoned it as they did not file a reply and instead filed their responses to the complaint.

**LEGAL STANDARDS**

First, under Rule 12(b)(6), "[t]he defendant has the burden of showing that the plaintiff has failed to state a claim for relief." *Wesley v. Campbell*, 779 F.3d 421, 428 (6th Cir. 2015). "[A] district court must construe the complaint in the light most favorable to the plaintiff, accept [his] allegations as true, and draw all reasonable inferences in [his] favor." *Id.* at 428 (internal quotation marks omitted). Second, as to summary judgment, it "is only proper if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *Hicks v. Scott*, 958 F.3d 421, 430 (6th Cir. 2020) (quoting Fed. R. Civ. P. 56(a)). The Court must "view the evidence in the light most favorable to the nonmovant." *Id.* "[S]ummary judgment is improper if the non-movant is given an insufficient opportunity for discovery." *White's Landing Fisheries, Inc. v. Buchholzer*, 29 F.3d 229, 231–32 (6th Cir. 1994).

**ARGUMENT**

**I.    Ohio-Law Immunities Do Not Apply To Section 1983 Federal Civil Rights Suits.**

William brought *federal* claims in *federal* court for *federal* constitutional violations under a *federal* statute (42 U.S.C. § 1983), but the bulk of Defendants' motion is dedicated to *Ohio* tort immunities under Ohio Revised Code Chapter 2744. *See* Mot. 4–6, 7, 8–9, 12–13. By that statute's own terms, those immunities do not apply to "[c]ivil claims based upon alleged violations of the constitution . . . of the United States." Ohio Rev. Code Ann. § 2744.09(E); *see also, e.g.*, *Two Bridges, LLC v. City of Youngstown*, No. 4:20CV2759, 2022 WL 1487607, at *8 (N.D. Ohio May 10, 2022) ("[T]he immunities found within R.C. Chapter 2744 do not apply to Section 1983 actions.") (collecting cases).

There is a good reason Ohio law does not purport to limit Section 1983 claims: "The elements of, and the defenses to, a federal cause of action are defined by federal law," and violations of the federal constitution "cannot be immunized by state law." *Howlett ex rel. Howlett*

*v. Rose*, 496 U.S. 356, 375–76 (1990) (internal quotation marks omitted). Thus, any "state law that immunizes government conduct otherwise subject to suit under § 1983 [would be] preempted." *Felder v. Casey*, 487 U.S. 131, 139 (1988).

## II. Defendants Are Not Entitled To Qualified Immunity.

### A. Skeletal Mentions Of Qualified Immunity Do Not Properly Raise the Defense.

Defendants assert that "the police officers have qualified immunity,"[2] Mot. 1, and in short, scattered passages they cite cases about the general rule of qualified immunity, or irrelevant cases about excessive force or the right to record police, *see* Mot. 8, 13–14. But Defendants make no effort to explain how qualified immunity would apply to the complaint's actual claims.

By failing to "address qualified immunity with respect to" the specific facts of William's case "or whether the right[s]" William is asserting "w[ere] clearly established law," Defendants have not properly invoked qualified immunity. *Lipman v. Budish*, 974 F.3d 726, 749 (6th Cir. 2020). They "may not present a skeletal argument, leaving the court to put flesh on its bones." *McGrew v. Duncan*, 937 F.3d 664, 669 (6th Cir. 2019) (internal quotation marks omitted). Rather than "leaving the court to do counsel's work," "a litigant has an obligation to spell out its arguments squarely and distinctly." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (internal quotation marks omitted).[3]

---

[2] Thus, only a subset of Defendants is even raising qualified immunity. The City itself categorically cannot assert the immunity because "a municipality is not entitled to qualified immunity." *Pollard v. City of Columbus*, 780 F.3d 395, 401 (6th Cir. 2015).

[3] *See also, e.g.*, *Watkins v. Healy*, 986 F.3d 648, 666–67 (6th Cir. 2021) ("[C]it[ing] boilerplate law related to the doctrine of qualified immunity" "fail[s] properly to assert qualified immunity." (internal quotation marks and emphasis omitted)); *Murphy v. Lockhart*, 826 F. Supp. 2d 1016, 1036–37 (E.D. Mich. 2011) ("[D]efendants' qualified immunity argument is found in a single paragraph at the end of their brief. They never developed the arguments, and the Court will not do so for them.").

