UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM FAMBROUGH, *et al.*, | ) | |
| | ) | CASE NO.  1:22-cv-00992 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| | ) | |
| CITY OF EAST CLEVELAND, *et al*., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

Plaintiffs brought this action against the city of East Cleveland (the "City") and a number

of its public employees under 42 U.S.C. § 1983, alleging various constitutional deprivations.

(*See* Doc. Nos. 1 & 44.)  All Defendants except for former police chief Scott Gardner filed a

motion to dismiss the First Amended Complaint under Rule 12(b)(6) or, in the alternative, for

summary judgment under Rule 56.  (Doc. No. 47.)  The moving individuals are referred to as the

"Individual Defendants."  Plaintiffs opposed the motion.  (Doc. No. 57.)  For the following

reasons, the motion to dismiss is GRANTED in part and DENIED in part.

## I.     Facts Alleged in the Amended Complaint

Plaintiff William Fambrough ("Fambrough") lives in East Cleveland and alleges that he

parked a step van at his home without question or incident for approximately fifteen years.  (Doc.

No. 44 at 714, ¶¶ 1-2.)[1]  Plaintiff Legacy Communications, LLC ("Legacy") is a media company

established in 2010.  (*Id.* at 716, ¶ 12.)  Fambrough runs the company and owns it with his wife.

(*Id.*)  Legacy is the registered owner of the step van.  (*Id.* at 721, ¶ 53.)

---

[1] For ease and consistency, record citations are to the electronically stamped CM/ECF document
and PageID# rather than any internal pagination.

Fambrough used the step van to carry Legacy's equipment. (*Id.* at 721, ¶ 52.) Occasionally, Fambrough would outfit the step van with a loudspeaker and use it as a sound truck. (*Id.* at 721, ¶ 55.) He would drive through the streets of East Cleveland with a political sign on the side of the van broadcasting pre-recorded messages in support of a campaign. (*Id.*) Several times in years past, he operated the sound truck in East Cleveland to broadcast pre-recorded messages in support of political candidates. (*Id.* at 721, ¶¶ 56-57.) But in 2021, when he used the van to campaign for the incumbent mayor's challenger, Fambrough claims that Defendants retaliated. (*Id.* at 714-15, ¶¶ 3-4.)

On May 14, 2021, Officer Mark Allen came to Fambrough's home and told him that parking a step van in his driveway violated East Cleveland Ordinance § 351.11 (the "Parking Ordinance"). (*Id.* at 724, ¶ 73.) The Parking Ordinance prohibited "park[ing] a truck, commercial tractor, trailer, semi-trailer, a motor home or recreational vehicle on a roadway or driveway at any time in front of or alongside property used for residential purposes except in case of a breakdown of such vehicle, or for loading and unloading purposes." (*Id.* at 724, ¶ 74.)

Officer Allen issued a warning ticket and gave Fambrough three days to comply. (*Id.* at 724, ¶ 73.) On May 17, 2021, Officer Allen returned to find the step van still in Fambrough's driveway and ordered that it be towed. (*Id.* at 724-25, ¶¶ 80-82.) However, the tow truck was not equipped for a vehicle the size of the step van. (*Id.* at 725, ¶ 82.) So, Fambrough drove the van away and parked it outside East Cleveland. (*Id.* at 725, ¶¶ 83-84.)

On June 28, 2021, Fambrough went to city hall to obtain a permit to operate a sound truck in East Cleveland. (*Id.* at 726, ¶ 91.) He intended to broadcast messages supporting Councilwoman Juanita Gowdy, who would challenge Mayor Brandon King in the Fall 2021 election. (*Id.* at 722, 726, ¶¶ 59-65, 91.)

East Cleveland Ordinance § 509.15(a) (the "Noise Ordinance") prohibited "play[ing] any radio, music player . . . audio system . . . or any other type of sound service upon any public road, street, highway or private property in this municipality in a manner or volume as to disturb the quiet, comfort or repose of other persons."  (*Id.* at 725, ¶ 85.)  The Noise Ordinance contained an exception for "organized events which have received a valid permit from the city as set forth in § 311.02 . . . ."  (*Id.* at 725, ¶ 86 (quoting E. Cle. Ord. § 509.15(a)).)

East Cleveland Ordinance § 311.02 (the "Permit Ordinance") prohibited "parad[ing] or hold[ing] a procession, or attempt[ing] to parade or hold a procession, in or upon any of the streets, park or public grounds of the city without first obtaining a permit therefor."  (*Id.* at 725, ¶ 87 (quoting East Cleveland Ordinance § 311.02(a)).)  "Under Section 311.02(c), a permit 'shall be issued only upon and after the approval by the Chief of Police and the Mayor.'"  (*Id.* at 725, ¶ 88 (quoting East Cleveland Ordinance § 311.02(c)).)  "The permit form used by East Cleveland – styled a 'sound device permit' – has signature lines for both the Mayor and the Chief of Police."  (*Id.* at 725, ¶ 89.)

Fambrough received a permit form from an assistant in the mayor's office, who directed him to obtain the police chief's signature.  (*Id.* at 726, ¶ 92.)[2]  He took it to the police department, and the police chief signed it the same day.  (*Id.* at 726, ¶ 94.)  Upon receiving that one signature on the permit, Fambrough began using his step van as a sound truck once or twice each week to broadcast messages in support of the mayor's challenger in East Cleveland.  (*Id.* at 726, ¶¶ 95-96.)

On July 27, 2021, police officers visited Fambrough's home and asked if he had used a

---

[2] Fambrough "understood that to mean that the Mayor's approval was implied."  (Doc. No. 44 at 726, ¶ 92.)

sound truck recently.  (*Id.* at 727, ¶ 103.)  He confirmed that he had.  (*Id.* at 727, ¶ 104.)  The officers advised in response that the local ordinance required him to have a permit to do so.  (*Id.*)  Fambrough responded that he would comply with the law.  (*Id.* at 727, ¶ 105.)  No citation was issued.  (*See id.*)  Fambrough alleged that police had not asked him about a permit when he operated his sound truck before – neither in years past nor in the preceding weeks.  (*Id.* at 727-28, ¶ 107.)

"Worried that the police would continue hassling him or even prevent him from using his truck, [Fambrough] went to the Cuyahoga County Sheriff's Office on July 29, 2021, and filled out a citizen's complaint . . . against the police officers who had written him the warning parking ticket, threatened to tow his step van, and bothered him about the permit for using his step van to campaign . . . ."  (*Id.* at 728, ¶ 108.)  "In his statement, [Fambrough] explained that he had a permit to operate his step van as a sound truck signed by the chief of police."  (*Id.* at 728, ¶ 109.)

 A few weeks later, on August 18, 2021, the step van was parked in front of Fambrough's home.  (*Id.* at 731, ¶ 132.)  He planned to take it out as a sound truck at 5:30 p.m.  (*Id.* at 731, ¶ 131.)  Officer Kyle Wood arrived with other officers and issued Fambrough a citation for violating the Parking Ordinance.  (*Id.* at 732, ¶ 139.)  The step van was towed.  (*Id.* at 733, ¶ 145.)  Neither Fambrough nor someone else was permitted to drive it away voluntarily.  (*Id.* at 732-33, ¶¶ 140-44.)

Officer Andrew Majercik issued a complaint and summons citation for violation of the Noise Ordinance.  (*Id.* at 734, ¶ 150.)  Officer Majercik allegedly commented that this was coming from his "boss," Chief Gardner, and "from the brass."  (*Id.* at 734, ¶ 151.)  Officer Majercik told Fambrough there had been service calls about the sound truck.  (*Id.* at 735, ¶ 155.)  Soon after, Fambrough received a notice to appear in court for the noise citation, scheduled for

September 23, 2021.  (*Id.* at 738, ¶ 179.)

On September 2, 2021, Fambrough filed petitions for civil stalking protection orders against Mayor King and Police Chief Gardner.  (*Id.* at 737, ¶¶ 171-73.)  The next day, the court denied *ex parte* relief and set a hearing date for September 20, 2021.  (*Id.* at 737, ¶ 174.)  King, Gardner, and law director Willa Hemmons attended that hearing, where the magistrate judge denied the petitions.  (*Id.* at 737, ¶ 175.)

