UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM FAMBROUGH, *et al.*, | ) | CASE NO.:  1:22-cv-00992 |
| | ) | |
| Plaintiffs, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF EAST CLEVELAND, *et al.*, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

Before the Court is the motion for summary judgment filed by the City of East Cleveland

("City" or "East Cleveland") and Michael Smedley ("Smedley") (collectively, "City

Defendants") (Doc. 103), the motion for summary judgment filed by William Fambrough

("Fambrough") and Legacy Communications, LLC ("Legacy") (collectively, "Plaintiffs") (Doc.

104), and Defendant Scott Gardner's ("Gardner") motion for summary judgment (Doc. 108).

For the reasons stated herein, the City Defendants' motion is GRANTED, Plaintiffs' motion is

DENIED, and Gardner's motion is GRANTED.

I.      **BACKGROUND**

        A.      **Ordinances at Issue**

        East Cleveland Ordinance § 351.11 (the "Parking Ordinance") prohibited "park[ing] a

truck, commercial tractor, trailer, semi-trailer, a motor home or recreational vehicle on a

roadway or driveway at any time in front of or alongside property used for residential purposes

except in case of a breakdown of such vehicle, or for loading and unloading purposes."  (Doc.

104-17 at 3851.)[1]  As written, the Parking Ordinance applied to pickup trucks, but was generally enforced against commercial vehicles only.  (Doc. 104-13 at 3671-72; Doc. 104-8 at 3489-90.)

East Cleveland Ordinance § 509.15(a) (the "Noise Ordinance") prohibited "play[ing] any radio, music player . . . audio system . . . or any other type of sound service upon any public road, street, highway or private property in this municipality in a manner or volume as to disturb the quiet, comfort or repose of other persons."  (Doc. 104-17 at 3852.)  The Noise Ordinance contained an exception for "organized events which have received a valid permit from the city as set forth in § 311.02 . . . ."  (*Id.*)

East Cleveland Ordinance § 311.02 (the "Permit Ordinance") prohibited "parad[ing] or hold[ing] a procession, or attempt[ing] to parade or hold a procession, in or upon any of the streets, park or public grounds of the city without first obtaining a permit therefor."  (*Id.* at 3853.)  Under § 311.02(c), a permit "shall be issued only upon and after the approval by the Chief of Police and the Mayor."  (*Id.*)  Section 311.02(g) provided:

> The Mayor may refuse to issue a parade permit if the applicant or group or organization or persons represented by the applicant, shall have previously violated provisions of a similar permit, or shall have violated any city ordinance or laws of the state or of the United States in connection with a previous parade or procession held within the city.  The Mayor may also refuse to issue a parade permit if:
>
> (1) The time, place, size or conduct of the parade including the assembly areas and route of march would unreasonably interfere with the public convenience and safe use of the streets and highways.
>
> (2) The parade would require the diversion of so great a number of police officers to properly police the line of movement, assembly area and areas contiguous thereto so as to deny normal police protection to the municipality.

---

[1] For ease and consistency, record citations are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination.

(3) The parade route of march or assembly areas would unreasonably interfere with the movement of police vehicles, firefighting equipment or ambulance service to other areas of the municipality.

(4) The parade would unreasonably interfere with another parade for which a permit has been issued.

(5) The information contained in the application is found to be false, misleading or incomplete in any material detail.

(6) An emergency such as a fire or storm would prevent the proper conduct of the parade.

(*Id.* at 3854.)

The permit form used by the City—styled a "request for sound device permit"—subjected motorcades and noise to additional standards, including: "No horn, microphone or public address sound shall be excessive, over-amplified or otherwise be unreasonably used from 12:00 noon to 5:00 p.m., to wind down by 6:00 p.m." (Doc. 104-46.) The permit form had signature lines for both the Mayor and the Chief of Police. (*Id.*) The cost to obtain a permit was one dollar. (Doc. 104-17 at 3853.)

**B.     Statement of Facts**

Fambrough has lived in East Cleveland since 2006. (Doc. 104-2 at ¶ 3.) His media company, Legacy, has worked with local governments, including East Cleveland, and political campaigns. (*Id.* at ¶¶ 5-8.)

Legacy was the registered owner of a commercial step van. (*Id.* at ¶ 9.) Fambrough generally used the van to transport Legacy's equipment. (*Id.*) He also used the vehicle as a sound truck because it could be equipped with speakers and political signage. (*Id.* at ¶¶ 9-11.) When assisting a campaign, he drove the vehicle through the City while broadcasting pre-recorded messages. (*Id.* at ¶ 9.) He typically broadcasted such messages in the evenings, between 5 p.m. and sunset. (*Id.* at ¶ 13.)

3

Fambrough has parked a step van at his home since moving to the City in 2006.  (*Id.* at ¶¶ 12-14.)  He operated the van as a sound truck without incident until 2021.  (*Id.* at ¶¶ 26-29.)  Indeed, in 2019, Fambrough obtained a permit to use the van for a school board election campaign.  (*Id.* at ¶ 13.)

In the spring of 2021, City Councilor Juanita Gowdy ("Gowdy") began her mayoral campaign against incumbent Mayor Brandon King ("King").  (*Id.* at ¶ 22.)  There were six mayoral candidates in the race.  (Doc. 104-16 at 3822.)  By May 2021, Fambrough was a known supporter of Gowdy's mayoral campaign.  (Doc. 104-2 at ¶ 23.)  Gowdy and Fambrough were members of a group of political challengers who voiced opposition to King's administration.  (Doc. 104-9 at 3569; Doc. 104-10 at 3592-94; Doc. 104-15 at 3761-62, 3784-85; Doc. 104-16 at 3809-10.)  They were well-known to senior City officials.  (*Id.*)

Michael Smedley ("Smedley"), King's Chief of Staff, oversaw the City department heads and had authority to direct them on King's behalf.  (Doc. 104-10 at 3584.)  King generally referred resident complaints to Smedley.  (*Id.* at 3584-85.)  Beginning around May 2021, and throughout that summer, King and Smedley received complaints from residents about Fambrough's vehicle.  (*See id.* at 3593-95, 3597; Doc. 104-16 at 3815-16, 3821-23.)

Around May 2021, King received a complaint that Fambrough's van was parked on a residential street.  (Doc. 104-10 at 3594-95.)  A resident on Fambrough's street, L.J., personally called King to complain about another commercial vehicle parked on the street.  (*Id.*)  While making her complaint, L.J. mentioned Fambrough's van was parked on the same street.  (*Id.*)  King did not document L.J.'s complaint.  (*Id.* at 3597.)  The owner of the other vehicle was visited by police to address the parking violation, but King did not know whether the owner was given a warning or a ticket.  (*Id.* at 3594-95, 3597.)  King also received complaints from

4

residents all over the City about loud noise from Fambrough's van during evening hours.  (*Id.* at 3597.)  The community had a lot of senior citizens, and they complained Fambrough's broadcasting kept them from sleeping.  (*Id.* at 3597, 3602.)  King specifically recalled receiving complaints from the following City residents: H.S.; W.J.; R.T.; G.W.; and S.H.  (*Id.* at 3597-98, 3602-03.)  King could not recall when those complaints were made.  (*Id.* at 3598.)  He informed Smedley about the complaints.  (*Id.* at 3593.)

Smedley received similar complaints.  (Doc. 104-16 at 3815, 3832.)  The complaints he recalled came from residents of the Forest Hills neighborhood.  (*Id.* at 3815.)  Smedley specifically recalled a noise complaint from F.R. and his wife, who came to City Hall to complain about Fambrough's broadcasting.  (*Id.* at 3815-16, 3821-23.)

Around May 2021, King and Smedley began informing various police officers about the complaints, including former Chief of Police Scott Gardner ("Gardner"), Police Commander Larry McDonald ("McDonald"), and Police Captain Kenneth Lundy ("Lundy").  (Doc. 104-10 at 3593; Doc. 104-16 at 3805-06.)  Smedley conveyed the complaints to Gardner and told Gardner to be on the lookout for Fambrough's van.  (Doc. 104-16 at 3831-33.)  King and Smedley expected police to take some enforcement action in response to the noise complaints.  (Doc. 104-10 at 3593; Doc. 104-16 at 3833.)