Nowhere in the motion do Defendants even mention First Amendment retaliation or the Equal Protection Clause, and they cite no cases that address them. Even as to the Fourth Amendment, Defendants do not explain what application the cases they cite have to William's unreasonable-seizure claim, and William is at a loss to find the connection. There is simply no way for William to know from the motion why Defendants think that the serious constitutional violations pled in the Complaint are subject to qualified immunity.

Moreover, qualified immunity is especially unwarranted here because this case is at the pleading stage, and "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Hart v. Hillsdale County*, 973 F.3d 627, 635 (6th Cir. 2020) (quoting *Wesley*, 779 F.3d at 433). That is "because development of the factual record is frequently necessary to decide whether the official's actions violated clearly established law." *Id.*

## B. The Complaint Alleges Violations Of Clearly Established Constitutional Rights, So Qualified Immunity Is Not Available To The Individual Defendants.

Even if Defendants had properly asserted qualified immunity, the complaint would survive. That immunity does not apply where an "official's conduct (1) violated a constitutional right that (2) was clearly established." *Hart*, 973 F.3d at 635. William alleged violations of clearly established rights, as the following subsections show for each violation alleged in the complaint.

### 1. The complaint alleges Defendants violated clearly established prohibitions on First Amendment retaliation.

It has been "settled" law—i.e., clearly established—for at least half a century that "the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citing *Crawford-El v. Britton*, 523 U.S. 574, 592 (1998), and *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)); *see also Zilich v. Longo*, 34 F.3d 359, 365 (6th Cir. 1994) ("The law is well settled in this Circuit that retaliation under color of law for the exercise of First Amendment rights is unconstitutional."). The elements

of a First Amendment retaliation claim are also clearly established: A plaintiff must show that (1) he "engaged in protected conduct"; (2) "an adverse action was taken against" him "that would deter a person of ordinary firmness from continuing to engage in that conduct"; and (3) "the adverse action was motivated at least in part by" his "protected conduct." *Hartman v. Thompson*, 931 F.3d 471, 484 (6th Cir. 2019) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)). The complaint amply alleges facts to establish each of those elements.

*First*, the complaint details "protected conduct"—namely, William's political speech on behalf of a challenger to the incumbent mayor. *See* Compl. ¶¶ 3, 54–59, 89–92, 193, 220; *supra* pp. 1–2. McCollough also indicated William was being punished for his "complaints about the police department." Compl. ¶ 157. These types of speech are not just protected, they are "core political speech, for which the 'importance of First Amendment protections is "at its zenith."' " *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 316 (6th Cir. 1998) (quoting *Meyer v. Grant*, 486 U.S. 414, 425 (1988)); *see also Rudd v. City of Norton Shores*, 977 F.3d 503, 513 (6th Cir. 2020) ("The freedom of speech . . . protects the right of an ordinary citizen to criticize public officials.").[4]

*Second*, the complaint recounts numerous adverse actions taken against William, each of which would "deter a person of ordinary firmness" from exercising his First Amendment rights. *Thaddeus-X*, 175 F.3d at 394. Most importantly, William received citations, hundreds of dollars in fines, and police threats; Compl. ¶¶ 68, 76, 95–101, 115, 126–130, 138–139, 165, 172, 178, 195; his van was towed and severely damaged, *id.* ¶¶ 112–25, 134–37, 140–43, 171, 173–77; and then he was threatened with future retaliation, *id.* ¶¶ 156–58, 163, 166, 180, 214. *See also supra*

---

[4] Defendant McCollough also made it clear William was targeted for his "public records requests," Compl. ¶ 157, which are protected by the First Amendment, too. *See Rudd*, 977 F.3d at 513–14.

pp. 2–4. These actions easily meet the deterring-a-person-of-ordinary-firmness standard, which is "intended to weed out only inconsequential actions." *Holzemer v. City of Memphis*, 621 F.3d 512, 524 (6th Cir. 2010) (internal quotation marks omitted).[5] Indeed, William's speech *was* stopped because his van was rendered inoperable, and his speech remains chilled by fear of future retaliation. *See* Compl. ¶¶ 171, 173–77, 179–80, 206, 216. If officials are permitted to issue citations and fines or to impound vehicles in retaliation for political speech, the First Amendment would be rendered meaningless.