On September 14, 2021, Mayor King prevailed over Gowdy and other challengers in the election.  (*Id.* at 738, ¶ 178.)

 On September 21, 2021, two days before a scheduled court date on the Noise Ordinance complaint, Fambrough's attorney called McCollough to plea bargain.  (*Id.* at 738, ¶¶ 179-80.)  McCollough pointed out that Fambrough's permit lacked the requisite signatures.  (*Id.* at 738, ¶ 181.)  McCollough allegedly stated that although she would normally resolve a noise pollution citation, she "might" not for Fambrough, who needed to "stand down."  (*Id.* at 738, ¶ 182.)  McCollough allegedly mentioned Fambrough's political activity, as well as his complaints against and records requests to the city.  (*Id.* at 739, ¶¶ 183-84.)  The Amended Complaint then detailed what occurred at the September 23, 2021, hearing:

> When Assistant Law Director McCollough arrived at the hearing, she characterized the citation [Fambrough] received as "just a noise" violation.  McCollough also told [Fambrough] and his attorney that she could not guarantee that [Fambrough] would be treated in the future as leniently as he was being treated that day if he continued to cause problems "downtown."

> [Fambrough] ultimately agreed to a plea of no contest to a reduced charge of disorderly conduct.  After [Fambrough] signed the plea form, the bailiff took it back to the judge to sign in chambers.  The judge assessed a fine of $5.00, plus court costs of $94.00.  [Fambrough] paid the fine a few days later.

> As [Fambrough] and his attorney were leaving the court room, McCollough called after them and said that [Fambrough] needed to watch himself and mind his own business going forward.

(*Id.* at 739-40, ¶¶ 188-92.)

In the Amended Complaint, Plaintiffs added facts regarding the mayor's chief of staff, Defendant Smedley.  (*See* Doc. No. 44.)  Plaintiffs alleged that Smedley directly spoke to and pressured the police chief to take enforcement action against Plaintiffs.  (*Id.* at 731, ¶ 128.)

II.  <u>Law and Analysis</u>

A.  **Standard of Review**

When addressing a motion to dismiss brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true.  *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 914 (6th Cir. 2017) (setting forth the standard of review for a motion to dismiss); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The sufficiency of the complaint is tested against the notice pleading requirement that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).  Although this standard is a liberal one, a complaint must still provide the defendant with "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"To survive a motion to dismiss, the pleading must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. (citing *Twombly*, 550 U.S. at 556).  Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.'"  *Id*.  "To state a valid claim, a complaint must contain direct or inferential allegations respecting all the material elements under some viable legal theory."  *Commercial*

*Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007).

A court must draw all reasonable inferences in a plaintiff's favor. *Ryan v. Blackwell*, 979 F.3d 519, 524 (6th Cir. 2020); *see also Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999) (a court "need not accept as true legal conclusions or unwarranted factual inferences"). "The plausibility of an inference depends on a host of considerations, including common sense . . . .'" *Ryan*, 979 F.3d at 524 (quoting *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013)). The Court need not accept as true "complaint allegations that are contradicted by public records and other evidentiary materials of which the Court may take judicial notice." *Lawson v. Lynch*, No. 4:15-cv-2140, 2017 WL 979115, at *3 (N.D. Ohio Mar. 14, 2017).

If a plaintiff pleads facts that prove a flaw in the claim or substantiate a defense, he may plead himself out of federal court. *See Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012); *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010); *O'Gorman v. City of Chicago*, 777 F.3d 885, 889 (7th Cir. 2015) ("A complainant can plead himself out of court by including factual allegations that establish that the plaintiff is not entitled to relief as a matter of law.").

The Supreme Court has affirmed dismissal under Rule 12 for state actors based on qualified immunity. *E.g.*, *Iqbal*, 556 U.S. at 680-82 (where plaintiff failed to plead unconstitutional actions); *Ashcroft v. al-Kidd*, 563 U.S. 731, 744 (2011) (where the law was not clearly established). Guided by such decisions, the Sixth Circuit explained the interplay between a qualified immunity defense and a Rule 12 motion:

> Although a defendant ordinarily bears the burden of proof for an affirmative defense, a plaintiff bears the burden of overcoming qualified immunity. Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery. [O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the

unlawfulness of their conduct was clearly established at the time. [A court] can address these requirements in either order. If one is lacking, [a court] need not address the other.

*Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021) (quotations and citations omitted).

Although some prior decisions indicated a preference against motions to dismiss in favor of summary judgment for qualified immunity, the Sixth Circuit explained in *Crawford* that "no such preference applies to the violation-of-a-constitutional-right prong. After all, asking whether there was a violation of a constitutional right resembles the Rule 12(b)(6) question – has the plaintiff pleaded facts that state a claim for relief in the complaint?" *Id.* at 764.

As to the second prong for evaluating qualified immunity, "the inquiry is nuanced. Dismissing for qualified immunity on this ground is sometimes difficult because the clearly established inquiry may turn on case-specific details that must be fleshed out in discovery." *Id.* at 765. However, "a complaint *distinguishable from . . . past cases on its face* will not often survive a motion to dismiss on qualified immunity grounds. This is especially true where granting relief to the plaintiff can only be done by recognizing a novel constitutional right." *Id.* at 766 (emphasis added). In sum, dismissal on qualified immunity grounds is proper when the "complaint establishes the defense." *Siefert v. Hamilton County*, 951 F.3d 753, 762 (6th Cir. 2020).

### B. Summary of Claims in the Complaint

Count One was brought against the Individual Defendants and alleges retaliation in violation of the First Amendment. (Doc. No. 44 at 746-54, ¶¶ 221-47.)

Count Two was brought against the city of East Cleveland and alleges an official policy or custom aimed at retaliation in violation of the First Amendment. (*Id.* at 754-57, ¶¶ 248-62.)

Count Three asserted that the Noise Ordinance and Permit Ordinance together constitute a prior restraint on speech that violates the First Amendment. (*Id.* at 757-61, ¶¶ 263-78.) Count

Three raised both a facial challenge to those ordinances as well as an as-applied challenge.  (*Id.* at 758, ¶ 264.)

Count Four asserted that Defendants selectively enforced the Noise and Parking Ordinances in violation of the Equal Protection Clause of the Fourteenth Amendment.  (*Id.* at 761, ¶¶ 279-86.)

Count Five asserted that towing the step van was an unreasonable seizure in violation of the Fourth and Fourteenth Amendments.  (*Id.* at 762, ¶¶ 287-301.)  Plaintiffs alleged that the tow was part of the retaliatory plan referenced in Counts One and Two.  (*Id.* at 764-65, ¶ 295.)

Counts Three, Four, and Five were brought against all Defendants.  (*Id.* at 757, 761-62.)[3]

## C.  Ohio Statutory Immunity

The moving Defendants argued that they are immune under Ohio Revised Code Chapter 2744.  (Doc. No. 47 at 785-87.)  On its face, Chapter 2744 does not grant immunity from liability under Section 1983.  "This chapter does not apply to, and shall not be construed to apply to . . . [c]ivil claims based upon alleged violations of the constitution or statutes of the United States . . . ."  Ohio Rev. Code § 2744.09(E); *see also Derrico v. Moore*, No. 1:17-cv-866, 2019 WL 1876960, at *16 (N.D. Ohio Apr. 25, 2019); *Summerville v. Forest Park*, 943 N.E.2d 522, 528 (Ohio 2010).

For these reasons, the motion to dismiss on the basis of Chapter 2744 of the Ohio Revised Code is denied.

## D.  Claims Against the City

The only immunity defenses for the City raised in the motion were those under Chapter 2744 of Ohio law.  (Doc. No. 47 at 785-86.)   That chapter does not provide immunity for a

---

[3] In a prior Order, the Court dismissed all claims against Willa Hemmons and Heather McCollough, two prosecuting attorneys in the city's law department.  (Doc. No. 56.)

Section 1983 claim, as discussed above.