Smedley would speak with Gardner each time he received a noise complaint about Fambrough.  (Doc. 104-16 at 3836-37.)  Gardner recalled receiving around 15 to 20 calls from Smedley from May 2021 to August 2021.  (Doc. 104-6 at 3438.)  Smedley would usually call Gardner about resident complaints after 6 p.m.  (Doc. 104-8 at 3497-98.)  Gardner recalled speaking with F.R., who complained about Fambrough's broadcasts.  (*Id.* at 3490.)  Gardner also

checked the Computer-Aided Dispatch ("CAD") system to verify there were noise complaints about Fambrough's van prior to taking enforcement action.  (*Id.* at 3491, 3494, 3505, 3515-16.)

King and Smedley testified that Fambrough's campaign activity for King's challenger was not a factor in requesting enforcement action.  (Doc. 104-10 at 3606-07; Doc. 104-16 at 3835-37.)  They were merely responding to citizens' complaints about Fambrough's broadcasting, particularly from older residents who complained about the loud noise late in the evening.  (Doc. 104-10 at 3602, 3607; Doc. 104-16 at 3835-36.)

Still in the summer of 2021, the City's department heads discussed the noise complaints at City cabinet or staff meetings.  (Doc. 104-8 at 3501; Doc. 104-10 at 3598-99; Doc. 104-16 at 3840.)  Attendees would have included King, Smedley, Gardner, Law Director Willa Hemmons ("Hemmons"), and Assistant Law Director Heather McCollough ("McCollough").  (Doc. 104-6 at ¶ 29; Doc. 104-8 at 3501; Doc. 104-10 at 3590-91.)  At their depositions, King, Smedley, and Gardner testified that mentions of Fambrough during City meetings were limited to comments about the noise complaints.  (Doc. 104-8 at 3501; Doc. 104-10 at 3598-99; Doc. 104-16 at 3840.)  Smedley admitted his frustration that noise complaints had been coming in for months, but police had not solved the problem through enforcement of City ordinances.  (Doc. 104-16 at 3839.)

It was Gardner's belief Smedley wanted police to take enforcement action against Fambrough for using the van to campaign for Gowdy, King's opponent.  (*Compare* Doc. 104-6 at ¶ 19, *with* Doc. 104-8 at 3496-97, 3514.)  At his deposition, Gardner testified he had no direct knowledge of Smedley's intent.  (Doc. 104-8 at 3496-97, 3514.)  Gardner never heard Smedley mention Fambrough's political activity.  (*Id.* at 3490, 3497, 3499, 3501.)  Smedley only mentioned noise complaints to Gardner.  (*Id.*)  Gardner's belief was based on his opinion it was

unusual for the Chief of Police to be involved in minor offenses like parking and noise complaints, especially given the City's violent crime rate and lack of resources.  (*Id.* at 3497.) To Gardner, Smedley's engagement meant Smedley wanted to stop Fambrough from campaigning for King's opponent.  (*Id.* at 3490, 3497, 3499, 3501.)

Gardner claimed discomfort with the proposed enforcement actions.  (Doc. 104-6 at ¶ 19; Doc. 104-8 at 3495, 3498.)  Gardner believed the Noise Ordinance violated the First Amendment.  (Doc. 104-8 at 3498.)  But Gardner believed the Parking Ordinance was valid.  (*Id.* at 3491.)  He sought confirmation from Hemmons that it was appropriate to enforce the Parking Ordinance as to Plaintiffs.  (*Id.* at 3491, 3500, 3517.)  Hemmons advised Gardner the Parking Ordinance could permissibly be enforced.  (*Id.* at 3500, 3517.)

On May 14, 2021, Gardner, Smedley, and McDonald exchanged text messages about Fambrough's van.  (Doc. 104-21.)  Smedley asked McDonald "about mt vernon the house on the corner with box truck in drive."  (*Id.* at 3919.)  McDonald responded, "Having it checked now." (*Id.*)

On May 14, 2021, Officer Mark Allen ("Allen") went to Fambrough's home.  (Doc. 104-2 at ¶ 32; Doc 104-7 at 3461.)  Allen told Fambrough that parking the commercial van in his driveway violated the Parking Ordinance.  (*Id.*)  King believed the visit from Allen occurred after L.J. complained about the two commercial vehicles parked on her residential street.  (Doc. 104-10 at 3594-95, 3597.)  Fambrough was issued a warning and given three days to comply with the Parking Ordinance.  (Doc. 104-2 at ¶ 34; Doc. 104-7 at 3454; Doc. 104-33.)

On May 17, 2021, Allen returned to find the van parked again in Fambrough's driveway. (*Id.* at ¶¶ 39-42; Doc. 104-7 at 3461-62.)  He ordered that it be towed.  (Doc. 104-2 at ¶¶ 39-42; Doc. 104-7 at 3461-62.)  However, the tow truck was not equipped for a vehicle as large as the

van.  (Doc. 104-2 at ¶ 41; Doc. 104-7 at 3461.)  Instead, Fambrough was allowed to drive the van away.  (Doc. 104-2 at ¶ 44.)  After that incident, he parked it outside the City when not using it. (*Id.* at ¶ 45.)

Also on May 17, 2021, McDonald texted Gardner and Smedley a picture of a letter. (Doc. 104-21 at 3917, 3919.)  McDonald explained he sent Allen back to Fambrough's home on the parking violation and had Allen deliver a letter to Fambrough.  (*Id.* at 3917.)  The letter, signed by Gardner, had the text of the Parking Ordinance.  (*Id.*; *see also* Doc. 104-8 at 3488-89; Doc. 104-45.)  In response, Gardner questioned McDonald, "That's the guy that we gave ample time didn't we?"  (Doc. 104-21 at 3917.)

On June 28, 2021, Fambrough went to City Hall to obtain a noise permit.  (Doc. 104-2 at ¶ 46.)  He had done so in 2019.  (*Id.* at ¶¶ 46-47.)  He intended to operate the van as a sound truck in support of Gowdy's mayoral campaign.  (*Id.* at ¶ 46.)  An assistant in the Mayor's office gave Fambrough a permit form and directed him to obtain the Police Chief's signature.  (*Id.* at ¶ 49; *see* Doc. 104-46.)  Fambrough believed that meant King's approval as Mayor was implied. (Doc. 104-2 at ¶ 50.)  On the form, Fambrough stated the reason for the permit was to "inform residents of election."  (Doc. 104-46 at 4003.)  He took it to the Police Department, and Gardner signed it that day.  (Doc. 104-2 at ¶ 52.)  Fambrough did not obtain King's signature on the permit or pay the one dollar permit fee.  (*Id.*)  After obtaining the partially signed permit, he believed the permit was active.  (*Id.*)  Fambrough used the van as a sound truck to broadcast campaign messages in support of Gowdy once or twice each week.  (*Id.* at ¶¶ 54-57.)

King was never asked to sign or approve Fambrough's permit.  He would have signed it if asked.  (Doc. 104-10 at 3596-97.)  Smedley believed King would have signed the permit.

(Doc. 104-16 at 3834, 3829.)  He also would have told King to sign it.  (Doc. 104-16 at 3834, 3829.)

On July 27, 2021, Lundy went to Fambrough's home.  (Doc. 104-2 at ¶ 62; Doc. 104-12 at 3652-53; Doc. 104-13 at 3691-91.)  Gardner asked Lundy to go there to inform Fambrough of the permit requirement.  (Doc. 104-12 at 3652.)  Plaintiffs' van was not there.  (Doc. 104-2 at ¶ 63.)  Lundy asked Fambrough if he broadcasted from his van recently.  (*Id.* at ¶ 64.)  Fambrough confirmed he had.  (*Id.* at ¶ 65.)  Lundy informed him he needed a permit to broadcast sound. (*Id.*; Doc. 104-12 at 3652-53.)  Fambrough said he would comply with the law but did not mention his partially signed permit.  (Doc. 104-2 at ¶ 65; Doc. 104-12 at 3652-53; Doc. 104-13 at 3692.)  Lundy did not issue a citation.  (Doc. 104-13 at 3691.)