*Third*, and finally, the complaint alleges ample facts to show that the adverse actions were "motivated at least in part" by protected political speech. *Thaddeus-X*, 175 F.3d at 394. Most glaring, Defendant McCollough *told* William and his attorney that the City's actions were because of his First Amendment activity and threatened further retaliation if William did not "stand down." Compl. ¶¶ 195, 209, 214; *see supra* p. 4. The surrounding circumstances also made Defendants' motivations clear: They targeted the sound truck that was being used to campaign against the incumbent mayor, Compl. ¶¶ 112–25, 127, 195, 217; used a parking ordinance that had never been enforced against *anybody*, including against William's own van or his neighbor's, *id.* ¶¶ 62–66, 69–73, 108–10, 123–25, 211; and used a noise ordinance that they had not enforced against similar activity even though he had a sound permit, *id.* ¶¶ 101, 212. *See also supra* p. 5.[6]

---

[5] These actions are at least as severe as others the Sixth Circuit has held satisfy the standard. *See, e.g.*, *Maben v. Thelen*, 887 F.3d 252, 267 (6th Cir. 2018) (issuing prisoner "minor misconduct ticket"); *Holzemer*, 621 F.3d at 524 ("delay tactics and hostility" in issuing permit); *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 399 (6th Cir. 2010) ("instigat[ing]" "police investigation").

[6] At minimum, the complaint raises material fact questions unsuitable for resolution on the pleadings. For instance, if a plaintiff "raises an inference that [Defendants'] conduct was motivated in part by plaintiff's protected activity," then "the burden shifts" to Defendants to prove they "would have taken the same action in the absence of the protected activity." *Kennedy v. City of Villa Hills*, 635 F.3d 210, 218–19 (6th Cir. 2011) (internal quotation marks and alterations omitted). Whether an adverse action would deter a person of ordinary firmness is also a fact

### 2. The complaint alleges Defendants violated William's clearly established First Amendment right against prior restraint.

The complaint alleges that Defendants violated a First Amendment prohibition on prior restraint that has an even older pedigree than the retaliation claims. Over 70 years ago, the Supreme Court explained that "[t]he sound truck has become an accepted method of political campaigning" and that "the right to be heard" using a sound truck may not be placed within the "uncontrolled discretion of" a government official. *Saia v. New York*, 334 U.S. 558, 560–61 (1948). The Sixth Circuit has since explained that the "Supreme Court has repeatedly struck down ordinances which condition the exercise of First Amendment activities on the broad discretion of local officials, resulting in virtually unreviewable prior restraints on First Amendment rights." *Plain Dealer Publ'g Co. v. City of Lakewood*, 794 F.2d 1139, 1144 (6th Cir. 1986), *aff'd in relevant part*, 486 U.S. 750 (1988).

As the complaint explains, the Noise and Permit Ordinances (i.e., East Cleveland Code of Ordinances §§ 509.15 and 311.02) are together precisely the sort of regulation that violates these longstanding First Amendment principles. The Noise Ordinance reaches essentially any "audio system," and the Permit Ordinance includes impermissibly discretionary grounds to deny a permit. Compl. ¶¶ 235–37, 239, 241, 245–46. Most egregiously, it allows officials to deny a permit if they believe it would "interfere with the public convenience." East Cleveland Code of Ordinances § 311.02(g)(1). This is essentially the same as the ordinance from nearby Lakewood that the Supreme Court held unconstitutional because it allowed the mayor to deny a permit simply by "mak[ing] the statement 'it is not in the public interest.'" *City of Lakewood*, 486 U.S. at 769. Defendants' particularly abusive enforcement here illustrates the problem: William received a

---

question, *Holzemer*, 621 F.3d at 524, and here Defendants actually blocked speech by physically disabling the means of communication (i.e., the sound truck).

permit from the police chief, and only after issuing a citation did Defendants retroactively change their usual practice to assert that the permit was invalid because William *also* needed the mayor's signature—the very official against whom he was campaigning. Compl. ¶¶ 84–88, 240–45.

### 3. The complaint alleges Defendants violated William's clearly established equal protection right against selective enforcement.

The complaint also makes claims under the Equal Protection Clause's prohibition against "[s]electivity in the enforcement" of laws based on "arbitrary classification." *Wayte v. United States*, 470 U.S. 598, 608 (1985). One clearly established way to show a violation is that "the challenged government action was motivated by animus or ill-will." *Johnson v. Morales*, 946 F.3d 911, 939 (6th Cir. 2020) (quoting *Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005)).