Moreover, qualified immunity is "a defense available only to individual government officials sued in their personal capacity. 'As qualified immunity protects a public official in his individual capacity from civil damages, such immunity is unavailable to the public entity itself.'" *United Pet Supply, Inc. v. City of Chattanooga, Tenn.*, 768 F.3d 464, 484 (6th Cir. 2014) (quoting *Everson v. Leis*, 556 F.3d 484, 501 n. 7 (6th Cir. 2009)); *see also Hidden Vill., LLC v. City of Lakewood*, 734 F.3d 519, 523 (6th Cir. 2013) ("Lakewood is not eligible for qualified immunity because it is a city, not an individual."). "[I]f the legal requirements of municipal . . . civil rights liability are satisfied, qualified immunity will not automatically excuse a municipality . . . from constitutional liability, even where the municipal . . . actors were personally absolved by qualified immunity, if those agents in fact had invaded the plaintiff's constitutional rights." *Scott v. Clay Cnty., Tenn.*, 205 F.3d 867, 879 (6th Cir. 2000) (emphases omitted; footnote omitted). "Under the law of this circuit, a municipality may not escape liability for a § 1983 violation merely because the officer who committed the violation is entitled to qualified immunity." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 365 (6th Cir. 1993).

Accordingly, the motion to dismiss the claims against the City in Counts Two, Three, Four, and Five is denied. The claims were adequately pleaded and allege a *de facto* policy of retaliatory and discriminatory treatment targeting Plaintiffs because of their political expressive activity.

### E.  Qualified Immunity Doctrine

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 567 (6th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800,

818 (1982)) (brackets and internal quotations omitted); *see also Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "Qualified immunity protects state officers against section 1983 claims unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time of the offense. And the burden lies with the plaintiff to show each prong." *Novak v. City of Parma, Ohio*, 33 F.4th 296, 303 (6th Cir. 2022) (quotations and citations omitted), *cert. denied*, 143 S. Ct. 773 (2023).

> A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all. Decision of this purely legal question permits courts expeditiously to weed out suits which fail the test without requiring a defendant who rightly claims qualified immunity to engage in expensive and time consuming preparation to defend the suit on the merits.

*Siegert v. Gilley*, 500 U.S. 226, 232 (1991) (holding that a complaint was properly dismissed for lack of a constitutional violation); *see also Davidian v. O'Mara*, 210 F.3d 371 (6th Cir. 2000). A "substantive rejection of plaintiff's claim effectively disposes of the qualified immunity issue." *Zilich v. Longo*, 34 F.3d 359, 364 (6th Cir. 1994) (quotations omitted).

The Supreme Court and Sixth Circuit have held that local officials who enforce an ordinance as written are typically entitled to qualified immunity – unless the law was grossly unconstitutional on its face. "When public officials implement validly enacted state laws that no court has invalidated, their conduct typically satisfies the core [qualified immunity] inquiry – the objective reasonableness of an official's conduct – that the immunity doctrine was designed to test." *Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 441 (6th Cir. 2016) (quoting *Harlow*, 457 U.S. at 818). A local official who "acted in the face of legislative action (a duly enacted, presumptively constitutional law) and judicial inaction (the absence of an on-point decision making the law unconstitutional) . . . did not violate clearly established law or otherwise act unreasonably" by enforcing that law. *Id.* The Supreme Court wrote in 1979 an assessment that

applies here as well:

> [T]here was no controlling precedent that this ordinance was or was not constitutional, and hence the conduct observed violated a presumptively valid ordinance.  A prudent officer, in the course of determining whether respondent had committed an offense under all the circumstances shown by this record, should not have been required to anticipate that a court would later hold the ordinance unconstitutional.

> Police are charged to enforce laws until and unless they are declared unconstitutional.  The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality – with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws.  Society would be ill-served if its police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement.

*Michigan v. DeFillippo*, 443 U.S. 31, 37-38 (1979).  Citing *DeFillippo* and later decisions, the Sixth Circuit observed in 2016 that "the Supreme Court has *never* denied qualified immunity to a public official who enforced a properly enacted statute that no court had invalidated.  This indeed would seem to be the paradigmatic way of showing objectively reasonable conduct by a public official."  *Citizens in Charge*, 810 F.3d at 441 (emphasis in original).

Qualified immunity "gives government officials "breathing room to make reasonable but mistaken judgments," and "protects all but the plainly incompetent or those who knowingly violate the law."  *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (cleaned up) (quoting *Ashcroft*, 563 U.S. at 743).  Courts must evaluate "the facts and circumstance of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight."  *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007).

This case is suited for evaluating qualified immunity at the Rule 12 juncture because the Amended Complaint was pleaded in a detailed, thorough manner.

> When assessing qualified immunity at the pleading stage, a court must examine the complaint for facts plausibly making out a claim that the defendant's conduct violated a constitutional right that was clearly established law at the time, such that a reasonable officer would have known that his conduct violated that right.

> Plaintiff must allege facts – not legal conclusions couched as . . . factual allegations – that, when viewed in the light most favorable to plaintiff, make out a violation of a constitutional right so clearly established in a particularized sense that a reasonable officer confronted with the same situation would have known that his conduct violated that right.  The allegations must demonstrate that each defendant officer, through his or her own individual actions, personally violated plaintiff's rights under clearly established law.

*Rapp v. Putman*, 644 F. App'x 621, 627 (6th Cir. 2016) (brackets omitted; quotations omitted from *Johnson v. Moseley*, 790 F.3d 649, 652-53 (6th Cir. 2015)).  Taking as true the pleaded allegations, the Court examines whether the face of the Amended Complaint establishes a qualified immunity defense for the Individual Defendants.

### F.  Count One - Retaliation in Violation of the First Amendment

Count One alleged that the Individual Defendants retaliated against Plaintiffs based on Fambrough's political expression.  (Doc. No. 44 at 746, ¶¶ 222-23.)  They did so by policing, prosecuting, and punishing Plaintiffs under the city's Noise, Permit, and Parking Ordinances.  (*Id.* at 746-47, ¶ 224.)

> As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech.  If an official takes adverse action against someone based on that forbidden motive, and non-retaliatory grounds are in fact insufficient to provoke the adverse consequences, the injured person may generally seek relief by bringing a First Amendment claim.

*Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (citations and quotations omitted); *see also Novak v. City of Parma*, 932 F.3d 421, 427 (6th Cir. 2019).  "The law is well settled in this Circuit that retaliation under color of law for the exercise of First Amendment rights is unconstitutional . . . ." *Zilich v. Longo*, 34 F.3d 359, 365 (6th Cir. 1994); *see also Holzemer v. City of Memphis*, 621 F.3d 512, 527-28 (6th Cir. 2010).

> To prevail, [a plaintiff] must demonstrate . . . (1) that he engaged in constitutionally protected speech, (2) that he suffered an adverse action likely to chill a person of ordinary firmness from continuing to engage in protected speech, and (3) that the

protected speech was a substantial or motivating factor in the decision to take the adverse action.

*Wood v. Eubanks*, 25 F.4th 414, 428 (6th Cir. 2022) (quotation omitted).