Two days later, Fambrough went to the Cuyahoga County Sheriff's Office to fill out a citizen's complaint against the officers who issued the warning, threatened to tow his van, and advised him about the permit requirement.  (Doc. 104-2 at ¶¶ 70-72; Doc. 104-50.)  Fambrough worried the police would continue to harass him or prevent him from using the van to campaign. (*See id.*)

On August 9, 2021, at 7:01 p.m., Gardner sent an email to the entire Police Department with the subject line "Vehicles with Loud Speakers":

> Please be advised that there is a vehicle with loudspeakers that are broadcasting political messages.
>
> I am getting an influx of complaints from the residents of the Forest Hills area. Please, find this vehicle and tow it.  Cite the operator with disturbing the peace and loud music.
>
> Please contact me as soon as this is complete to claim a surprise.

(Doc. 104-22.)  Gardner received a phone call from Smedley on his way home that night.  (Doc. 104-8 at 3540.)  Smedley told him Fambrough's van was broadcasting loud music in the area

again.  (*Id.*)  Gardner explained the reference to political messages in his email was to help officers identify the vehicle.  (*Id.*)  In accordance with Gardner's directive, officers were instructed at their daily briefings to be on the lookout for Plaintiffs' van.  (Doc. 104-14 at 3731.)

On August 18, 2021, Officers Andrew Majercik ("Majercik") and Kyle Wood ("Wood") saw the van parked in front of Fambrough's home.  (Doc. 104-2 at ¶¶ 73-75; Doc. 104-14 at 3731.)  Fambrough does not dispute it was there, but asserts it was only there for a few hours so he could load equipment.  (Doc. 104-2 at ¶ 74.)  He planned to use the van to campaign at the end of the day.  (*Id.* at ¶¶ 75, 100.)  The encounter was captured by Majercik's body camera.  (*See* Docs. 104-23, 104-24, 104-25, 104-26; Doc. 105.)  Fambrough was not loading or unloading the van when the officers arrived.  One of the officers called in a tow truck.  (Doc. 104-14 at 3733-34.)

Majercik radioed Gardner.  (Doc. 104-8 at 3504; Doc. 104-14 at 3735-36.)  Gardner confirmed the Police Department received five citizen complaints about noise from the van.  (Doc. 104-8 at 3504-07; Doc. 104-14 at 3735; Doc. 104-24 at 6:00-6:26.)  He told Majercik to issue citations and tow the van.  (Doc. 104-8 at 3504-07; Doc. 104-14 at 3735; Doc. 104-24 at 6:00-6:26.)  Fambrough tried to show Majercik his partially signed permit, but Majercik informed Fambrough the order to write citations was "coming from the brass," from "Chief Gardner."  (Doc. 104-14 at 3737; Doc. 104-25 at 3:33-3:38.)

Majercik issued a parking citation for violating the Parking Ordinance.  (Doc. 104-52 at 4016; Doc. 104-14 at 3736-37.)  Majercik also issued a misdemeanor citation for violating the Noise Ordinance.  (Doc. 104-55 at 4022.)  It stated noise pollution from Plaintiffs' van resulted in five citizen complaints in the area.  (*Id.*)  The August 18, 2021 CAD report also mentioned multiple complaints from residents.  (Doc. 104-27 at 3934.)

Fambrough and others at the scene were not permitted to drive the van away.  (Doc. 104-2 at ¶¶ 85-86.)  The van was towed.  (*Id.* at ¶ 88.)  Fambrough later received a notice to appear in court for the noise citation on September 23, 2021.  (*Id.* at ¶ 120.)

Fambrough recovered his van from the impound lot, after paying an $80 fee to the City and $448.20 in impound fees.  (*Id.* at ¶¶ 106-07; Doc. 104-57; Doc. 104-58.)  He asserts the tow damaged the van.[2]  (Doc. 104-2 at ¶¶ 108-12.)  He was unable to use it to campaign for Gowdy during the final weeks of the campaign.  (*Id.* at ¶ 112)

On September 2, 2021, Fambrough filed petitions for civil stalking protection orders against King and Gardner.  (Doc. 104-2 at ¶¶ 113-17.)  The next day, the court denied *ex parte* relief and set a hearing for September 20, 2021.  (*Id.* at ¶ 117.)  King, Gardner, and Hemmons attended that hearing.  (*Id.* at ¶ 118.)  The petitions were denied.  (*Id.*)

On September 14, 2021, King was re-elected.  (*Id.* at ¶ 119.)

On September 21, 2021, two days before a scheduled court date on the Noise Ordinance complaint, Fambrough's attorney called McCollough to discuss a potential plea.  (Doc. 104-5 at ¶ 5.)  McCollough noted Fambrough's permit was not valid because it lacked the requisite signatures.  (*Id.* at ¶ 6.)

On September 23, 2021, the day of the hearing, McCollough spoke with Fambrough and his attorney in the courtroom.  (*Id.* at ¶ 18.)  She told them she could not guarantee Fambrough would be treated in the future as leniently if he continued to cause problems for the City.  (*Id.* at ¶ 18.)  McCollough testified:

> I told him that – Fambrough had made himself an annoyance at this point, with the complaints and the protection orders . . . and the public records requests . . . . Don't be an annoyance, don't be a problem, and then expect a favor when you

---

[2] Defendants assert any damage was sustained because Fambrough refused to hand over his keys to facilitate the tow.  (Doc. 106 at 4156-57; Doc. 104-14 at 3738-39.)

get cited . . . . Why would I dismiss your case after you've done nothing but try and be a problem, but I still treated him the way I would treat anybody else coming in.

(Doc. 104-15 at 3774; *see also id.* at 3776 ("If you're going to keep being a problem, I don't have to give you a break next time you come in here."); *id.* at 3784 ("You're not garnering favors with the administration you're actively fighting against, so go do your activities, but then don't come to us and ask me to do you a favor in court.").)

Fambrough pleaded no contest to a reduced charge of disorderly conduct.  (Doc. 104-2 at ¶ 126.)  He was fined $5.00, plus $94.00 in court costs.  (*Id.* at ¶ 127.)

### C.    Procedural History

Count One alleges King, Smedley, Gardner, Hemmons, McCollough, Allen, Bailey, Lundy, Majercik, Nevels, and Wood (collectively "Individual Defendants") retaliated against Plaintiffs in violation of the First Amendment.[3]  (Doc. 44 at ¶¶ 221-47.)  Count Two alleges the City had an official policy or custom aimed at retaliation in violation of the First Amendment. (*Id.* at ¶¶ 248-62.)  Count Three alleges the Noise and Permit Ordinances operate as a prior restraint on protected speech in violation of the First Amendment.  (*Id.* at ¶¶ 263-78.)  Count Four alleges all Defendants selectively enforced the Noise and Parking Ordinances in violation of the Equal Protection Clause of the Fourteenth Amendment.  (*Id.* at  ¶¶ 279-86.)  Count Five alleges all Defendants unreasonably seized Plaintiffs' van in violation of the Fourth and Fourteenth Amendments.  (*Id.* at ¶¶ 287-301.)

All Defendants except for Gardner previously filed a motion to dismiss the Amended Complaint, which was granted in part and denied in part.  (Doc. 71.)

---

[3] In a prior Order, the Court dismissed all claims against Hemmons and McCollough, two prosecuting attorneys in the City's law department.  (Doc. 56.)