The complaint explains in detail how the parking and noise ordinances were arbitrarily enforced against William in a way they are never otherwise enforced, without any rational justification. Compl. ¶¶ 208–15; 249–55; *see supra* pp. 2–5. It also alleges overwhelming evidence of animus and ill-will. Defendant McCollough expressly stated the City's animus, and the disproportionate force deployed by the police against William over the course of months reveals animus, too. *E.g.*, Compl. ¶¶ 112–14, 155–56, 195, 214. Defendants' own motion—authored by Defendant Hemmons—shows yet more animus, as its factual summary begins with *ad hominem* attacks on William for having an "elevated sense of importance," betraying a "grandiose misperception of events," and "devolv[ing] into outright unreasonableness." Mot. 2.

### 4. The complaint alleges Defendants violated William's clearly established Fourth Amendment right against unreasonable seizure.

#### a. *Seizing the van was unreasonable under clearly established law.*

The complaint alleges that Defendants violated William's Fourth Amendment right against "unreasonable . . . seizures" when they towed his step van even though it was not causing any traffic problems. Compl. ¶¶ 111, 117–20, 257–61. No legitimate purpose was served by

impounding the truck, when Defendants could simply have issued a citation and had William drive the truck away. *Id.* ¶¶ 119, 264. Defendants also unreasonably seized the expensive sound equipment in the van without a legitimate reason to prevent William removing it. *Id.* ¶¶ 120, 262.

It has long been clearly established that officers may impound a vehicle only for a legitimate purpose, such as to "permit the uninterrupted flow of traffic" or to remove vehicles that "jeopardize . . . public safety." *South Dakota v. Opperman*, 428 U.S. 364, 368–69 (1976) (internal quotation marks omitted). A recent Sixth Circuit panel explained: "*When there is no one else readily available to accept possession*, the police have the discretionary authority 'to impound the vehicle *in the absence of any licensed driver to attend to it*.' " *Shandor v. City of Eastpointe*, No. 20-1385, 2021 WL 4775190, at *2 (6th Cir. Oct. 13, 2021) (quoting *United States v. Harvey*, 16 F.3d 109, 112 (6th Cir. 1994)) (emphases added).[7] The seizure here failed to satisfy that rule's conditions because multiple drivers *were* available to attend to the van. *See* Compl. ¶¶ 119, 264.

The seizure was clearly unreasonable for an independent reason, too. Even if there had been some legitimate public-safety basis to impound the van—which there was not—the Fourth

---

[7] This reflects decades of cases where the Sixth Circuit distinguished reasonable impounds from the circumstances present here. *See, e.g.*, *Collins v. Nagle*, 892 F.2d 489, 494 (6th Cir. 1989) (reasonable where "no other person immediately available to take custody of the vehicle"); *Harvey*, 16 F.3d at 112 (reasonable in "absence of any licensed driver to attend to" the vehicle); *United States v. Jackson*, 682 F.3d 448, 455 (6th Cir. 2012) (reasonable where it was "not an option to allow [the available drivers] to drive the vehicle from the scene").

The Sixth Circuit rule is consistent with case law nationwide. For instance, the leading Fourth Amendment treatise explains: "When the police find a vehicle to be illegally parked under circumstances *where the continued presence of the vehicle at that place will impede traffic or constitute some other hazard*, then impoundment of that vehicle is lawful, *assuming of course the operator of the vehicle is not present to take charge of the vehicle*." Wayne R. LaFave, 3 *Search and Seizure* § 7.3(d) (6th ed. 2021) (emphases added) (collecting cases nationwide); *see also, e.g.*, *Miranda v. City of Cornelius*, 429 F.3d 858, 866 (9th Cir. 2005) ("An officer cannot reasonably order an impoundment in situations where the location of the vehicle does not create any need for the police to protect the vehicle or to avoid a hazard to other drivers." (citing *United States v. Squires*, 456 F.2d 967, 970 (2d Cir. 1972))).

Amendment nevertheless requires that "[d]iscretion as to impoundment" be " 'exercised according to standard criteria.' " *United States v. Kimes*, 246 F.3d 800, 805 (6th Cir. 2001) (quoting *Colorado v. Bertine*, 479 U.S. 367, 375–76 (1987)). The officials here were plainly *not* acting according to "standard criteria," as vehicles that supposedly violate the parking ordinance are routinely left parked around the City. *See supra* p. 5. If nothing else, it would be premature to dismiss this case when there is at least a serious fact question about what Defendants' "standard criteria" were.