"In a First Amendment retaliatory-prosecution claim . . . a plaintiff must also show that the prosecution lacked probable cause." *Rapp*, 644 F. App'x at 624 (6th Cir. 2016) (citing *Barnes v. Wright*, 449 F.3d 709, 720 (6th Cir. 2006)); *see also Wood*, 25 F.4th at 428 n. 4. So, if the adverse action alleged to be retaliatory resulted in a prosecution, then a plaintiff must plead and ultimately prove that the charge(s) lacked probable cause. *Barnes*, 449 F.3d at 719 ("'want of probable cause must be alleged and proven' by a plaintiff bringing a § 1983 . . . suit for retaliatory prosecution" (quoting *Hartman v. Moore*, 547 U.S. 250, 252 (2006)).[4] Even where a speaker engaged in protected expression, a First Amendment claim will fail as a matter of law – and a qualified immunity defense will prevail – if probable cause existed to support the prosecution. *See, e.g.*, *Novak v. City of Parma, Ohio*, 33 F.4th 296, 305 (6th Cir. 2022), *cert. denied,* 143 S. Ct. 773 (2023); *Bickerstaff v. Lucarelli*, 830 F.3d 388, 399 (6th Cir. 2016); *Smith v. Walters*, 849 F. App'x 551, 557 (6th Cir. 2021); *Davis v. Butler Cnty., Ohio*, 658 F. App'x 208, 215 (6th Cir. 2016); *cf. Enoch v. Hamilton Cnty. Sheriff's Off.*, 818 F. App'x 398, 405 (6th Cir. 2020).[5] Where probable cause existed to support law enforcement actions such as arrest or prosecution, as a matter of law, the defendant is entitled to qualified immunity on a First

---

[4] In *Hartman,* the Supreme Court detailed its reasoning for adopting the 'no probable cause' rule as a required element for retaliatory prosecution claims. 547 U.S. at 259-66. Although *Hartman* involved a *Bivens* action against a federal official, the Court explicitly adopted the same rule for Section 1983 claims as well. *See id.* Plaintiffs here acknowledged that the 'no probable cause' rule applies to First Amendment retaliatory prosecution claims under Section 1983. (Doc. No. 39 at 557 n.5.)

[5] Recently the Supreme Court adopted the 'no probable cause' rule as an element for First Amendment claims alleging retaliatory arrests by police. *Wood*, 25 F.4th at 428 n. 4 (citing *Nieves*, 139 S. Ct at 1724-25).

Amendment retaliation claim. *See Burton v. City of Detroit*, No. 22-1222, 2022 WL 17177323, at *4 (6th Cir. Nov. 23, 2022); *Hartman v. Thompson*, 931 F.3d 471, 484-85 (6th Cir. 2019).

### 1. Applicability of the 'No Probable Cause' Rule

Plaintiffs previously argued that *Hartman* and the probable cause rule do not apply here and that the claims should be evaluated under *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). (Doc. No. 39 at 557-60.) In opposition to the present motion to dismiss, Plaintiffs did not cite any case law showing an established right to be free from allegedly retaliatory law enforcement actions notwithstanding the presence of probable cause. (*See* Doc. 57 at 878-80.) Put simply, Plaintiffs maintain their position that they need not plead the absence of probable cause. (*See id.*) The Court disagrees.

The facts of *Mt. Healthy* are inapposite to those at issue here. In *Mt. Healthy*, an untenured teacher called a radio station and reported the substance of an internal faculty memo regarding proper dress and attire. 429 U.S. at 281-83. When he was not rehired, the teacher sued, alleging retaliation for his protected expression disclosing the memo to the radio station. *Id*. at 283-84. The Supreme Court referenced the balancing test used when government employees speak on matters of public concern. Public employees' First Amendment rights are weighed against a state's interests in its capacity as an employer. *See id.* at 284 (quoting *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968)). Drawing on the *Pickering* balancing test, the Court in *Mt. Healthy* laid out a burden-shifting approach:

> Initially, in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a "substantial factor" or to put it in other words, that it was a "motivating factor" in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct.

*Id.* at 287. The *Mt. Healthy* test was crafted to weigh public employment dynamics that are absent here.

Those distinctions aside, the *Mt. Healthy* and *Hartman* tests point in the same direction. Both decisions insulated state actors from First Amendment retaliation claims if independent reasons existed to justify the adverse action taken. Under *Mt. Healthy*, the protection came in the form of a defense that a state actor defendant must prove (*i.e.*, some reason other than the employee's speech for the adverse action). Under *Hartman* (and, more recently, *Nieves*), the protection came as an element of the retaliation cause of action (*i.e.*, to show the absence of probable cause for the adverse action taken against the plaintiff).

The retaliatory prosecution rule in *Hartman* and *Nieves* applies to Count One, which is replete with references to the enforcement of the City's ordinances. In fact, all of the retaliatory incidents of which Plaintiffs complain in Count One are acts in connection with policing or prosecution under those ordinances.[6]

"Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005) (quoting *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (*en banc*)). Probable cause is established if there is an objectively reasonable basis for the belief that a crime has been committed. *Id*. at 563. In the context of a local ordinance violation, the Sixth Circuit

---

[6] The Court here is addressing only qualified immunity for Individual Defendants on Count One – not the *Monell* claim in Count Two against the City. In *Lozman v. City of Riviera Beach, Fla.*, 138 S. Ct. 1945, 1955 (2018), the Supreme Court held that the existence of probable cause for an arrest on one charge would not defeat a First Amendment claim against a municipality that adopted a policy of retaliation or retribution against the plaintiff, which had manifested itself in ways other than the arrest. *See Novak*, 932 F.3d at 429-30. *Lozman* left open the possibility that the *Mt. Healthy* approach might be suited for a *Monell* retaliation claim based on a retributive municipal policy. 138 S. Ct. at 1955.

has written:

> We hold that so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment. . . .  The stop is reasonable if there was probable cause, and it is irrelevant what else the officer knew or suspected about the traffic violator at the time of the stop.  It is also irrelevant whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop.
>
> . . .  [I]f the facts known to the officer at the time of the stop were sufficient to constitute probable cause to believe that a traffic violation had occurred, a reviewing court may not look at the officer's ordinary routine, or his conduct or conversations that occurred before or after the stop to invalidate the stop as pretextual.

*Ferguson*, 8 F.3d at 391 (citations omitted).

Because this is a motion to dismiss, the facts pleaded in the Amended Complaint are taken as true, and the existence of probable cause becomes a question of law for the Court.  *See Gerics v. Trevino*, 974 F.3d 798, 805 (6th Cir. 2020).  While a probable cause determination will not always be possible from the face of every lawsuit, the specificity in Plaintiffs' Amended Complaint allows for such a determination.

### 2.  Enforcement of the Criminal Noise Ordinance

The Noise Ordinance prohibited "play[ing] any . . . audio system . . . or any other type of sound service upon any public road, street, highway or private property in this municipality in a manner or volume as to disturb the quiet, comfort or repose of other persons" except for "organized events which have received a valid permit from the city as set forth in § 311.02 . . . ."  East Cleveland Ordinance § 509.15(a).  The Permit Ordinance required "approval by the Chief of Police and the Mayor."  East Cleveland Ordinance § 311.02(c).  The City's permit form contained signature lines for both officials.  (Doc. No. 44 at 725, ¶ 89.)

From the face of the Amended Complaint, the Individual Defendants had probable cause

to issue a citation to Fambrough for violation of the Noise Ordinance for lack of a permit that conformed to the Permit Ordinance.

Fambrough's permit form was ineffective because it did not satisfy the plain language of the Permit Ordinance.  His form contained the police chief's signature but not the mayor's. (Doc. No. 44 at 725-26, ¶¶ 89, 92, 94.)  According to the Amended Complaint, the face of the permit itself could have and should have alerted a reasonable applicant *or* a reasonable police officer that the permit was not in compliance with the Permit Ordinance.  The permit had "signature lines for both the Mayor and the Chief of Police."  (Doc. No. 44 at 725, ¶ 89.)  That corresponds to subsection (c) of the Permit Ordinance, which provides that approval from both officials is required.

Fambrough had a permit that – on its face – did not conform to the express requirements of the Permit Ordinance.  That created a corresponding problem under the Noise Ordinance.  A sound truck was prohibited by the Noise Ordinance unless the operator had a permit as prescribed by the Permit Ordinance.  *See* East Cleveland Ordinance § 509.15(a).  Legally speaking, Fambrough had a partially complete form – not a permit that satisfied the explicit text of the ordinances.

Twice Fambrough admitted to East Cleveland police that he used his step van as a sound truck in the city.  The first time was when police visited his home on July 27, 2021.  (Doc. No. 44 at 727, ¶¶ 103-05.)  Officers informed him on that date of the permit requirement.  (*Id.* at 727, ¶ 104.)  Then on July 29, 2021, Fambrough filed a complaint against East Cleveland police with the Cuyahoga County Sheriff's Office.  (*Id.* at 728, ¶ 108.)  Fambrough admitted that he used his step van to campaign and that the permit he carried to operate a sound truck was signed only by the chief of police.  (*Id.* at 728, ¶¶ 108-10.)