The moving Defendants argued they had immunity under Ohio Revised Code Chapter 2744.  (Doc. 47 at 785-87.)  The Court held Chapter 2744, on its face, did not grant immunity from liability under § 1983.  (Doc. 71 at 1099.)  Because the City's only asserted immunity defenses were pursuant to Chapter 2744, the Court denied the motion to dismiss all claims against the City in Counts Two, Three, Four, and Five.  (*Id.* at 1099-1100.)

On Counts One, Three, and Five, the Court detailed its findings that King, Allen, Lundy, Majercik, Nevels, Wood, Smedley, and Bailey were entitled to qualified immunity.  (*Id.* at 1109-14, 1126.)  On Count Four, the Court found Smedley was not entitled to qualified immunity at the motion to dismiss stage.  (*Id.* at 1125.)  The Court found the other moving Individual Defendants were entitled to qualified immunity.  (*Id.*)

Counts One, Three, Four, and Five remain pending against Gardner.  Count Four also remains pending against Smedley.  Counts Two, Three, Four, and Five remain pending against the City.

The City Defendants move for summary judgment on all counts.  (*See* Doc. 103.)  They assert Gardner's declaration is an attempt to manufacture "material" facts by the former police chief, and deposition testimony by Gardner and others contradict the declaration.  (Doc. 103 at 3311, 3314, 3316.)  The City Defendants argue *Monell* did not preclude Smedley from asking police to stop Fambrough from violating the Ordinances after citizen complained; Smedley is entitled to qualified immunity because there is no clearly established right to amplify noise through City streets at night, in violation of the Permit and Noise Ordinances; and there is no underlying constitutional violation for enforcing the Ordinances after Plaintiffs received several warnings.  (*Id.* at 3319-26.)  And despite the Court's motion to dismiss ruling to the contrary, the City Defendants renew their argument they are entitled to immunity under Ohio Revised Code

13

Chapter 2744, and Plaintiffs' claims are barred by the *Heck* and *Rooker-Feldman* doctrines.[4]  (*Id.* at 3318-19, 3326-29.)

Plaintiffs also move for summary judgment on all counts.  (*See* Doc. 104.)  Plaintiffs assert: the enforcement actions against Fambrough are attributable to the City; the record shows Defendants violated the First and Fourteenth Amendments through retaliation and selective enforcement against Plaintiffs; the City developed post-hoc justifications for enforcement regarding the invalid permit; the Noise and Permit Ordinances together are an unconstitutional, standardless, prior restraint on speech; and the tow and impound of Fambrough's step van violated the Fourth Amendment.  (Doc. 104 at 3345-55.)

In Gardner's motion (Doc. 108), he argues the facts fail to raise genuine issues of material fact, and Plaintiffs' claims are insufficient to defeat his entitlement to qualified immunity.  (Doc. 108 at 4166-67.)

## II.    LAW AND ANALYSIS

### A.    Standard of Review

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  The moving party bears the burden of showing that no genuine issues of material fact exist.  *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (citations and quotations omitted).  A "material" fact is one that "might affect the outcome of the suit under the governing law[.]"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[4] Because the Court previously rejected these arguments, this Order does not address them again.

14

"[A] genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849-50 (6th Cir. 2020) (citations and quotations omitted).

"Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Queen v. City of Bowling Green, Ky.*, 956 F.3d 893, 898 (6th Cir. 2020) (quotation and citations omitted). On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005). A party asserting or disputing a fact must cite evidence in the record or show the record establishes either the absence or the presence of a genuine dispute. *See* Fed. R. Civ. P. 56(c) & (e). Rule 56 further provides "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation and citation omitted). The Court's role is not to make credibility determinations or "weigh" conflicting evidence. *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014). "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Id.* "This standard of review does not differ when reviewing cross-motions for summary judgment versus a motion filed by only one party." *Hamilton Cnty. Educ. Ass'n v. Hamilton*

15

*Cnty. Bd. of Educ.*, 822 F.3d 831, 835 (6th Cir. 2016) (citing *U.S. SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013)).

"[A] plaintiff is deemed to have abandoned a claim when [he] fails to address it in response to a motion for summary judgment." *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (collecting cases). However, the party moving for summary judgment "always bears the burden of demonstrating the absence of a genuine issue as to material facts," and this burden applies, "regardless if an adverse party fails to respond." *Carver v. Bunch*, 946 F.2d 451, 454-55 (6th Cir. 1991) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970)). A district court "cannot grant summary judgment in favor of a movant simply because the adverse party has not responded." *Id.* at 455. Instead, "[t]he court is required, at a minimum, to examine the movant's motion for summary judgment to ensure that he has discharged that burden." *Id.*; *see also Delphi Auto. Sys., LLC v. United Plastics, Inc.*, 418 F. App'x 374, 381 (6th Cir. 2011) (holding a movant was not entitled to summary judgment simply because the other party failed to respond).

### B.    Gardner's Summary Judgment Motion

Gardner's motion for summary judgment is his first dispositive motion in this case. In it, he asserts qualified immunity for the first time on all claims. (*See* Doc. 108.) Plaintiffs offer little in response. Plaintiffs "do not believe Gardner is entitled to qualified immunity." (Doc. 110 at 4199.) Instead, they "acknowledge that the qualified-immunity reasoning in this Court's principal decision at the motion-to-dismiss stage would apply to Gardner." (*Id.*) Plaintiffs explain:

> But Plaintiffs concede that the Court could grant Defendant Gardner's motion for summary judgment on the basis of the Court's earlier reasoning on qualified immunity. *See* Doc. 71 at 1127 (inviting Gardner to file an early summary-judgment motion "on the issue of qualified immunity"). Judicial economy counsels in favor of this approach and not trying to change the Court's mind.

16

> Without conceding any argument and preserving all avenues of appeal, Plaintiffs grant that Gardner is similarly situated to the other individual defendants for purposes of the Court's qualified-immunity reasoning.  Unless the Court is open to reconsidering its motion-to-dismiss rulings on qualified immunity, Plaintiffs would acknowledge that their arguments are better preserved for eventual appeal to the Sixth Circuit rather than re-litigating them in response to Defendant Gardner's invocation of qualified immunity.

(*Id.* at 4201.)

"The doctrine of qualified immunity provides that 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 738 (6th Cir. 2022) (quoting *Williams*, 9 F.4th at 430).  When there is more than one individual defendant in a case, "[e]ach defendant's liability must be assessed individually based on his [or her] own actions."  *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010).  Once asserted by a defendant, a "[p]laintiff bears the burden of showing that defendants are not entitled to qualified immunity."  *Maben v. Thelen*, 887 F.3d 252, 269 (6th Cir. 2018) (citing *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009)); *Palma v. Johns*, 27 F.4th 419, 427 (6th Cir. 2022).  The plaintiff must demonstrate both the challenged conduct violated a constitutional right and the right was clearly established.  *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014).  "If the plaintiff fails to establish either element, the defendant is immune from suit."  *Id; see also Barber v. Miller*, 809 F.3d 840, 844 (6th Cir. 2015) ("Once a defendant invokes qualified immunity, the plaintiff bears the burden of showing that (1) the defendant's acts violated a constitutional right and (2) the right at issue was clearly established at the time of the defendant's alleged misconduct.").  "Between these two considerations, [the Court] may take them in either order.  *Hall v. Navarre*, 118 F.4th 749, 759 (6th Cir. 2024) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Gardner asserts qualified immunity applies because the tow was objectively reasonable under the community caretaking doctrine. (Doc. 108 at 4166.) Gardner also argues his conduct did not violate a clearly established constitutional right. (*Id.* at 4166-67.) Plaintiffs do not state any opposition to either of Gardner's assertions. (*See* Doc. 110.)

Notwithstanding, the Court must independently analyze whether Gardner is entitled to qualified immunity. *See Winter v. City of Westlake*, No. 16CV1753, 2018 WL 838283, at *9, 2018 U.S. Dist. LEXIS 24340, at *26 (N.D. Ohio Feb. 13, 2018) (granting summary judgment based on qualified immunity where plaintiff failed to argue against defendant's motion for qualified immunity and no evidence weighed against granting qualified immunity). Here, the Court begins with the second consideration—whether Plaintiffs demonstrated the rights they allege Gardner violated were clearly established—"as that analysis begins and ends the matter." *Hall*, 118 F.4th at 759; *see also Tlapanco v. Elges*, 969 F.3d 638, 656-57 (6th Cir. 2020) (declining "to address the first prong of the qualified immunity analysis" when the second was "dispositive").