> b.     *Defendants' counterarguments are all invalid.*

The Fourth Amendment count is the only one on which Defendants engage at all on the merits, but their cursory treatment is unpersuasive.

Defendants cite several Fourth Amendment cases where courts granted qualified immunity, but they are all *excessive force* cases with nothing to say about seizing or impounding vehicles. *See* Mot. 13–14. They have no relevance to this case, and Defendants do not even attempt to explain how their facts or holdings would undermine William's unreasonable-seizure claims.[8]

Defendants also obliquely try to justify the seizure as reasonable. In a single sentence, they say that "officers . . . tried to either get Plaintiff to get a permit or get him to cease" his political broadcasting. Mot. 8. Setting aside that Defendants were not neutrally enforcing the Noise Ordinance and that William had a permit, *see, e.g.*, Compl. ¶¶ 84–89, 212, this theory has another problem: The van was towed based on the *parking* ordinance, not the noise ordinance, *id.* ¶¶ 115–16. In fact, the first attempt to tow the van was before any official raised noise issues and before William used the van as a sound truck to campaign for Gowdy. *See id.* ¶¶ 76–78, 85–89, 95–98.

---

[8] A paragraph that appears to come from another brief—because it references a person who is not a party to this case—cites *Thompson v. Clark*, 142 S. Ct. 1332 (2022). *See* Mot. 13. That case is about the elements of a Fourth Amendment *malicious prosecution* claim, but it has no relevance to William's *unreasonable seizure* claims, and Defendants provide no explanation of any link.

Even if the basis for towing the van was that William's sound permit was invalid because it had only the police chief's signature and not the mayor's—and that was not the real basis, *see* Compl. ¶¶ 84, 212—the seizure was unreasonable. William had demonstrated he was willing to get a permit, and Defendants could simply have informed him that he needed the mayor's signature without towing the van. Moreover, the complaint's allegations reveal Defendants were not following any "standard criteria" in impounding William's van, *Kimes*, 246 F.3d at 805 (internal quotation marks omitted), as the police did not impound it when William was actively broadcasting and never suggested there was a problem with his broadcasting in prior campaigns that were not on behalf of candidates running against Mayor King. Compl. ¶¶ 50–52, 84, 93, 101, 212, 250.

**III.    Defendants Hemmons and McCollough Are Not Entitled To Absolute Immunity.**

Defendants' invocation of absolute immunity is even more perfunctory, limited to the assertion that "[t]he prosecutors have absolute immunity" and a string-cite of largely out-of-circuit cases without any effort to apply them to this case. *See* Mot. 1. This skeletal argument yet again fails to properly raise the issue, especially because "the official seeking absolute immunity bears the burden of showing that such immunity is justified." *Burns v. Reed*, 500 U.S. 478, 486 (1991); *accord Stockdale v. Helper*, 979 F.3d 498, 502 (6th Cir. 2020) ("Because we grant absolute immunity only 'sparingly,' officials seeking its ironclad protection 'bear the burden' of showing that" it applies. (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)) (brackets omitted)).

Even had defendants made an actual argument, the facts in the complaint make clear that neither Hemmons nor McCollough—the only Defendants who could even assert the immunity— was acting within the scope of prosecutorial immunity. Such "[a]bsolute immunity applies" only "to functions intimately associated with the judicial phase of the criminal process,"—that is, actions that are "those of an advocate." *Stockdale*, 979 F.3d at 502 (internal quotation marks omitted). It does not apply to "functions which are more 'investigative' or 'administrative' in

16

nature." *Koubriti v. Convertino*, 593 F.3d 459, 467 (6th Cir. 2010) (quoting *Burns*, 500 U.S. at 486). The allegations against Hemmons and McCollough do not concern their roles as advocates in court—and thus fall outside the bounds of prosecutorial immunity—for at least two reasons.

*First*, those Defendants' constitutionally offensive conduct had nothing to do with judicial process. McCollough threatened William with the use of municipal power if he did not "stand down" from exercising his First Amendment rights, both on the phone with his attorney and in a courtroom where no judge ever appeared, including *after* William's noise complaint had been resolved. Compl. ¶¶ 154–66. Her superior, Hemmons, approved or ratified such unconstitutional threats. *Id.* ¶¶ 190, 226–27. That had nothing to do with advocacy in a judicial process.