On August 18, 2021, the step van was parked on Fambrough's street, outfitted with sound amplification equipment.  (*Id.* at 731, ¶¶ 131-32.)  That afternoon, East Cleveland police issued Fambrough a citation for "noise pollution."  (*Id.* at 731-34, ¶¶ 130-54 (detailing the events).)

Even if the Court assumed *arguendo* that no city resident truly complained to police about Fambrough's sound truck activities and that the complainer was the mayor's chief of staff – as the Amended Complaint alleged – Fambrough's admissions gave the Individual Defendants probable cause to believe that he did not have a proper permit and therefore had violated the Noise and Permit Ordinances.  Plaintiffs also acknowledge that they publicly operated the sound truck in the city in the weeks prior to the citation (during which police overserved Fambrough).  (Doc. No. 44 at 751, ¶ 242(b).)

Courts routinely hold that officers have probable cause to enforce the law when they observe facts indicative of a violation of a statute that has not been held by a court to be unconstitutional.  *See, e.g.*, *United States v. Stevenson*, 43 F.4th 641, 648 (6th Cir. 2022)*.*  When it is not objectively unreasonable for police to conclude that they would be enforcing a valid statute if they seize a suspect or his property, police officers have probable cause to arrest and are entitled to qualified immunity on a First Amendment retaliation claim.  *See Enoch v. Hamilton Cnty. Sheriff's Off.*, 818 F. App'x 398, 405 (6th Cir. 2020).  Because city officials here "had probable cause[,] . . . [Plaintiffs] fail[ed] to meet [their] burden in establishing the elements of a First Amendment retaliation claim, and . . . the [o]fficials are entitled to qualified immunity." *Burton v. City of Detroit*, No. 22-1222, 2022 WL 17177323, at *5 (6th Cir. Nov. 23, 2022).

### 3.     Enforcement of the Civil Parking Ordinance

The Parking Ordinance provided: "No person shall park a truck, commercial tractor, trailer, semi-trailer, a motor home or recreational vehicle on a roadway or driveway at any time

in front of or alongside property used for residential purposes except in case of a breakdown of such vehicle, or for loading and unloading purposes."  East Cleveland Ordinance § 351.11.

> Police officers are authorized to provide for the removal and impounding of a vehicle and/or placement of an automobile immobilization device under the following circumstances:
>
> Whenever any vehicle is found parked in a space where parking is not permitted, is parked illegally or is in a parking meter space beyond the maximum legal time[.]

East Cleveland Ordinance § 307.03(a)(1).

Although the Parking Ordinance contained prohibitions with penalties, East Cleveland did not label it a "criminal" law.  *See* East Cleveland Ordinance § 350.02.  The label, however, does not take Plaintiffs' retaliation claim out of the *Hartman v. Moore* rubric.  *See generally Hartman*, 547 U.S. at 256 ("[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions, *including* criminal prosecutions, for speaking out . . . .") (emphasis added).  For example, the Sixth Circuit has recognized that retaliation could take the form of delaying or denying a permit to a disfavored speaker-applicant.

> [The government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests – especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.

*Holzemer*, 621 F.3d at 525 (quoting *Rutan v. Republican Party*, 497 U.S. 62, 72 (1990)).

In these civil statute situations, "probable cause" may not be the appropriate moniker, but the basic question remains the same: whether defendants had a reasonable, objectively discernible basis to enforce a law, to refuse a permit, *etc.*  This is consistent with the cases where the *Hartman* approach was applied to retaliation claims based on the enforcement of parking laws, permit requirements, and municipal regulatory ordinances.  *See, e.g.*, *Rapp*, 644 F. App'x at 623-25; *Williams v. City of Carl Junction, Missouri*, 480 F.3d 871, 873-78 (8th Cir. 2007)

(relying on the Sixth Circuit's reasoning in *Barnes*).

The Amended Complaint showed why the *Hartman/Nieves* rule is apt here.  The Individual Defendants "enforced" the Ordinance with "enforcement actions" (Doc. No. 44 at 746-45, 750-51, ¶¶ 224-25, 241), which included "[i]ssuing two citations for violating the Parking Ordinance," (*id.* at 746, ¶ 224(b)).  Fambrough described those actions as intended, *inter alia,* "to punish" him.  (*Id.* at 746, ¶ 224.)

The facts alleged in the Amended Complaint show that the Individual Defendants had an objectively reasonable basis to believe that Plaintiffs violated the Parking Ordinance.  On May 14, 2021, East Cleveland police officer Allen came to Plaintiff's home and told him that he was violating East Cleveland Code Ordinance § 351.11 by parking his step van in his driveway and wrote him a warning.  (Doc. No. 44 at 724, ¶ 73.)  Officer Allen gave Fambrough three days to comply.  (*Id.*)  Fambrough did not move the step van, which was still parked in the residential driveway, three days later, on May 17, 2021.  (*Id.* at 724, ¶¶ 80-81.)  On that day, Officer Allen attempted to have the step van towed, so Fambrough elected to drive the step van himself out of the driveway and out of East Cleveland.  (*Id.* at 725, ¶¶ 82-84.)

On the morning of August 18, 2021, Fambrough retrieved his step van from outside the city and parked it on the street in front of his residence.  (*Id.* at 731, ¶¶ 131-32.)  Fambrough intended to leave the step van there on the street until he planned to go campaign at 5:30 p.m. (*Id.*)  East Cleveland police arrived in the afternoon that day.  (*Id.* at 732, ¶ 136.)  According to Plaintiffs, the step van had been parked on the residential street for hours (*i.e.*, from morning until afternoon).  (*See id.* at 731-32, ¶¶ 131-36.)  Police issued Fambrough a citation for violating the Parking Ordinance and towed the vehicle.  (*Id.* at 732-33, ¶¶ 139-40 & 144-45.)

The plain language of the Parking Ordinance prohibited parking the step van on a

residential street – other than when loading or unloading.  Fambrough pleaded and admitted that he was neither loading nor unloading the vehicle; he left it on the residential street for hours on the day it was towed.  Fambrough thus admitted facts that rendered the step van in violation of the Parking Ordinance.  From what police officers could see in plain view on a public street, they could reasonably conclude that the step van was parked in violation of the Parking Ordinance.

It is clear from the allegations in the Amended Complaint that there were reasonable grounds and cause to cite Fambrough for violating the city's parking law.  *See* East Cleveland Ordinance § 351.11.  Moreover, city law provided that an unlawfully parked vehicle was subject to immobilization and/or impoundment.  *See* East Cleveland Ordinance § 307.03(a)(1).

As a matter of law, the Individual Defendants are entitled to qualified immunity on Count One for enforcing the Parking Ordinance.  The decision to enforce an ordinance that no court before had ruled invalid was reasonable.  The facts pleaded in the Amended Complaint show an objective, reasonable basis for the Individual Defendants to deem Fambrough and the step van to be in violation of the Parking Ordinance.  Had that statute been criminal, the face of the Amended Complaint showed what would have been probable cause, precluding relief under *Hartman* and its progeny.  The same result applies to the civil enforcement of the parking law alleged in Count One.  There was no constitutional violation because the Individual Defendants had reasonable grounds to issue citations and prosecute Fambrough for violating the Parking Ordinance.

### 4. No Clearly Established Law

Even if this Court presumed for the sake of argument that Count One stated a viable cause of action for retaliation under the First Amendment, qualified immunity applies because there was no clearly established law akin to the facts alleged here.  "For a constitutional right to

be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quotations and citations omitted).

If an officer's actions are not clearly afoul of constitutional principles, the plaintiff "must identify a case that puts [the officer] on notice that his specific conduct was unlawful."  *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021).  The Supreme Court has –

> repeatedly told courts not to define clearly established law at too high a level of generality.  It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

*City of Tahlequah, Oklahoma v. Bond*, 142 S. Ct. 9, 11-12 (2021) (quotations and citations omitted); *White v. Pauly*, 580 U.S. 73, 79 (2017) ("The clearly established law must be particularized to the facts of the case.  Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."  (cleaned up)).  "This does not mean, however, that [the plaintiff] must point to a case 'on all fours' with the instant fact pattern to form the basis of a clearly established right.  All that is required is a sufficiently analogous case (or cases) . . . ."  *Rhodes v. Michigan*, 10 F.4th 665, 679 (6th Cir. 2021) (quotations and citations omitted).