In addressing the clearly established prong, the Court assesses "the 'objective legal reasonableness' of the allegedly unlawful action 'in light of the legal rules that were clearly established at the time it was taken.'" *Hall*, 118 F.4th at 759 (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). Plaintiffs must demonstrate the rights Gardner "allegedly invaded [are] sufficiently 'particularized,' enough 'that a reasonable official would understand that what he is doing violate[d]'" those rights. *Id.* (quoting *Anderson*, 483 U.S. at 640).

That the Parking Ordinance was rarely enforced demonstrates a violation of their right to be free from a retaliatory and politically motivated prosecution, Plaintiffs urge. (*See* Doc. 104 at 3346-50.) But this very general assertion, without more, "frames the right at an impermissibly

18

high level." *Hall*, 118 F.4th at 760 (collecting cases where plaintiffs defined clearly established

law at a high level of generality).  Indeed, Plaintiffs do not address several undisputed facts:

- King and Smedley testified to receiving a parking complaint and several noise complaints about Plaintiffs' van from City residents.  (Doc. 104-10 at 3593-95, 3597; Doc. 104-16 at 3815-16, 3821-23.)

- Gardner verified there were noise complaints before taking enforcement action. (Doc. 104-8 at 3491, 3494, 3505, 3515-16.)

- Gardner conferred with Hemmons, the City's Law Director, about enforcing the Parking Ordinance.  (*Id.* at 3491, 3500, 3517.)

- On May 14, May 17, and July 27, 2021, police officers warned Fambrough about his noncompliance with the Ordinances.  (Doc. 104-2 at ¶¶ 32, 39, 62.)

- On August 9, 2021, Gardner sent an email instructing officers to find Plaintiffs' van and tow it, and to issue citations for loud music and disturbing the peace. (Doc. 104-22.)

- Fambrough admits he used the van as a sound truck without a valid permit.  (Doc. 104-2 at ¶¶ 52-57.)

- On August 18, 2021, officers arrived at Fambrough's home and observed the van parked on a residential street, and Fambrough was not loading or unloading the van when officers arrived.  (*Id.* at ¶¶ 73-75, 105; Doc. 104-14 at 3731; s*ee also* Docs. 104-23, 104-24, 104-25, 104-26.)

- Gardner informed the responding officers there had been citizen complaints related to the van.  He instructed them to issue noise citations and to tow the vehicle.  (Doc. 104-8 at 3504-07; Doc. 104-14 at 3735.; Doc. 104-24 at 6:00-6:26.)

Critically, Gardner asserts Smedley directed this enforcement action against Plaintiffs.  (Doc.

104-8 at 3491.)  This was done after Fambrough was warned and after he failed to obtain a fully

executed permit.

Acting on Smedley's instruction, without more, does not entitle Gardner to qualified

immunity, but "qualified immunity may be warranted when 'reasonable officers could conclude

they have probable cause' for their conduct 'based on plausible instructions from a supervisor

when viewed objectively in light of their own knowledge of the surrounding facts and circumstances.'" *Hall*, 118 F.4th at 760 (quoting *Bunkley v. City of Detroit*, 902 F.3d 552, 562-63 (6th Cir. 2018)).  Here, Plaintiffs have not shown Gardner's enforcement of the Ordinances, after warnings were given, after Fambrough was allowed to drive his van away once, and after he did not get a valid permit, violated a clearly established right.

For these reasons, Gardner is entitled to qualified immunity.  Gardner is dismissed from Counts Three, Four, and Five.  Because Gardner is the only remaining defendant in Count One, that claim is dismissed in its entirety.

### C.    First Amendment Retaliation (Count Two)

There are four ways Plaintiffs may prove § 1983 liability for the City's alleged illegal policy or custom: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations."  *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).  On their retaliation claim, Plaintiffs proceed under the ratification theory.  (Doc. 104 at 3345-46.)

There can be no § 1983 liability for the City without an underlying constitutional violation.  *See Lee v. Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 449 (6th Cir. 2011).  To the City Defendants, the City acted after numerous citizens complained, and Plaintiffs were given several warnings.  (Doc. 103 at 3319-26.)

For their First Amendment retaliation claim, Plaintiffs must specifically prove: "(1) they engaged in constitutionally protected speech, (2) they suffered an adverse action likely to chill a person of ordinary firmness from continuing to engage in protected speech, and (3) that the

protected speech was a substantial or motivating factor in the decision to take the adverse action." *Wood v. Eubanks*, 25 F.4th 414, 428 (6th Cir. 2022) (quotation omitted).

Plaintiffs must also show Defendants lacked probable cause to press the underlying criminal charges. *Bickerstaff v. Lucarelli*, 830 F.3d 388, 399 (6th Cir. 2016) (citing *Hartman v. Moore*, 547 U.S. 250, 265-66 (2006) ("[b]ecause showing an absence of probable cause will have high probative force, . . . it makes sense to require such a showing as an element of a plaintiff's case")). However, under *Lozman v. City of Riviera Beach*, 585 U.S. 87, 101 (2018), showing a lack of probable cause is not necessary in retaliation claims where a governmental entity, such as a municipality, enacts an official policy to retaliate against a citizen's speech. *See Novak v. City of Parma, Ohio*, 932 F.3d 421, 429-30 (6th Cir. 2019).

Lozman brought a First Amendment retaliation claim against the city after he was arrested for disorderly conduct at a council meeting. *Lozman*, 585 U.S. at 92-93. He had previously criticized city officials. *Id.* Although Lozman "concede[d] that there was probable cause for the arrest," the Supreme Court concluded the existence of probable cause itself did not doom his claim. *Id.* at 95, 100-01. The Court highlighted five characteristics: (1) Lozman alleged "more governmental action than simply an [officer's] arrest" because he claimed the city "itself retaliated against him pursuant to an 'official municipal policy' of intimidation"; (2) Lozman alleged the city's retaliation plan was "premeditated" and formed months earlier (before the arrest); (3) Lozman had "objective evidence" of a policy motivated by retaliation—he had a transcript of a closed-door meeting where a councilmember stated the city should use its resources to "intimidate" Lozman and others who filed lawsuits against the city; (4) there was less of a concern about the causation problem because the city's official policy of retaliation was formed months earlier, there was little relation between the "protected speech that prompted the

21

retaliatory policy and the criminal offense (public disturbance) for which the arrest was made," and "it was unlikely that the connection between the alleged animus and injury will be weakened by an official's legitimate consideration of speech"; and (5) the plaintiff's speech—the right to petition—was "one of the most precious of the liberties safeguarded by the Bill of Rights" and was "high in the hierarchy of First Amendment values." *Id.* at 100-01.

Because probable cause does not defeat a claim under *Lozman*, the *Mt. Healthy Bd. of Education v. Doyle*, 429 U.S. 274 (1977) burden-shifting framework applies to *Monell* retaliation claims.  Under *Mt. Healthy*, the plaintiff has the burden of proving by a preponderance of the evidence that the impermissible motive was a substantial factor (not the but-for cause or the sole cause) for the adverse action.  429 U.S. at 287.  Once the plaintiff does this, the plaintiff has made out a prima facie case and will prevail on the merits unless the defendant can prove, by a preponderance of the evidence, that the defendant would have taken the same action even in the absence of the protected conduct.  *Id.* at 287.

Here, the first two elements of First Amendment retaliation are not disputed: Plaintiffs' campaigning was protected political activity, and the Ordinances were enforced such that the van was impounded and Fambrough pleaded to disorderly conduct.  Only causation is disputed.