The complaint also alleges that the City's law department—and its director Hemmons in particular—directed or ratified the retaliatory scheme against William, wholly disconnected from judicial process. Specifically, Hemmons and the law department "directed, approved, or ratified" the enforcement of the noise and parking ordinances against William, *id.* ¶ 191, directed the police officers' retaliation against William, *id.* ¶ 199, and approved or willfully refrained from stopping the police's retaliation, *id.* ¶ 202. And given that East Cleveland has a "small circle" of government officials, *see id.* ¶ 24, it is a reasonable inference given the expansive, city-government-wide retaliatory scheme against William that more evidence will emerge in discovery to show the law department's administrative role in directing or advising the police department's retaliation.

*Second*, and independently, courts reject prosecutorial immunity where a prosecutor " 'couple[s] a threat of prosecution with . . . demands' " beyond her authority. *Rouse v. Stacy*, 478 F. App'x 945, 952 (6th Cir. 2012) (quoting *Doe v. Phillips*, 81 F.3d 1204, 1210 (2d Cir. 1996)). Thus, in *Rouse*, the Sixth Circuit held that a prosecutor lacked absolute immunity for ordering an assault on a prisoner to coerce a plea bargain because that was plainly outside any "legitimate

prosecutorial 'jurisdiction.' " *Id.* at 952–53. In *Phillips*, the Second Circuit denied a prosecutor absolute immunity for compelling a defendant to make on oath on the Bible because, given the First Amendment, the prosecutor could have "no authority to require" a religious profession. 81 F.3d at 1210. McCollough's threats—and Hemmons' approval or ratification of them—are just like those cases. She had no legitimate authority, given the First Amendment, to demand that William abandon his core political speech. She was thus necessarily acting outside any "legitimate prosecutorial authority" in demanding that he do so and in threatening him if he did not.

## IV. The Complaint States Claims For *Monell* Liability Against The City Of East Cleveland Because It Alleges Unconstitutional Policies or Customs.

Defendants suggest that "Plaintiff's *Monell* claims likewise fail." Mot. 6. That is incorrect, and not just because Defendants' arguments are so threadbare as to be ignored.

A *Monell* claim survives dismissal if a plaintiff alleges violations of federal rights under color of state law and that "a municipality's policy or custom caused that violation to happen." *Ayers v. Ohio*, No. 18-cv-2890, 2019 WL 4812957, at *9 (N.D. Ohio Oct. 1, 2019) (citing *Bright v. Gallia County*, 753 F.3d 639, 660 (6th Cir. 2014)). The policy or custom can take several forms, including an official illegal policy, ratification of illegal actions by an official with final decision-making authority, or a custom of tolerating violations. *See Lipman*, 974 F.3d at 747. "[W]hich theory [a plaintiff] ultimately pursues . . . may largely depend on discovery." *Osberry v. Slusher*, 750 F. App'x 385, 398 (6th Cir. 2018). At the motion-to-dismiss stage, it is enough for a plaintiff to "allege[] in detail the constitutional violations committed by City employees" and "clearly state[] in the[] Complaint that these violations were caused by" the city's policies or customs. *Rolen v. City of Cleveland*, 12-cv-1914, 2013 WL 12145960, at *4 (N.D. Ohio Aug. 7, 2013).

William's complaint does so. As explained at length above, it alleges constitutional violations, *see supra* pp. 6, 9–15, and it also alleges that these were the result of all three types of

municipal policy. *First*, an official policy: William alleged that "East Cleveland adopted and enforced an official policy or custom to retaliate against William for his First Amendment-protected activities" that was "deliberate, executed over the course of several months, and pervasive throughout the police department and law department." Compl. ¶¶ 219, 221; *see also id.* ¶¶ 255 (Fourteenth Amendment), 265 (Fourth Amendment). And the prior-restraint claim is based on unconstitutional ordinances on the City's books. *See id.* ¶¶ 233–234. *Second*, ratification: William alleged that the decisions to selectively enforce municipal ordinances against William and tow his truck were directed or ratified by Mayor King, Chief of Police Gardner, and Law Director Hemmons—all City policymakers. *See, e.g.*, *id.* ¶¶ 6, 105, 150–51, 187, 190, 191, 199–202, 222–29, 255, 266–68. And *third*, toleration: William alleged a pattern or practice of retaliatory conduct against him in the form of repeated police retaliation that was tolerated by City policymakers. *See, e.g.*, *id.* ¶¶ 3–4, 67–73, 74–78, 95–101, 106–43, 210, 264.[9]