Plaintiffs have not shown that the Individual Defendants violated a clearly established right.  None of the cases cited in Plaintiffs' briefs held that a First Amendment retaliation claim would be cognizable, notwithstanding the Individual Defendants' objectively reasonable belief that Fambrough had violated the City's statutory prohibitions.

For the reasons above, all remaining Individual Defendants' motion to dismiss Count

One on qualified immunity grounds is granted.

### G.  Count Two - Retaliation in Violation of the First Amendment

Count Two was brought solely against the City.  The motion to dismiss did not develop arguments for the dismissal of claims against the City beyond Ohio statutory immunity.  As previously explained, that immunity does not extend to Section 1983 actions.  The motion to dismiss Count Two is denied.

### H.  Count Three - Prior Restraint in Violation of the First Amendment

The Individual Defendants are entitled to qualified immunity on Count Three for three independent reasons, which were made plain on the face of the Amended Complaint.  First, there was no constitutional violation in enforcing the Noise and Permit Ordinances.  Second, the way those ordinances were applied to Fambrough did not violate the First Amendment.  Third, Plaintiffs did not identify clearly established law that would have put the Individual Defendants on notice that enforcement of the ordinances would violate the constitution.

#### 1.  Facial Challenge to the Noise and Permit Ordinances

Plaintiffs raised a facial challenge to two City ordinances.

> The Noise Ordinance (i.e., East Cleveland Code of Ordinances § 509.15) and the Permit Ordinance (i.e., East Cleveland Code of Ordinances § 311.02) together unconstitutionally condition the exercise of First Amendment activities on the broad discretion of local officials.  They are facially unconstitutional . . . .

(Doc. No. 44 at 758, ¶ 264.)  The Amended Complaint requested "a judgment declaring [that] the Noise and Permit Ordinances together violate the First Amendment, both facially and as applied . . . ."  (*Id.* at 767.)  Plaintiffs characterized the ordinances as a prior restraint by virtue of alleged unbridled discretion in permit issuance or denial.  (*Id.* at 758-59, ¶¶ 266-71.)

The facial challenge in Count Three bears on Plaintiffs' arguments against qualified immunity for Counts One and Three.  "On their face," Plaintiffs alleged, "the Noise and Permit

Ordinances together violate clearly established First Amendment law reflected in decades of U.S. Supreme Court and Sixth Circuit case law."  (*Id.* at 759, ¶ 272.)  The Court reaches the opposite conclusion on this question of law, which was framed by the face of the Amended Complaint and local ordinances.

**a)**  **The Ordinances**

The Noise Ordinance provided in pertinent part:

> (a)   No person shall play any radio, music player such as a "boom box", tape cassette, disc player or television, audio system or musical instrument, or any other type of sound service upon any public road, street, highway or private property in this municipality in a manner or at a volume as to disturb the quiet, comfort or repose of other persons.  An exception is made for organized events which have received a valid permit from the city as set forth in § 311.02 and any other applicable section.
>
> \*\*\*
>
> (d)   Upon conviction for a violation of this section, the sound device used during the commission of the offense shall be subject to seizure and payment of a judgment.

East Cleveland Ordinance § 509.15.

The Permit Ordinance, which is referenced in subsection (a) of the Noise Ordinance, provided in pertinent part:

> (a)   Permit required.  No person or persons shall parade or hold a procession, or attempt to parade or hold a procession, in or upon any of the streets, park or public grounds of the city without first obtaining a permit therefor.
>
> \*\*\*
>
> (c)   Permit issuance and approval.  Any person or persons desiring to parade or hold a procession in or upon any street, park or public ground of the city for any purpose whatsoever shall before parading or holding such procession, obtain from the Mayor a permit therefor, which shall be issued only upon and after the approval by the Chief of Police and the Mayor.
>
> (d)   Form of application.  Each application for a permit shall be made out in duplicate.  Each copy shall be signed by the applicant and shall be in such form as

the Mayor shall prescribe.  Such application shall be filed with the Mayor at least five days prior to the date upon which the parade is to be held.

(e)    Permit fee.  For each parade permit issued a fee of $1 shall be paid by the applicant upon making application.  However, if the permit is refused, the fee shall be returned to the applicant.

(f)    Form of permit.  Each permit, when issued, shall have attached a duplicate copy of the application provided for in division (d) above signed by the applicant, and each permit shall be in such form as the Mayor shall prescribe.

(g)    Permit refusal or revocation.  The Mayor may refuse to issue a parade permit if the applicant or group or organization or persons represented by the applicant, shall have previously violated provisions of a similar permit, or shall have violated any city ordinance or laws of the state or of the United States in connection with a previous parade or procession held within the city.  The Mayor may also refuse to issue a parade permit if:

(1)    The time, place, size or conduct of the parade including the assembly areas and route of march would unreasonably interfere with the public convenience and safe use of the streets and highways.

(2)    The parade would require the diversion of so great a number of police officers to properly police the line of movement, assembly area and areas contiguous thereto so as to deny normal police protection to the municipality.

(3)    The parade route of march or assembly areas would unreasonably interfere with the movement of police vehicles, firefighting equipment or ambulance service to other areas of the municipality.

(4)    The parade would unreasonably interfere with another parade for which a permit has been issued.

(5)    The information contained in the application is found to be false, misleading or incomplete in any material detail.

(6)    An emergency such as a fire or storm would prevent the proper conduct of the parade.

(h)    Contracting for special police. The Mayor may condition the permit to require contracting for special police duty pursuant to § 129.03 of the Administrative Code. A parade permit may be revoked at any time by the Mayor for the reasons herein set forth, provided that notice of such revocation shall immediately be given to the applicant, and that within ten days an appeal may be taken for a hearing before the City Council.

East Cleveland Ordinance § 311.02.

**b)** **Facial Attacks under the First Amendment**

"A facial challenge to a law's constitutionality is an effort 'to invalidate the law in each of its applications, to take the law off the books completely.'" *Speet v. Schuette*, 726 F.3d 867, 871-72 (6th Cir. 2013) (quoting *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009) (*en banc*). It is "a claim that the law is 'invalid *in toto* – and therefore incapable of any valid application.'" *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n. 5 (1982) (quoting *Steffel v. Thompson*, 415 U.S. 452, 474 (1974)). "Sustaining a facial attack to the constitutionality of a state law . . . is momentous and consequential. It is an 'exceptional remedy.'" *Speet*, 726 F.3d at 872 (quoting *Carey v. Wolnitzek*, 614 F.3d 189, 201 (6th Cir. 2010)).

"Where a plaintiff makes a facial challenge under the First Amendment to a statute's constitutionality, the 'facial challenge' is an 'overbreadth challenge.'" *Id.* "[A] plaintiff must show substantial overbreadth: that the statute prohibits "'a substantial amount of protected speech both in an absolute sense and relative to [the statute's] plainly legitimate sweep[.]'" *Id.* (quoting *Wolnitzek*, 614 F.3d at 208). "Only a statute that is substantially overbroad may be invalidated on its face." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 458 (1987). "To succeed in an overbreadth challenge, therefore, a plaintiff must demonstrate from the text of [the statute] and from actual fact that a substantial number of instances exist in which the [statute] cannot be applied constitutionally." *Speet*, 726 F.3d at 873 (quotations omitted).