Proving causation "generally requires that the protected speech be a 'but-for cause' of the harmful action."  *Blackwell v. Nocerini*, 123 F.4th 479, 488 (6th Cir. 2024) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019)).  The "but-for" inquiry asks: Would the defendant still have taken the harmful action if the plaintiff had not spoken?  *Id.*

Plaintiffs argue Smedley directed other City officials to institute a policy of retaliation.  (Doc. 104 at 3345, 3350.)  Even so, Plaintiffs must establish their "constitutional injury was 'incurred because of the execution of that policy.'"  *Hall v. Navarre*, 118 F.4th 749, 757 (citing

*Jackson v. City of Cleveland*, 925 F.3d 793, 829 (6th Cir. 2019)).  Plaintiffs must show "the City 'was the moving force' behind the alleged injury.'"  *Id.* (citing *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997) ("*Bryan County*")).  "That climb is even greater when . . . the policy at issue is facially legal . . . ."  *Id.* (citing *Bryan County*, 520 U.S. at 405).  "When a facially legal municipal policy is at issue, more than but-for causation is required. Otherwise, *Monell* would 'become a dead letter.'"  *Id.* at 758 (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) (plurality opinion)).  Plaintiffs must have evidence Smedley ordered the enforcement against Plaintiffs in retaliation for their First Amendment activity, and the City was deliberately indifferent to the possible constitutional consequences of the enforcement.  *See id.* (citing *Bryan County*, 520 U.S. at 407).

Plaintiffs have not presented any objective evidence connecting the enforcement of the Ordinances to their political speech.  As discussed above, it is undisputed that:

- King and Smedley testified to receiving a parking complaint and several noise complaints from City residents.  (Doc. 104-10 at 3593-95, 3597; Doc. 104-16 at 3815-16, 3821-23.)

- Gardner verified there were noise complaints before taking enforcement action. (Doc. 104-8 at 3491, 3494, 3504-07, 3515-16; Doc. 104-14 at 3735; Doc. 104-24 at 6:00-6:26.)

- Gardner conferred with Hemmons before enforcing the Parking Ordinance.  (Doc. 104-8 at 3491, 3500, 3517.)

- On May 14, May 17, and July 27, 2021, police officers warned Fambrough about his noncompliance with the Ordinances.  (Doc. 104-2 at ¶¶ 32, 39, 62.)

- Fambrough used the van as a sound truck without a valid permit.  (Doc. 104-2 at ¶¶ 52-57.)

- On August 18, 2021, officers arrived at Fambrough's home and observed the van parked in violation of the Parking Ordinance.  (Doc. 104-2 at ¶¶ 73-75, 105; Doc. 104-14 at 3731; *see also* Docs. 104-23, 104-24, 104-25, 104-26.)

Notwithstanding, Plaintiffs direct the Court to inferences to be drawn in their favor. Fambrough was part of a well-known group of political dissidents.  (*See* Doc. 104 at 3346; Doc. 104-9 at 3569; Doc. 104-15 at 3761, 3781, 3785-86; Doc. 104-16 at 3809-10, 3820-21.)  The Ordinances were not routinely enforced.  (*See* Doc. 104-2 at ¶¶ 12-16, 26-30, 91-92; Doc. 104-13 at 3674-76, 3682, 3686-88; Docs. 104-18-20, 104-35-44, 104-61.)  And, to them, Smedley's direct involvement with minor parking and noise infractions suggests an ulterior motive.  (Doc. 104-8 at 3496, 3514.)  To Plaintiffs, all of these facts lead to an inference of retaliatory intent.  (Doc. 104 at 3347-50.)

Plaintiffs also rely on Gardner's March 31, 2023 declaration, which gives his own thoughts on Smedley's motivation.  (*See* Doc. 104-6.)  "An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4); *see also Ondo v. City of Cleveland*, 795 F.3d 597, 605 (6th Cir. 2015).

At his January 23, 2024 deposition, Gardner said he did not know if Smedley was acting because of Fambrough's political speech.  That was just Gardner's personal belief, but Smedley never said that to Gardner.  (Doc. 104-8 at 3497.)  Gardner's statements that Smedley acted because of retaliatory animus are not based on personal knowledge.  His statements are nothing more than speculation and legal conclusions.  Such statements are not admissible and do not create genuine disputes of material fact.  *See Blount v. Stanley Eng'g Fastening*, 55 F.4th 504, 515-16 (6th Cir. 2022); *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 805 F. Supp. 2d 396, 406 (S.D. Ohio 2011).

Gardner further clarified the following at his deposition:

- Smedley only referenced noise complaints, not Fambrough's political activity. (Doc. 104-8 at 3497.)

- Even when enforcement was discussed at meetings with City officials, it was discussed relative to the noise complaints.  (*Id.* at 3501.)

- Smedley usually relayed noise complaints to Gardner after 6 p.m.  If Fambrough was broadcasting after 6 p.m., he would have violated the Permit Ordinance even with a valid permit.  (*Id.* at 3497-98; *see also* Doc. 104-46.)

- Hemmons counseled Gardner it was fine to enforce the Parking Ordinance against Fambrough—she did not say it was fine to enforce the ordinance against "only" Fambrough.  (Doc. 104-8 at 3516-17.)

- The reference to a vehicle "broadcasting political messages" in Gardner's August 9, 2021 email was meant to help officers identify the vehicle that prompted noise complaints.  (*Id.* at 3450.)

These facts are not in dispute.

Plaintiffs challenge the existence of citizen complaints because Defendants did not produce contemporaneous documentation of those complaints.  (Doc. 104 at 3343-44.)  But Plaintiffs have not established the City was required to document such complaints, and they have presented no evidence to dispute the testimony of King, Smedley, and Gardner, who all testified that such complaints were received.  (*See* Doc. 104-8 at 3490; Doc. 104-10 at 3593-95, 3597; Doc. 104-16 at 3815-16, 3821-23.)  Indeed, Gardner used the CAD system to confirm the receipt of noise complaints.  (Doc. 104-8 at 3491, 3494, 3504-07, 3515-16.)  Gardner can even be heard on the August 18, 2021 video confirming to Majercik that five citizen complaint calls had come in about noise and loud music from Plaintiffs' vehicle.  (Doc. 104-24 at 6:00-6:26.)

Unlike in *Lozman*, where the plaintiff had a transcript of the closed-door city council meeting, Plaintiffs have not presented any "objective evidence of a policy motivated by retaliation to survive summary judgment."  *Lozman*, 585 U.S. at 100-01; *see also Brown v. City*

25

*of Albion*, No. 22-CV-1240, 2024 WL 2178304, at *3, 2024 U.S. Dist. LEXIS 87368, at *7 (W.D. Mich. May 15, 2024).[5]  Nor does this record direct the Court to statements made by City officials that would support Plaintiffs' theory that the actions against them were taken for political reasons.

In viewing the facts in the light most favorable to Plaintiffs, Plaintiffs have not shown the record, taken as a whole, could lead a rational trier of fact to find in their favor.  Plaintiffs have not put forth objective evidence the enforcement action was in retaliation for Plaintiffs' protected speech.  Nor have they put forth evidence the City was deliberately indifferent to the possible constitutional consequences of enforcing the Ordinances.  Plaintiffs were given warnings about non-compliance.  They also had knowledge of the permit process and the opportunity to complete all necessary steps to obtain the required permit.  They did not adhere to the warnings. They also did not complete the permit process.  Plaintiffs have not established a First Amendment violation.   For these reasons, the City is entitled to summary judgment on Count Two.

### D.      First Amendment Prior Restraint (Count Three)

Plaintiffs assert the Noise and Permit Ordinances operate as a standardless prior restraint on protected speech.[6]  (Doc. 104 at 3350-52.)  Plaintiffs only assert a facial challenge, not an as-applied challenge.  (*Id.*)

_____

[5] Furthermore, Plaintiffs do not cite authority to extend the reasoning in *Lozman*, a retaliatory arrest claim, to this retaliatory prosecution claim.