## V. Defendants Do Not Make Arguments To Dismiss The Claims For Prospective Relief.

In addition to money damages, William sought prospective relief: injunctions against future enforcement of the City's unconstitutional noise ordinance and against further retaliatory or selective enforcement, as well as declarations that Defendants acted unconstitutionally. *See* Compl. at 49 (Request for Relief ¶¶ C–G). Defendants raise no arguments to dismiss these claims. To the extent Defendants raised any federal immunity defenses, they are only against money damages. *See, e.g.*, *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 417 (6th

---

[9] Defendants argue "[t]here is no evidence that there is any [police] practice or pattern . . . that forced Plaintiff to plead guilty to a misdemeanor and pay a fine." Mot. 6. Apart from misapprehending the constitutional claims, this "argument[] based on an evaluation of evidence [is] premature at [the motion-to-dismiss] stage." *Garceau v. City of Flint*, 12-cv-15513, 2013 WL 5954493, at *10 n.8 (E.D. Mich. Nov. 7, 2013); *see also Rolen v. City of Cleveland*, 12-cv-1914, 2013 WL 12145960, at *4 (N.D. Ohio Aug. 7, 2013) ("More often than not, [information concerning a policy or custom] will be very difficult for a plaintiff to find without discovery.").

Cir. 2019) (qualified immunity not available for injunctive or declaratory relief); *Collyer v. Darling*, 98 F.3d 211, 222 (6th Cir. 1996) (same for prosecutorial immunity). And Defendants' cursory *Monell* defense can—at most—resolve some claims against the City, not against any of the individual defendants.

## VI.     Summary Judgment Is Inappropriate And Premature.

Defendants' halfhearted attempt to make their motion to dismiss double as a motion for summary judgment fails, too.

*First,* it is procedurally improper. "[B]efore a district court tests a party's evidence, the party should have the opportunity to develop and discover evidence." *Moore v. Shelby County*, 718 F. App'x 315, 320 (6th Cir. 2017). Accordingly, a "plaintiff must receive 'a full opportunity to conduct discovery' to be able to successfully defeat a motion for summary judgment." *Ball v. Union Carbide Corp.*, 385 F.3d 713, 719 (6th Cir. 2004). Concurrently with this response, William is filing a motion and declaration under Rule 56(d), which fully explain why discovery would be necessary to oppose a proper summary judgment motion.

*Second,* the summary judgment request is substantively deficient because Defendants have not actually made an argument for it. That section of their motion consists mostly of irrelevant, pages-long recitations of Ohio-law summary judgment standards. *See* Mot. 9–12. The only 'argument' is a conclusory sentence that "Plaintiff has failed to respond with evidence demonstrating the existence of any genuine issue of material fact." *Id.* at 12. But it is the *moving* party that has the burden to show summary judgment is appropriate, and Defendants do not say at all why summary judgment is appropriate here or why the scant evidence they attached to their motion disproves William's allegations. There is just no argument to respond to.

## CONCLUSION

For the foregoing reasons, Defendants' motion should be denied in its entirety.

August 5, 2022

Respectfully submitted,

/s/ *Benjamin A. Field*
Benjamin A. Field*
Caroline Grace Brothers*
Brian A. Morris (Bar No. 0093530)
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Phone:      (703) 682-9320
Facsimile:  (703) 682-9321
bfield@ij.org
cgbrothers@ij.org
bmorris@ij.org

Jeffrey Rowes*
INSTITUTE FOR JUSTICE
816 Congress Ave., Suite 960
Austin, TX 78701
Phone:      (512) 480-5936
Facsimile:  (512) 480-5937
jrowes@ij.org

*Counsel for Plaintiff*

*Admitted pro hac vice.*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Plaintiff's Memorandum in Opposition to Defendants' Motion To Dismiss Or In the Alternative, Motion for Summary Judgment complies with Local Rule 7.1(f) because the memorandum does not exceed 20 pages and it relates to a dispositive motion in a case that has not yet been assigned to a track.

/s/ *Benjamin A. Field*
Benjamin A. Field

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of August, 2022, a true and correct copy of the foregoing Plaintiff's Memorandum in Opposition to Defendants' Motion To Dismiss Or In the Alternative, Motion for Summary Judgment was filed via the ECF system and that all Defendants were thereby electronically served via the ECF system.

/s/ *Benjamin A. Field*
Benjamin A. Field

*Counsel for Plaintiff*