Plaintiffs may "raise a facial challenge to [a] licensing scheme. Although facial challenges to legislation are generally disfavored, they have been permitted in the First Amendment context where the licensing scheme vests unbridled discretion in the decisionmaker and where the regulation is challenged as overbroad." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223 (1990); *see also City of Littleton, Colo. v. Z.J. Gifts D-4, LLC*, 541 U.S. 774, 784

(2004); *Freedman v. Maryland,* 380 U.S. 51, 56 (1965) ("In the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license."); *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940) (in the First Amendment context, "[o]ne who might have had a license for the asking may . . . call into question the whole scheme of licensing when he is prosecuted for failure to procure it").  The Supreme Court has —

> identified two major First Amendment risks associated with unbridled licensing schemes: self-censorship by speakers in order to avoid being denied a license to speak; and the difficulty of effectively detecting, reviewing, and correcting content-based censorship "as applied" without standards by which to measure the licensor's action.  It is when statutes threaten these risks to a significant degree that courts must entertain an immediate facial attack on the law.  Therefore, a facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers.  This is not to say that the press or a speaker may challenge as censorship any law involving discretion to which it is subject.  The law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks.

*City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988).

Still, "even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quotation omitted).  "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."  *Id.*

The Supreme Court has recognized noise abatement as a permissible basis for regulation.

The Supreme Court in *Ward* rejected a facial challenge to a noise ordinance for a local bandshell where the theory was that government officials purportedly had unbridled discretion over noise amplification.

> [G]overnment ha[s] a substantial interest in protecting its citizens from unwelcome noise.  This interest is perhaps at its greatest when government seeks to protect the well-being, tranquility, and privacy of the home, but it is by no means limited to that context, for the government may act to protect even such traditional public forums as city streets and parks from excessive noise.

*Id.* at 796 (quotations and citations omitted).  While "the officials implementing them will exercise considerable discretion, perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."  *Id.* at 794.  "The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted."  *Id.* at 800 (quotation omitted).

### c)  Plaintiff's Facial Challenge

Plaintiffs alleged that the Noise Ordinance broadly prohibits any use of an "audio system" that could "disturb the quiet . . . of other persons."  This expansive language, they pleaded, sweeps in a wide swath of First Amendment protected speech, such as using sound trucks to communicate political messages.  (Doc. No. 44 at 758, ¶ 266.)

The Supreme Court long ago recognized that "[t]he sound truck has become an accepted method of political campaigning."  *Saia v. People of State of New York*, 334 U.S. 558, 561 (1948).  Nonetheless, the Court also acknowledged that use of a sound truck is subject to reasonable regulation.

> City streets are recognized as a normal place for the exchange of ideas by speech or paper.  But this does not mean the freedom is beyond all control.  We think it is a permissible exercise of legislative discretion to bar sound trucks with broadcasts of public interest, amplified to a loud and raucous volume, from the public ways of

municipalities. . . . We cannot believe that rights of free speech compel a municipality to allow such mechanical voice amplification on any of its streets.

*Kovacs v. Cooper*, 336 U.S. 77, 87 (1949). The Sixth Circuit recently cited *Kovacs* for the proposition that "[t]here is no First Amendment right to amplified sound *per se* . . . ." *Reform Am. v. City of Detroit, Michigan*, 37 F.4th 1138, 1159 (6th Cir. 2022), *cert. denied*, 143 S. Ct. 448 (2022).

Even on the view that the First Amendment protects the use of sound trucks to broadcast political messages ahead of an election, the Amended Complaint revealed that the ordinances in question did not bar this mode of expression. Plaintiffs alleged that sound trucks for campaigns were used in the City multiple times over the years. (Doc. No. 44 at 714, 720-21, ¶¶ 2, 49-58.) Plaintiffs thus cannot show that the ordinances in question categorically bar using sound trucks to broadcast political messages. They pleaded and admitted the opposite.

Further, Plaintiffs did not plead substantial overbreadth. The Amended Complaint did not contain allegations plausibly showing that the City's ordinances prohibit a substantial amount of protected speech or burden a substantial number of speakers. The Amended Complaint did not plausibly identify a category, class, type, or number of speakers whose expression is at risk by virtue of these ordinances.

The Amended Complaint did not allege that the Permit Ordinance standing alone was unconstitutional. Plaintiffs repeatedly emphasized that the Noise Ordinance and Permit Ordinance "together" are facially invalid. (Doc. No. 44 at 758-59, 761, 767 ¶¶ 264, 270, 272, 278.)

Instead of showing an overbroad effect of the ordinances, Count Three objected in principle to the requirement of an advance permit in order to operate a sound truck a noise permit. (*Id.* at 759, ¶ 270.) Plaintiffs suggested that First Amendment rights may not be

subjected to a permit requirement that would be issued by government actors exercising discretion.  That is incorrect.

"[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired. . . . [Activities] protected by the First Amendment, are subject to reasonable time, place, and manner restrictions."  *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) (citations omitted).  "Given the city's significant interest in ensuring the safety of travelers on public rights of way, the Supreme Court long ago recognized that requiring permits for marches or parades proceeding on public rights of way constitutes a legitimate exercise of governmental authority."  *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 604-05 (6th Cir. 2005) (*citing Cox v. New Hampshire*, 312 U.S. 569, 574 (1941)).  "Although the pre-approval process for obtaining permission to speak . . . creates risks of its own, it alleviates any notice problems: A party wondering whether she may speak . . . can ask and find out . . . ."  *Lowery v. Jefferson Cnty. Bd. of Educ.*, 586 F.3d 427, 436 (6th Cir. 2009).

Plaintiffs' facial challenge suggests that the statutory criteria for refusing a permit under the City ordinances are standardless.  A "statute is unconstitutionally vague if it denies fair notice of the standard of conduct for which the citizen is to be held accountable, or if it is an unrestricted delegation of power which leaves the definition of its terms to law enforcement officers."  *Am.-Arab Anti-Discrimination*, 418 F.3d at 608-09.  But "officials are not vested with undue discretion under a licensing scheme, so long as the licensing scheme contains narrow, objective, and definite standards to guide the licensing authority."  *Id.* at 609 (citation and quotations omitted).

Plaintiffs alleged that the Permit Ordinance gave the mayor or police chief "broad

discretion" to deny a permit.  (Doc. No. 44 at 758, 760, ¶ 264, 267, 274.)  The Permit Ordinance "lists a wide variety of grounds on which the 'Mayor may refuse to issue' a permit, many of which are so malleable that they leave open important questions of enforcement to official discretion," the Complaint alleged.  (*Id.* at 758, ¶ 268.)  However, the Permit Ordinance was far more concrete – and the grounds for a mayor to deny a permit are far more objectively discernible – than Plaintiffs characterized.

Section (g) of the Permit Ordinance provided that a permit could be denied if an applicant previously violated the rules for a similar permit or violated any state or local law with respect to a parade or procession on public streets.  The Court has reviewed the subsections of Section (g) and concludes that these represent typical and reasonable grounds for refusing or delaying a street use permit or noise permit.

> The inclusion of a reasonable margin, to insure effective enforcement, will not put upon a law, otherwise valid, the stamp of invalidity.  Such laws may also find their justification in the fact that, in some fields, the bad fades into the good by such insensible degrees that the two are not capable of being readily distinguished and separated in terms of legislation.  In the light of these considerations, we are not prepared to say that the end in view was not sufficient to justify the general rule of the ordinance, although some [conduct] of an innocent character might fall within the proscribed class.  It cannot be said that the ordinance in this respect passes the bounds of reason and assumes the character of a merely arbitrary fiat.

*Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 388-89 (1926) (quotations and citations omitted).  Moreover, this ordinance is akin to other Ohio laws that survived facial challenges.

*See, e.g.*, *State v. Carrick*, 965 N.E.2d 264, 268 (Ohio 2012) (rejecting facial challenge to statute prohibiting any person from recklessly causing inconvenience, annoyance, or alarm by making unreasonable noise); *Columbus v. Kendall*, 798 N.E.2d 652, 654-55 (Ohio Ct. App. 2003) (upholding local noise ordinance against facial challenge and cataloging federal and Ohio decisions upholding such ordinances); *see also State v. Cornwell*, 776 N.E.2d 572, 575 (Ohio Ct. App. 2002) (collecting authorities).