[6] To Plaintiffs, Defendants conceded this issue by not responding to it in opposition to Plaintiffs' motion for summary judgment.  (Doc. 112 at 4221-22.)  But Defendants asserted the Ordinances are valid.  (*See* Doc. 106 at 4158.)  They also move for summary judgment on all counts.  (*See* Doc. 103.)  While they did not expressly respond to Plaintiffs' cited authority, the Court finds the Ordinances are valid.

"A facial challenge to a law's constitutionality is an effort 'to invalidate the law in each of its applications, to take the law off the books completely.'"  *Speet v. Schuette*, 726 F.3d 867, 871-72 (6th Cir. 2013) (quoting *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009) (en banc)).  "Sustaining a facial attack to the constitutionality of a state law . . . is momentous and consequential.  It is an 'exceptional remedy.'"  *Id.* at 872 (quoting *Carey v. Wolnitzek*, 614 F.3d 189, 201 (6th Cir. 2010)).  To succeed on an overbreadth challenge, a plaintiff must show "from the text of [the statute] and from actual fact that a substantial number of instances exist in which the [statute] cannot be applied constitutionally."  *Id.* 873 (quoting *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 11 (1988)).  Facial challenges to a licensing scheme "have been permitted in the First Amendment context where the licensing scheme vests unbridled discretion in the decisionmaker and where the regulation is challenged as overbroad."  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223 (1990).  The Supreme Court has explained:

> [A] facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers.  This is not to say that the press or a speaker may challenge as censorship any law involving discretion to which it is subject.  The law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks.

*City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988).

Here, Plaintiffs assert the Noise and Permit Ordinances give the Mayor unbridled discretion to prevent the use of sound trucks to convey political messaging.

To be sure, "[t]he sound truck has become an accepted method of political campaigning."  *Saia v. People of State of New York*, 334 U.S. 558, 561 (1948).  Nonetheless, the use of a sound truck is subject to reasonable regulation.  *Kovacs v. Cooper*, 336 U.S. 77, 87 (1949).  "There is

27

no First Amendment right to amplified sound *per se* . . . ."  *Reform Am. v. City of Detroit, Michigan*, 37 F.4th 1138, 1159 (6th Cir. 2022), *cert. denied*, 143 S. Ct. 448 (2022).  "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired. . . . [Activities] protected by the First Amendment, are subject to reasonable time, place, and manner restrictions."  *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) (citations omitted).  "Although the pre-approval process for obtaining permission to speak . . . creates risks of its own, it alleviates any notice problems: A party wondering whether she may speak . . . can ask and find out . . . ."  *Lowery v. Jefferson Cnty. Bd. of Educ.*, 586 F.3d 427, 436 (6th Cir. 2009).

Noise abatement is a permissible basis for pre-approval ordinances.  "[E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quotation omitted).  While "the officials implementing them will exercise considerable discretion, perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."  *Id.* at 794-96 (rejecting a facial challenge to a noise ordinance where plaintiffs argued government officials had unbridled discretion over noise amplification; "government ha[s] a substantial interest in protecting its citizens from unwelcome noise").

As stated above, Plaintiffs' facial challenge rests on their assertion the Noise and Permit Ordinances are unconstitutionally vague because they lack discernible standards.  A "statute is unconstitutionally vague if it denies fair notice of the standard of conduct for which the citizen is

to be held accountable, or if it is an unrestricted delegation of power which leaves the definition of its terms to law enforcement officers."  *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 608-09 (6th Cir. 2005) (citation omitted).  But "officials are not vested with undue discretion under a licensing scheme, so long as the licensing scheme contains narrow, objective, and definite standards to guide the licensing authority."  *Id.* at 609 (citation and quotations omitted).

The Noise and Permit Ordinances provide the necessary standards to guide the Mayor's licensing authority related to noise abatement.  (Doc. 104-17 at 3852-54.)  Moreover, the Ordinances at issue here are similar to other Ohio laws that survived facial challenges.  *See, e.g.*, *State v. Carrick*, 965 N.E.2d 264, 268 (Ohio 2012) (rejecting facial challenge to statute prohibiting any person from recklessly causing inconvenience, annoyance, or alarm by making unreasonable noise); *Columbus v. Kendall*, 798 N.E.2d 652, 654-55 (Ohio Ct. App. 2003) (upholding local noise ordinance against facial challenge and cataloging federal and Ohio decisions upholding such ordinances); *see also State v. Cornwell*, 776 N.E.2d 572, 575 (Ohio Ct. App. 2002) (collecting authorities).

That King testified the Mayor has discretion in granting permits does not invalidate the Ordinances.  (*See* Doc. 104-11 at 3619-23.)  Plaintiffs assert King's testimony is evidence of unbridled discretion.  The Court is not persuaded.  King explained how the standards listed in subsection (g) of the Permit Ordinance, along with the consideration of the health and safety of the community, guide decisions on whether to issue permits.  (*Id.* at 3619-20.)

Notwithstanding this discretion, sound trucks for campaigns were authorized in the City multiple times over the years.  (Doc. 104-2 at ¶¶ 12, 13, 46, 47; Doc. 104-10 at 3594.) Fambrough could have obtained a permit, much like he did in 2019, but he did not complete the

29

application process.  (Doc. 104-2 at ¶ 52; Doc. 104-10 at 3596-97; Doc. 104-16 at 3834, 3829).
Plaintiffs thus cannot show the ordinances in question categorically bar using sound trucks to
broadcast political messages.  The Court finds the Noise and Permit Ordinances are not facially
invalid.  Count Three is summarily dismissed.

### E. Fourteenth Amendment Selective Enforcement (Count Four)

"Selective enforcement claims are judged according to ordinary Equal Protection
standards, which require a petitioner to show both a discriminatory purpose and a discriminatory
effect." *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000).  A licensing or regulatory
scheme that is neutral on its face violates the Equal Protection Clause if it is selectively enforced
for arbitrary or discriminatory reasons.  *See generally Birth Control Ctrs., Inc. v. Reizen*, 743
F.2d 352, 359 (1984); *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886).

"In order to establish selective enforcement . . . that rises to the level of a violation of
their equal protection rights, the plaintiffs must prove *intentional*, *purposeful* discrimination."
*Reizen*, 743 F.2d at 359 (emphasis in original).  "Discriminatory intent is a factual matter . . . ."
*Id.*  "A claim of selective application of a facially lawful state regulation requires a showing
that . . . the selective treatment was motivated by an intention to discriminate on the basis of
impermissible considerations, . . . to punish or inhibit the exercise of constitutional rights, or by a
malicious or bad faith intent to injure the person." *Wright v. MetroHealth Med. Ctr.*, 58 F.3d
1130, 1137 n.7 (6th Cir. 1995) (quoting *FSK Drug Corp. v. Perales*, 960 F.2d 6, 10 (2d Cir.
1992)); *see also Arnold v. City of Columbus*, 515 F. App'x 524, 538-39 (6th Cir. 2013).

Plaintiffs must show: (1) the exercise of a protected right; (2) the enforcer's "stake" in the
exercise of that right; (3) the unreasonableness of the enforcer's conduct; and (4) that the
enforcement was initiated with the intent to punish plaintiff for the exercise of the protected
right.  *Futernick v. Sumpter Twp.*, 78 F.3d 1051, 1056 n.7 (6th Cir. 1996).  Even under a "class

of one" selective enforcement theory, Plaintiffs must show they have been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

### 1. Smedley

Smedley invokes qualified immunity on this claim.  As discussed above, Plaintiffs must demonstrate both that Smedley's conduct violated a constitutional right, and that the constitutional right was clearly established.  *T.S.*, 742 F.3d at 635.