In sum, the grounds for denial of a permit in section (g) of the Permit Ordinance withstand a facial challenge or a suggestion of vagueness or ambiguity.  The situations listed in section (g) are not abstract or incapable of being understood.  They are not so inherently open-ended as to give a mayor a "blank check" or unfettered discretion.

For the reasons above, the Court concludes, as a matter of law, that the Noise and Permit Ordinances were not invalid on their face.

### 2.    As-Applied Challenge

What remains of Count Three is the contention that the ordinances, as applied to Plaintiffs, constituted a prior restraint in violation of the First Amendment.  Plaintiffs cited case law dealing with statutory and regulatory schemes that vest unbridled discretion in government officials.  (Doc. No. 57 at 880 (citing *Plain Dealer Publ'g Co. v. City of Lakewood*, 794 F.2d 1139, 1144 (6th Cir. 1986), *aff'd in relevant part,* 486 U.S. 750 (1988)).  Plaintiffs' argument was almost entirely focused on the purported facial invalidity of the Permit Ordinance.  (Doc. No. 57 at 880-81.)  For the reasons discussed in the prior section, the ordinances were not unconstitutional as written, nor were they incapable of being constitutionally applied.

Plaintiffs included one sentence of argument in support of an as-applied challenge suggesting that requiring a signature from both the mayor and police chief was a change of practice for the city.  (Doc. No. 57 at 881.)  In any event, Plaintiffs did not cite any case that would have made it clear to the Individual Defendants that they would be precluded from enforcing the two-signature rule as statutorily required just because officials allegedly had not required such compliance in the past.  Plaintiffs also did not cite case law that would have put the Individual Defendants on notice of some particular infirmity violating established law in the ordinances themselves.  Finally, Plaintiffs did not cite case law that would require government

officials to take account of the content of a permit applicant's message or would excuse an applicant from having to obtain a signature from a government official who the applicant publicly criticized.  In sum, Plaintiffs did not allege facts or cite law that show a clearly established right that was or might have been violated by enforcing the East Cleveland Ordinances as written.

For the reasons above, the Individual Defendants' motion to dismiss Count III on qualified immunity grounds is granted.[7]

I. **Count Four - Selective Enforcement in Violation of the Equal Protection Clause**

A licensing or regulatory scheme that is neutral on its face violates the Equal Protection Clause if it is selectively enforced for arbitrary or discriminatory reasons.  *See generally Birth Control Centers, Inc. v. Reizen*, 743 F.2d 352, 359 (1984); *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886).  "In order to establish selective enforcement . . . that rises to the level of a violation of their equal protection rights, the plaintiffs must prove *intentional, purposeful* discrimination."  *Reizen*, 743 F.2d at 359 (emphasis in original).  "Discriminatory intent is a factual matter . . . ."  *Id.*  "A claim of selective application of a facially lawful state regulation requires a showing that . . . the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, . . . to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person."  *Wright v.*

---

[7] The Amended Complaint posited that the mayor in theory might have refused to sign a permit for a sound truck that would campaign for the mayor's adversary.  But Plaintiffs did not allege that such a situation played out here.  Notably, there is no allegation that the City's mayor saw or acted on Fambrough's permit form, which had been presented only to the police chief for signature.  If these types of facts had been properly pleaded, it would be amenable to an as-applied challenge, since government officials may not discriminate based on viewpoint when enforcing a time, place, or manner restriction.  *See generally Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 156 (2015).

*MetroHealth Medical Center*, 58 F.3d 1130, 1137 n.7 (6th Cir. 1995) (quoting *FSK Drug Corp. v. Perales*, 960 F.2d 6, 10 (2d Cir. 1992)).

The Amended Complaint contained allegations regarding Smedley, the mayor's chief of staff.  (Doc. 44 at 728-31, ¶¶ 112-29.)  Plaintiffs alleged that Smedley intentionally spearheaded and persisted in the effort for otherwise unenforced laws to be applied to Plaintiffs.  (*See id.*)  The motion to dismiss, however, does not attempt to establish that these facts, if true, would not entitle Plaintiffs to relief.

As to the remainder of the Individual Defendants, the Amended Complaint does not contain specific or plausible facts from which to infer the sort of discriminatory intent necessary to render them liable on a selective enforcement theory.  Count IV fails to state a claim upon which relief may be granted as to those other Individual Defendants.  Moreover, neither the facts in the Amended Complaint nor the case law cited in Plaintiffs' briefing shows a clearly established right in circumstances similar to this case that would render those Defendants on notice or liable, notwithstanding their apparent lack of animus toward Plaintiffs.

For the reasons above, the Individual Defendants' motion to dismiss Count IV is granted, with the exception of Defendant Smedley.

### J.  Count Five - Unreasonable Seizure in Violation of the Fourth Amendment

Plaintiffs contend that the impoundment of the step van on August 18, 2021, was an unreasonable seizure in violation of the Fourth Amendment.  Because Plaintiffs' claim against the City has not been dismissed, below the Court addresses whether Count Five states a claim for violation of a clearly recognized right by the Individual Defendants.

Plaintiffs admitted in their opposition brief that "[t]he van was towed based on the *parking* ordinance, not the noise ordinance[.]"  (Doc. No. 57 at 884 (emphasis in original).)  Plaintiffs argue at length from cases where the Sixth Circuit and other courts have considered

police decisions to tow vehicles in the absence of a driver available to move it voluntarily. (*See id.* at 882-84.)

Here Plaintiffs admitted that police issued Fambrough a warning ticket previously for parking the step van on his street. (Doc. No. 44 at 724, 732 ¶¶ 73, 139.) Three days later, officers returned to find the step van still parked on Fambrough's street. (*Id.* at 724-25, ¶¶ 80-82.) Because the tow truck on scene that day was not equipped to move the step van, Fambrough drove the van away himself. (*Id.* at 725, ¶¶ 82-83.) On August 18, 2021, the step van was parked on Fambrough's street yet again – indeed, Plaintiffs pleaded that Fambrough's intention had been to leave the van parked there from morning until 5:30 p.m. (*Id.* at 731, ¶¶ 131-32.)

Plaintiffs did not point the Court to case law establishing that police must forego impoundment for a repeated parking violator who asks to drive his unlawfully parked vehicle away. Plaintiffs also have not constructed a legal argument that the Parking Ordinance did not authorize the tow. The facts, as pleaded in the Amended Complaint, show that the Individual Defendants did not act unreasonably or in flagrant defiance of settled constitutional law. As such, they are entitled to qualified immunity.

For the reasons above, the Individual Defendants' motion to dismiss Count Five is granted.

### III.  <u>Conclusion</u>

For the reasons above, the motion to dismiss is GRANTED in part and DENIED in part. Counts Two, Three, Four, and Five remain pending against the City. Counts One, Three, Four, and Five are dismissed as to each of the moving Individual Defendants with one exception: Smedley's motion to dismiss Count Four is denied. Counts One, Three, Four, and Five remain pending against defendant Gardner.

The Court also DENIES *without prejudice* the City's and the Individual Defendants' motion as it alternatively seeks summary judgment under Fed. R. Civ. P. 56 (Doc. No. 47 at 790-95) and the separate motion for summary judgment filed by these Defendants (Doc. No. 58).  Plaintiffs' motion relating to the summary judgment motion is also DENIED as moot.  (Doc. No. 65.)  Pursuant to the Court's Standing Order, no party may file a motion for summary judgment prior to the close of discovery.  (Doc. No. 33 at 382.)  *See also Ball v. Union Carbide Corp.*, 385 F.3d 713, 719 (6th Cir. 2004) ("It is well-established that the plaintiff must receive 'a full opportunity to conduct discovery' to be able to successfully defeat a motion for summary judgment.")  Defendants Gardener and Smedley, however, may file a summary judgment motion prior to the close of discovery on the issue of qualified immunity.  *Summers v. Leis*, 368 F.3d 881, 886 (6th Cir. 2004) (district courts must consider ruling on a summary judgment motion prior to the close of discovery if the motion seeks qualified immunity).  But such a motion must comply with the requirements outlined in Fed. R. Civ. P. 56 and Local Rule 7.1.

**IT IS SO ORDERED.**

_____
BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE

**Date**: August 14, 2023