Plaintiffs assert the factual basis for the selective enforcement claim is the same as their retaliation claim.  (Doc. 104 at 3346.)  Although Smedley was not entitled to qualified immunity at the motion to dismiss stage, the record before the Court on summary judgment establishes he is entitled to qualified immunity.  As discussed in connection with the retaliation claim, Plaintiffs have not put forth evidence Smedley initiated the enforcement with the intent to punish Plaintiffs for protected activity.  Residents complained about the noise from Plaintiffs' van, especially late at night.  Fambrough was warned about failing to comply with the Ordinances.  And despite being given months to comply, it is undisputed that, on August 18, 2021, Fambrough was not in compliance when officers arrived at his home.  Officers observed the vehicle parked in violation of the Parking Ordinance.  They informed Fambrough of the noise complaints.  Even if the lack of enforcement of the Ordinances was enough to establish Fambrough was treated differently, the record does not establish Smedley was motivated by an intention to discriminate on the basis of Plaintiffs' political speech.

Even under a class of one theory, Plaintiffs have not established they were similarly situated in all respects to others who were treated differently (*i.e.*, were subject to resident complaints, were given warnings, but still failed to comply).  *Johnson v. Morales*, 946 F.3d 911, 939 (6th Cir. 2020).  Plaintiffs assert commercial vehicles and RVs were regularly parked in

31

residential areas in the City.  (*See* Docs. 104-18-19, 104-34-44 (photos/video of trucks parked around the City); *see also* Doc. 104-14 at 3726 (confirming trucks in photos were violating the ordinance).)  And City records show police officers enforced the specific Parking Ordinance at issue only four times from 2018-2021.  (Doc. 104-13 at 3675; *see also* Doc. 104-29.)  To Plaintiffs, this demonstrates the Ordinances were selectively enforced against them.  In response, the City asserts dozens of vehicles were towed pursuant to any one of fifteen parking violations in 2021.  (*See* Doc. 104-31.)

But the photographs and videos of commercial vehicles that were not towed do not establish whether the owners of those vehicles were previously warned of non-compliance with the Ordinances or whether those vehicles were the subject of multiple citizen complaints.  The same goes for the City's enforcement records.  Plaintiffs have not negated every conceivable basis which might support the enforcement or demonstrated that the challenged enforcement was motivated by animus or ill will.  *Johnson*, 946 F.3d at 939.  The Court therefore finds Plaintiffs have not met their burden.

Even if Plaintiffs could establish a Fourteenth Amendment violation, Plaintiffs have not shown the right to use their van in this way was a clearly established constitutional right.  Plaintiffs have put forth no case law to establish Smedley, the Mayor's Chief of Staff, could not direct the enforcement of valid municipal ordinances after receiving citizens' complaints, especially where Plaintiffs were given months to comply and did not.  *See Hines v. City of Brighton*, 539 F. Supp. 2d 908, 918 (E.D. Mich. 2008) ("this Court does not believe that attempting to expand one's business without complying with the applicable ordinance and codes is a constitutionally protected right").

2.     **The City**

The question of whether a municipality is liable under § 1983 has two parts: '(1) whether [the] plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation.'" *Lee*, 432 F. App'x at 449 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992)).  Accordingly, "there is no liability under *Monell* without an underlying constitutional violation." *Zucker v. City of Farmington Hills*, 643 F. App'x 555, 570 (6th Cir. 2014) (citing *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014)); *see also Morrow v. Metro. Gov't of Nashville & Davidson Cnty.*, No. 22-5232, 2023 U.S. App. LEXIS 21582, 2023 WL 5237332 (6th Cir. Tenn., Aug. 15, 2023), *cert. denied*, 144 S. Ct. 2534 (2024).  And as discussed above, Plaintiffs have not shown the City "was the moving force" behind their alleged injury.  *Hall*, 118 F.4th at 757 (citing *Bryan County*, 520 U.S. at 404-05).

Here, the Ordinances at issue are facially valid.  The City focuses on its repeated warnings and Plaintiffs' non-compliance.  Plaintiffs have not demonstrated intentional, purposeful discrimination.  Because Plaintiffs cannot establish a violation of their constitutional rights, their selective enforcement claim against the City also fails.

F.     **Fourth Amendment Search and Seizure (Count Five)**

Plaintiffs assert Fambrough's van was unreasonably towed and seized in violation of the Fourth Amendment.  The City is the only remaining defendant on this claim.

Plaintiffs argue the Fourth Amendment permits police to impound vehicles without a warrant only when two conditions are satisfied.  (Doc. 104 at 3352-55.)  First, discretion to impound must be "exercised according to standard criteria." *United States v. Kimes*, 246 F.3d 800, 805 (6th Cir. 2001) (quoting *Colorado v. Bertine*, 479 U.S. 367, 375 (1987)).  Second, warrantless vehicle seizures must be "[i]n the interests of public safety" to serve a "community

caretaking function[]." *South Dakota v. Opperman*, 428 U.S. 364, 368 (1976) (quotation marks omitted); *Kimes*, 246 F.3d at 804 (same).

To Plaintiffs, the testimony of City police officers establishes a failure to follow any standardized criteria, and, to the extent such criteria existed, that criteria was not followed here. (Doc. 104 at 3352-55; Doc. 104-13 at 3701-02; Doc. 104-29.)  They also cite to instances of non-enforcement of the same or similar parking violations.  Thus, the inference to be drawn from non-enforcement practices reveals the City did not adhere to its own criteria.  (Doc. 104 at 3352-55.)  In response, the City asserts the tow was valid under the Parking Ordinance, dozens of vehicles were towed pursuant to any one of fifteen parking violations in 2021, and Plaintiffs' van was towed pursuant to standard City procedures.[7]  (Doc. 106 at 4154-57; Doc. 104-14 at 3726-28; Doc. 104-29; Doc. 104-31.)

Cameron McLay, Plaintiffs' expert on police conduct, opined that the City did not employ uniform procedures for police-ordered tows.  (Doc. 104-63 at 4093.)  In practice, he said the policy "default[ed] more to discretion than uniformity."  (*Id.* at 4091.)  But Plaintiffs incorrectly assert that uniformity is required.  As long as discretion is exercised according to standard criteria, a measure of discretion is permissible.  *Kimes*, 246 F.3d at 805.  Here, the parties do not dispute the City had a written policy outlining the standard criteria for impoundment.  (*See* Doc. 104-29; *see also United States v. Tackett*, 486 F.3d 230, 233 (6th Cir. 2007) (standard criteria requirement for impoundment need not be detailed or contained in a written policy).)  And Plaintiffs' own expert recognized towing the van under these circumstances was reasonable: "[t]heir goal is to motivate compliance with the law, and if

---

[7] Plaintiffs assert Defendants abandoned this claim by failing to respond to Plaintiffs' cited authority.  But Defendants assert the tow was valid under the Parking Ordinance, and the Court agrees.

warnings are not working, ticketing and towing would be reasonable." (*See* Doc. 104-63 at 4091-92.)

As for allowing Plaintiffs to avoid impoundment on one occasion, a decision to impound may still be permissible even where alternatives to impoundment exist. *United States v. Hockenberry*, 730 F.3d 645, 658 (6th Cir. 2013) (citing *Kimes*, 246 F.3d at 805). Defendants were not required to allow Fambrough, or others present at the scene, to drive the van away to avoid the tow.

Plaintiffs must also direct the Court to some evidence that seizing and impounding the vehicle was unrelated to a community caretaking function. But the case law on this point is clear. "Police will also frequently remove and impound *automobiles which violate parking ordinances* and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic." *Opperman*, 428 U.S. at 368-69 (emphasis added). Authority to seize and remove vehicles impeding traffic or threatening public safety and convenience is beyond challenge. *Id.* at 369. Towing the vehicle was both reasonable and related to this function.

The City is granted summary judgment on this claim.

## III.    CONCLUSION

For the reasons stated herein, the City Defendants' motion for summary judgment on all counts is GRANTED (Doc. 103), Plaintiffs' motion for summary judgment is DENIED (Doc. 104), and Gardner's motion for summary judgment is GRANTED (Doc. 108).


**IT IS SO ORDERED.**


**Date**:  March 19, 2025

_____

BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE

35